**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

**Amie Carrier,**

*Plaintiff,*

v.

**VCA Animal Hospitals, Inc.,**

*Defendant.*

Civil No. 8:11-cv-0129-DKC

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**PAGE**

**SUMMARY OF THE ARGUMENT** .................................................................................. 1

**I.      STATEMENT OF FACTS** ....................................................................................... 4

      **A. Plaintiff's Employment in the VCA Residency Program** ........................... 4

      **B. Plaintiff's Medical Condition of Seizures/Convulsions** ............................... 5

      **C. Plaintiff's Periods of Leave and Medical Notes Provided to VCA** ............. 8

      **D. Plaintiff Did Not Experience Another Seizure After Returning from Leave in Late May 2008, Through the Duration of her Employment with VCA** ...................................................................................................... 14

      **E. VCA's Continued Expressions of Concern for Plaintiff to Get Rest Following Her Return from the May 2008 Period of Leave** ..................... 15

      **F. VCA's Termination of Plaintiff's Employment** ......................................... 17

**II.     STANDARDS GOVERNING SUMMARY JUDGMENT** .................................... 18

**III.    VCA IS ENTITLED TO SUMMARY JUDGMENT ON ALL COUNTS OF THE COMPLAINT** ........................................................................................... 19

      **A. Plaintiff Cannot Establish a *Prima Facie* Case under the ADA** ............... 21

            **1. Plaintiff is not a qualified person with a disability under the ADA** ....................................................................................... 21

            **2. Plaintiff was not "regarded as" having a disability under the ADA** ....................................................................................... 26

            **3. Plaintiff did not request a reasonable accommodation** .............. 28

            **4. VCA had legitimate and nondiscriminatory reasons for its actions, and Plaintiff cannot show pretext** ................................... 31

      **B. Plaintiff Cannot Establish that VCA Violated the Applicable Provisions of Maryland Law in Relation to Her Claim under Count II** .. 35

      **C. Plaintiff's Claims of Disability Discrimination under the Montgomery County Code are Not Viable and Must Fail** ................................................. 38

**IV.** **CONCLUSION** ............................................................................................................ **40**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **Amie Carrier,** | |
| *Plaintiff*, | |
| v. | Civil No. 8:11-cv-0129-DKC |
| **VCA Animal Hospitals, Inc.,** | |
| *Defendant*. | |

**DEFENDANT'S MEMORANDUM OF LAW IN
SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Defendant VCA Animal Hospitals, Inc. ("Defendant" or "VCA"), through undersigned counsel, hereby submits the following Memorandum of Law in Support of its Motion for Summary Judgment.  Plaintiff Dr. Amie Carrier ("Plaintiff" or "Dr. Carrier") avers that she was discriminated against because Defendant failed to properly accommodate her alleged disability of epilepsy and ultimately terminated her employment because of it.  For the reasons explained herein, Plaintiff's claims must fail and therefore, judgment on all counts should be entered in favor of Defendant.

**SUMMARY OF THE ARGUMENT**

In May 2008, VCA personnel encouraged Plaintiff – an at-will employee in its residency program at one of its hospitals in Gaithersburg, Maryland – to get help for various problems that she was apparently experiencing.  Although VCA personnel were not fully sure of all of the problems that Plaintiff was dealing with, they believed that she needed time away from work in order to get help and to that end, VCA personnel required Plaintiff to take leave.

During this period of leave, VCA personnel received a note concerning Plaintiff from Dr. James Yan, Plaintiff's treating neurologist, to whom VCA personnel had sent a position description for his evaluation in relation to Plaintiff's ability to return to work and to perform the duties of her position.   Exhibit 1, Yan, Dep. Exhibit 4, Fax Cover Sheets and Position Description.[1]

Dr. Yan reviewed the position description, which included a physical requirement of a willingness to "work long or irregular hours under pressure conditions" and sent a letter back to VCA, dated May 21, 2008, through which he certified that Plaintiff had been under his care for "SEIZURE/CONVULSION," and further certified that –

> "DR. CARRIER HAS SEIZURE.  CURRENTLY, WE ARE ADJUSTING HER MEDICATION. SHE SHOULD BE ABLE TO GO BACK TO HER REGULAR JOB **WITHOUT RESTRICTION** ON 052708, OR EARLIER."

Exhibit 1, Yan, Dep. Exhibit 5 (emphasis added).[2]

Once Plaintiff returned to work, she did not, through the duration of her employment with VCA which ended on December 11, 2008, experience another seizure.  Exhibit 1, Yan, Dep. Exhibit 6, p. 1 (noting that the date of the last seizure was May 2008); Yan, Dep. Tr., 26:15 – 31:15; Exhibit 2, Carrier, Dep. Tr., 138:16 – 140:2; Exhibit 3, Declaration of Cheryl Smith and exhibits attached thereto (VCA 159-160).  In other words, the medication prescribed to Plaintiff by Dr. Yan apparently worked to prevent her from experiencing another seizure.  A key reason for the effectiveness of Dr. Yan's treatment of Plaintiff was her apparent adherence to taking her

---

[1] Exhibits filed in support of this Memorandum are referred to as "Exhibit 1, 2, etc."  Where such Exhibits constitute deposition testimony, they are subsequently referred to by the deponent's name, with appropriate transcript cites (e.g., "Yan, Dep. Tr., 26:15 – 31:15.").  Also, where deposition Exhibits are used, they are referred to as such (e.g., "Yan, Dep. Exhibit 6.")

[2] Dr. Yan also completed another letter, dated 05/09/2008, which stated that Plaintiff had been under his professional care for SEIZURE/CONVULSION, and that she was allowed to return to work on 05/27/2008.  This note also did not note any restrictions or limitations concerning Plaintiff's return to work. Exhibit 1, Yan, Dep. Exhibit 3.

prescribed medication, which she apparently had not been faithfully doing prior to her period of leave in May 2008.  Exhibit 4, Luban, Dep. Tr., 11:21 – 15:15; Luban, Dep. Exhibit 1, p. 18 (noting in a Chart Note, "I strongly suspected that she had not been faithful to taking three per day and that a level of 3.4 did not reflect that.").

The fact that Plaintiff did not have another seizure after she returned to work at VCA in late May 2008, through the duration of her employment with VCA, makes sense in light of the deposition testimony of Dr. Yan, who testified that Plaintiff's "seizure is easy to control" and that "if she take[s] medicine, she should be okay," and that Plaintiff's seizures occurred infrequently when compared to others who have the same medical condition.  Exhibit 1, Yan, Dep. Tr., 34:18 – 35:5.

Dr. Yan's testimony is but one portion of the undisputed, record evidence that is fatal to Plaintiff's claims of disability discrimination, for the reasons explained herein.  Nevertheless, in spite of this undisputed record evidence, Plaintiff alleges that she was discriminated against based upon her alleged disability of epilepsy in violation of the ADA and Maryland State and local laws.

Plaintiff's claims notwithstanding, they must fail because, in relation to Counts I and III, Plaintiff cannot prove that she was a person with a disability under the ADA or the Montgomery County Code while she was employed by VCA or that she was regarded as having a disability. Even assuming *arguendo* that Plaintiff could demonstrate that she was a person with a disability during that period of time, in relation to all of the Counts of the Complaint, she cannot demonstrate that she requested a reasonable accommodation from VCA or that VCA failed to fulfill its duties in relation to any such request.  Finally, in relation to all of the Counts of the Complaint, there is no basis upon which Plaintiff can demonstrate that VCA discriminated

3

against her because of her alleged disability when it terminated her employment due to her erratic behavior and performance issues.   Rather, Defendant's decision to terminate Plaintiff's employment was based upon legitimate, nondiscriminatory reasons and Plaintiff cannot demonstrate that it was pretextual for the motive to discriminate against her because of her alleged disability.   As a result, VCA is entitled to the entry of judgment on all of the Counts of the Complaint.

I.   **STATEMENT OF FACTS**

     A.   **Plaintiff's Employment in the VCA Residency Program.**

     1.   VCA owns and operates a network of 540 animal hospitals throughout the United States.   Plaintiff began working as a resident veterinarian at VCA's facility in Gaithersburg, Maryland, Veterinary Referral Associates ("VRA"), in July of 2007 and was terminated on December 11, 2008.   Exhibit 3, Declaration of Cheryl Smith and Exhibits attached thereto.

     2.   As a resident, Plaintiff entered into an Employment Agreement with VCA.   Under this Agreement, Plaintiff was an "at-will" employee whose employment could be terminated by herself or by VCA at any time and either with or without cause.   Exhibit 5, Employment Agreements with Plaintiff (signed on 8/14/2007 and on 9/12/207).   Additionally, as a resident, Plaintiff was required to perform assigned shifts that would typically constitute four ten-hour shifts per week, or five eight-hour shifts per week, during which she would see patients or accompany other doctors in seeing patients.   Residents also had other, periodic duties, to include completing certain continuing education hours, making rounds with residents, participating in teaching lectures, present some lectures, read journal articles, and participate in a journal club. Exhibit 6, Sanders, Dep. Tr., 24:21 – 38:2.

**B.**     <u>**Plaintiff's Medical Condition of Seizures/Convulsions.**</u>

3.     According to Plaintiff, in December 2007, she experienced a seizure for the first time.  Plaintiff testified that she thought that in total, during the term of her employment with VCA, that she experienced ten (10) seizures.  Exhibit 2, Carrier, Dep. Tr., 149:2 – 7.

4.     During her deposition, Plaintiff described the seizures as lasting between 20 and 30 seconds, and she recalled that she regained her bearings within a few minutes after she experienced a seizure.  Exhibit 2, Carrier, Dep. Tr., 115:9 - 116:1.

5.     Plaintiff also testified that aside from not being permitted to drive for a period of three months after she experienced her first seizure, she really did not do anything differently in response to this condition, stating as follows:

112

```
10   Q.   Was there a time when you were not
11 legally permitted to drive?
12     A.   Yes.
13     Q.   When was that?
14     A.   When I first had my seizure, there is a
15 three-month period where I wasn't supposed to
16 drive, and that's it.  So if I have the chance to
17 drive the car or I'm going to take a ten-mile run
18 and go to the store, I will run and go to the
19 store and come back.
20     Q.   So aside from the three-month period
21 you mentioned, you haven't been legally precluded
22 or prohibited from driving?
23     A.   Right.
24     Q.   And you mentioned you sort of did
25 everything -- you didn't do anything differently.
```

**113**

```
1 Is that in relation to your job?  Is that what you
2 were talking about, or --
3     A.   In relation to my job, my life.  There
4 wasn't anything, like I didn't have a form where I
5 walked out and said, okay, I just had a seizure,
```

5

6   **whatever, and checked it.  I didn't ask to go home**
7   **or anything after I had a seizure.  I didn't -- I**
8   **really didn't do anything differently.**
9        The only thing now, now when I know
10   that a seizure is coming on, I can take some
11   Gabapentin and Klonopin to try to prevent that
12   from happening.
13      **Q.   And so from your perspective you feel**
14   **you were still able to do your job, it wasn't**
15   **interfering with your ability to do your job?**
16      **A.   Right, once I was coherent.  I don't**
17   **want you to think that I pop out of it.  It's not**
18   **that.  I had said that it takes a couple minutes**
19   **for me to actually kind of get my bearings and**
20   **figure out, okay, this is what just happened.  All**
21   **right.**

Exhibit 2, Carrier, Dep. Tr., 112:10 – 113:21 (emphasis added).

6.      During the course of this lawsuit, Plaintiff designated Dr. Yan as an expert witness.  Exhibit 7, Plaintiff's Rule 26(a)(2) Expert Witness Disclosures.   Through this Disclosure, Plaintiff stated that Dr. Yan would testify as "both a fact witness regarding Plaintiff's illness and treatment and as an expert witness testifying about epilepsy, its diagnosis, symptoms, treatment, side effects from medications and such other issues as are relevant to Dr. Carrier's particular situation."

7.      Dr. Yan did not produce a report of his findings and conclusions in relation to the issues about which he was designated as an expert witness.

8.      Dr. Yan first began treating Plaintiff for the condition of seizures/convulsions on December 18, 2007, and continues to treat Plaintiff for this condition.  Exhibit 1, Yan, Dep. Exhibit 6, p. 4.

9.      During his deposition, Dr. Yan testified as follows concerning the type of seizures that Plaintiff apparently experienced:

33

7    Q.   Doctor, in dealing with someone with a
8  seizure condition, is there any sort of scale, if
9  you will, to evaluate the type of seizure or the
10  level of the seizure?  I'm not asking this very
11  clearly, I know, but are there different types of
12  seizures?
13    A.   Yes.
14    Q.   Did you ever, in treating Amie Carrier,
15  form an opinion about the type or types of seizures
16  she was reportedly having?
17    A.   Her seizure probably something we call
18  **compressed partial seizure**.  The reason I'm saying
19  that, because on the EEG, it's only focal on one
20  side over the temporal lobe area.  Then that area
21  is not normal based on the EEG, so she probably had

34

1  compressed partial seizure.  It only means on the
2  seizure, sources is from temporal lobe.
3    Q.   So that helps to identify the location of
4  the brain where it's coming from?
5    A.   Yes.
6    Q.   Or developing?
7    A.   That's right.

Exhibit 1, Yan, Dep. Tr., 33:7 – 34:7 (emphasis added).

   10.    Dr. Yan   also   testified   as   follows   concerning   the   gravity   of   the   seizures   that

Plaintiff apparently experienced:

34

11    Q.   Did you, in dealing with Amie Carrier as
12  a patient, ever reach that sort of assessment of
13  sort of the gravity or seriousness of the seizures
14  themselves?
15    A.   I cannot remember.
16    **Q.  If you had, would that be noted in your**
17  **records somewhere?**
18    **A.   Yes.  Her seizure is easy to control,**
19  **because she doesn't have seizure like some people**
20  **have seizure every day.  It just comes if she**

7

21   doesn't take medicine or sleep deprived.[3]  If she

**35**

1   take medicine, she should be okay.
2        Q.  So from what you understood from Amie
3   Carrier, the frequency of her seizures were fairly
4   infrequent; is that correct?
5        A.  That's correct.
6        Q.  And then from your perspective, you
7   understood that either avoiding sleep deprivation
8   and/or taking appropriate medicine should control
9   them?
10       A.  Yes.
11       Q.  I think you mentioned that some patients
12  you deal with have seizures even on a daily basis?
13       A.  That's correct.

Exhibit 1, Yan, Dep. Tr., 34:11 – 35:13 (emphasis added).

**C.      Plaintiff's Periods of Leave and Medical Notes Provided to VCA.**

11.      Prior to May 2008, VCA personnel had encouraged Plaintiff to get help for

various problems that she was apparently experiencing.  Exhibit 6, Sanders, Dep. Tr., 63:20 –

68:12.

12.      For example, the following comments were written in Plaintiff's evaluation for

the time period between November 2007 and January 2008:

> We are concerned about your well-being and hope that you will ask for/take any
> time necessary to help get back on track.  We will work with you and give you
> the time you need as long as you openly communicate your needs to us.  Having
> said this, it is important to keep the appropriate people in the loop if you are
> going to miss time . . . Please do your best to contact these people if you are
> going to miss work time.  We are very willing to support you.  Taking necessary
> time off is encouraged, we just need an open line of communication.

Exhibit 9, Declaration of Nancy Sanders and Exhibits attached thereto (VCA 356).

---

[3] Plaintiff testified at her deposition that she had suffered from problems sleeping since she was a kid, and
that "throughout all of high school, undergrad, vet school, internship, I had always gotten maybe about
two to four hours of sleep a night, and it wasn't a big deal to me, and I was actually proud that I could
function on just a couple hours of sleep."  Exhibit 2, Carrier, Dep. Tr., 43:8 – 45:4.

13.     Similarly, in an evaluation of Plaintiff for the time period of November 2007 through February 2008, Plaintiff was advised that she should "never be afraid to ask for help or advice in any way." *Id.*

14.     One instance when VCA personnel expressed this concern was in December 2007, when they supported Plaintiff taking leave to try and get help with issues that she was apparently experiencing. *Id.*

15.     Plaintiff took leave from approximately mid-December 2007, until January 18, 2008.  Exhibit 2, Carrier, Dep. Tr., 101:6 – 20; Exhibit 8, Smith, Dep. Tr., 57:22 – 59:5; Exhibit 3, Declaration of Cheryl Smith..

16.     During this period of leave, VCA personnel received a note from Dr. Norman Luban, a neurologist, which stated that Plaintiff was seen on December 31, 2007, and that she was "able to return to work as of 1/18/08."  Exhibit 4, Luban, Dep. Tr., 26:8 – 27:1.

17.     VCA personnel continued to have concerns about Plaintiff's behavior and conduct even after she returned from this period of leave.  To that end, Plaintiff attended a continuing education course in Hawaii shortly after she returned from leave, from approximately January 31 through February 7, 2008.  It was subsequently reported to Ms. Cheryl Smith, Hospital Administrator, that while on this trip, Plaintiff had –

- Threatened to jump off of the balcony of her hotel;

- Fought several times over the telephone with her boyfriend;

- Drank alcohol to an excessive degree;

- Refused to eat almost any food; and

- Left the hair dryer on while trying to fall asleep.

Exhibit 3, Declaration of Cheryl Smith and Exhibits attached thereto (VCA 119-123).

18.     This information concerning Plaintiff's behavior on the trip to Hawaii was reported to Ms. Smith and Dr. Sanders by two other doctors in VCA's residency program, Dr. Nicole Guma and Dr. Sara Brown.  *Id.*; *see also*, Exhibit 6, Sanders, Dep. Tr., 69:6 – 70:17.

19.     At or near this time, due to their continuing concerns about Plaintiff's well-being, VCA personnel considered holding an "intervention" for Plaintiff to try to encourage her to get help for various problems that she was apparently experiencing, but eventually decided not to do so.  Exhibit 9, Declaration of Dr. Nancy Sanders and exhibits attached thereto (VCA 72-73, 127).

20.     Ms. Margaret Austin, Office Manager for VRA, brought another behavioral issue to Ms. Smith's attention in late February 2008.  Ms. Austin reported to Ms. Smith that in response to a request that Plaintiff speak with the owners of a patient as soon as possible because they were trying to decide whether or not to put their cat down, Plaintiff – after asking whether or not the owners could hear her – "started screaming and cussing asking if they were fucking idiots."  Exhibit 3, Declaration of Cheryl Smith and Exhibits attached thereto.  During her deposition, Plaintiff testified that she did not recall this occurring, and she further said that if it had occurred, it would not have been due to medication she was taking to treat her condition of epilepsy.  Exhibit 2, Carrier, Dep. Tr., 130:20 – 133:8; Carrier, Dep. Exhibit 5.  Dr. Sanders also received complaints at times about Plaintiff's interactions with staff members and other VCA personnel.  Exhibit 6, Sanders, Dep. Tr., 53:6 – 16.

21.     Although VCA personnel were not fully sure of all of the problems that Plaintiff was dealing with, they continued to believe that she needed time away from work in order to get help.  Exhibit 3, Declaration of Cheryl Smith and exhibits attached thereto; Exhibit 6, Sanders, Dep. Tr., 83:10 - 18.

22.     On April 26, 2008, an incident occurred at the hospital, in which Plaintiff locked herself in a bathroom at the hospital.   Dr. Brown reported to Ms. Smith the following information concerning Plaintiff through a Memorandum dated April 30, 2008:

> "On the evening of April 26th at approximately 9:30 PM, I was alerted by the cleaning staff that water was running in one of VRA's small bathrooms, the door was locked and banging had been heard inside.  Attempts were made by me, Dr. Nicole Guma and VRA's support staff to unlock the door from the handle release on the outside.
>
> After approximately 5 minutes, Dr. Amie Carrier opened the door from the inside.  She was sitting on the floor in a hunched position. Amie was difficult to rouse at first, but then I was able to talk to her.  I asked her if she was having a seizure and she responded that she was not.  I asked if she had fallen asleep then asked if she had eaten anything that day. Amie responded that she wanted to be left alone and said that she was having gastrointestinal upset.  She asked that I shut the door.  I said that I would shut the door only if she would leave it unlocked so I could check on her.
>
> I checked on Amie again a few minutes later and she was hunched on the toilet and again difficult to rouse.  It was as if she was asleep but she was very slow to come around and incompletely responsive.  Nicole and I decided to phone the paramedics due to concern for Amie's safety.  At this time, Nicole phoned 911 and Amie locked the bathroom door.  I was eventually able to get the door unlocked from the outside.  I told Amie we had called the paramedics, Dr. Sanders and her boyfriend.  She asked that we not call her boyfriend if we already hadn't done it.  I was able to get Amie into a chair outside of the bathroom.  She was ataxic and her mentation was inappropriate.
>
> The paramedics arrived approximately 10 minutes later.  They evaluated her and explained to me that her vitals were normal and she was responsive.  I explained my concern for Amie's physical and emotional well-being and the lead paramedic told me that the team could not take Amie to the hospital without her consent.  They asked Amie to go to the hospital for evaluation, but she declined and they left.  Dr. Nancy Sanders then arrived and spoke with Amie in the larger bathroom.  Dr. Sanders took Amie home."

Exhibit 3, Declaration of Cheryl Smith and exhibits attached thereto (VCA 130); Exhibit 6,

Sanders, Dep. Tr., 76:9 – 80:4.

23.     After this occurred, VCA personnel required Plaintiff to take leave to try and get

help for the issues that she was experiencing. Exhibit 6, Sanders, Dep. Tr., 83:10 - 18.

24.     On May 8, 2008, Dr. Luban wrote a Chart, which was ultimately mailed to VCA

which stated as follows:

> "Dr. Carrier is under my care for a seizure disorder.  There are well known
> triggers for seizures, which will cause breakthroughs including sleep deprivation.
> It is my understanding that Dr. Carrier has been required to be up all night for
> more than one night in a row and in my opinion that is not serving her best health
> interest.  I think it puts her at significant risk for having an epileptic seizure.  I
> would suggest and recommend that any accommodation be made on her behalf.  I
> hope this information is clear and if there are questions, I will be happy to try to
> answer them."

Exhibit 4, Luban, Dep. Exhibit 1, p. 11.

25.     Dr. Luban also signed a certification which was provided to VCA, indicating that

Plaintiff had been seen in his office on May 8, 2008, which also stated: "Able to return to work.

Sleep deprivation to be avoided."  Exhibit 4, Note from Dr. Luban.

26.     On May 15, 2008, Plaintiff was taken to the emergency room at Shady Grove

Hospital for an apparent overdose of either Dilantin, or alcohol, or perhaps both.  Plaintiff was

treated by Dr. Alex Rosin while at the emergency room.  Exhibit 10, Rosin, Dep. Tr., 1 – 4, 6, 9

– 17, 20 – 29, 34 – 37.

27.     Dr. Luban noted in a "Chart Note" dated May 15, 2008, the following concerning

a telephone conversation that he had with Plaintiff's boyfriend, who contacted him via a page

which indicated that Plaintiff had been in the emergency room with a high Dilantin level and that

she had left the emergency room against medical advice:

- He refused to allow Dr. Luban to speak with Plaintiff when he (Dr. Luban) called
  him after receiving the page message;

- Based on Plaintiff's increase in her Dilantin level (i.e., from 3.4 to 39) with just
  an increase of 100 mg (i.e., one capsule), Dr. Luban "strongly suspected that she

had not been faithful to taking three per day and that a level of 3.4 did not reflect that" (and the boyfriend "agreed" with this);

- The same day that Plaintiff had come to see him (i.e., May 8, 2008) after not coming to see him for several months, Plaintiff had also seen Dr. Yan; and

- Dr. Luban noted his suggestion during the call that "she needed psychiatric" help, and that he found it "very strange that she had seen me after allegedly leaving Dr. Yan several months ago and that she then disappeared for months alleging that she was unable to come in because she was under strict work requirements."

Exhibit 4, Luban, Dep. Tr., 11:21 – 17:12; Luban, Dep. Ex. 1, p. 18.

28.     Dr. Luban promptly terminated his professional relationship with Plaintiff. Exhibit 4, Luban, Dep. Tr., 19:16 – 20:11; Luban, Dep. Ex. 1, p. 12 (stating, "This letter is written to serve as a dismissal effective immediately . . . .").

29.     As conveyed to Dr. Luban by Plaintiff's boyfriend, Plaintiff had also been seen by Dr. Yan at or near the time that she had just seen Dr. Luban (i.e., in May 2008).  Exhibit 4, Luban, Dep. Exhibit 1, p. 18; Exhibit 1, Yan, Dep. Exhibit 3.

30.     VCA personnel sent a position description to Dr. Yan for him to evaluate in relation to Plaintiff's ability to return to work and to perform the duties of her position.  Exhibit 1,  Yan, Dep. Tr. 25:6 – 26:3; Yan, Dep. Exhibit 4, Fax Cover Sheets and Position Description.

31.     Dr. Yan reviewed the position description, which included a physical requirement of a willingness to "work long or irregular hours under pressure conditions" and sent a letter back to VCA, dated May 21, 2008, through which he certified that Plaintiff had been under his care for "SEIZURE/CONVULSION," and further certified that –

> "DR. CARRIER HAS SEIZURE.  CURRENTLY, WE ARE ADJUSTING HER MEDICATION. SHE SHOULD BE ABLE TO GO BACK TO HER REGULAR JOB **WITHOUT RESTRICTION** ON 052708, OR EARLIER."

Exhibit 1, Yan, Dep. Tr., 26:4  - 27:3; Yan, Dep. Exhibit 5 (emphasis added).

32.     Dr. Yan did not subsequently submit any other documents to VCA regarding Plaintiff's medical condition or the treatment thereof.  Exhibit 3, Declaration of Cheryl Smith.

**D.     Plaintiff Did Not Experience Another Seizure After Returning from Leave in Late May 2008, Through the Duration of her Employment with VCA.**

33.     Once Plaintiff returned to work on or about May 27, 2008, she did not, through the duration of her employment with VCA, experience another seizure.  Exhibit 1, Yan, Dep. Tr., 26:15 – 31:15; Yan, Dep. Exhibit 6 (noting on this form, which was completed by Dr. Yan on October 13, 2008, on page one, block 3, that the date of the last seizure was May 2008); Exhibit 2, Carrier, Dep. Tr., 138:16 – 140:2 (stating that she reported each seizure she experienced to Dr. Yan, and that she did not know if she had another seizure after she returned from leave in late May 2008, through the duration of her employment with VCA).  To be sure, Plaintiff did not report having any other seizures to either Dr. Luban or Dr. Yan after she returned to work on or about May 27, 2008, through the duration of her employment with VCA.     Exhibit 4, Luban Dep. Tr., 20:14 – 18; Luban, Dep. Exhibit 1, p. 12; and Exhibit 1, Yan, Dep. Tr., 29:4 – 30:12.

34.     On October 13, 2008, Dr. Yan completed a "Physician's Report" on a form issued by the Maryland Motor Vehicle Administration, concerning Plaintiff.  Exhibit 1, Yan, Dep. Tr., 27:20 – 33:1; Yan, Dep. Exhibit 6.

35.     On the first page of this form, Dr. Yan provided the following information:

Blackout Spells, Dizzy Spells, Epilepsy, Seizure, Loss of Consciousness:   Yes May 2008

Date of Last Episode: May 2008

Exhibit 1, Yan, Dep. Exhibit 6.

36.     On page two of the same form, Dr. Yan indicated "No" in response to numerous questions about other possible issues relating to Plaintiff's condition, to include those of "Other Neurological   Impairments,"   "Nervousness,"   "Depression/Confusion,   Other   Psychiatric

14

Disorders," "Memory Impairment," or any "Other Diseases/Ailments/Complications."  Exhibit
1, Yan, Dep. Exhibit 6, p. 2.

37.     On the same form, Dr. Yan also indicated that Plaintiff's prognosis was "Good,"
and he did not provide any information in response to the following question:

"Description of Limitation(s) – including any effect this may have on the patient's ability
to safely operate a motor vehicle."
Exhibit 1, Yan, Dep. Exhibit 6, p. 4.

38.     Dr. Yan further indicated that Plaintiff was taking her prescribed medications, and
that her "seizures/medical condition" was controlled.  *Id.*

**E.**     **VCA's Continued Expressions of Concern for Plaintiff to Get Rest Following Her Return from the May 2008 Period of Leave.**

39.     After Plaintiff returned from her second period of leave through the duration of
her employment with VCA, VCA personnel also continued to express their concern for Plaintiff,
her well-being, and the need for her to get sufficient rest. To that end, Plaintiff testified as
follows:

166

10     **Q.   Do you recall if any of the reviews**
11     **included a comment about, you know, wanting you to**
12     **take time off if you needed it or have rest if you**
13     **needed it, that sort of thing?**
14          **A.   I think if it wasn't actually written**
15     **down that that was the -- that was the doctors'**
16     **entire feeling was that if you need something,**
17     **please let us know.**  It was the doctors in the
18     emergency, critical care and internal medicine
19     department.

Exhibit 2, Carrier, Dep. Tr., 166:10 – 19 (emphasis added).

40.     In July of 2008, Dr. Sanders emailed Plaintiff, advising her to call Dr. Sanders for backup if the emergency room got busy.  Exhibit 9, Declaration of Dr. Nancy Sanders with attached Exhibits (VCA 166).  Plaintiff essentially refused this offer, effectively foreclosing the option and advising that she was prepared to go in at "9 am and stay until whenever."  *Id.*

41.     Dr. Sanders responded as follows to Plaintiff:

> You are supposed to be getting REST! I REALLY appreciate the offers and extra time you put in here and the TEAM-playing, but I DON'T want you overdoing it! Try to sleep in late and only come in the am if they call you!!!  *Id.*

42.     Additionally, in Plaintiff's September 2008 quarterly evaluation, for the time period of June 2008 through September 2008, Dr. Sanders commented as follows concerning Plaintiffs' hours:

> "Aimee seems to be doing better about getting out of the hospital a little earlier which is great! However, on days off she's calling in and trying to manage cases through interns when that should be left to the interns and the seniors on duty UNLESS there are some specific questions (which sometimes occur because records are not always complete!) Try to balance keeping records complete (but still leaving at a decent hour) so your time off is really your time off!"

Exhibit 6, Sanders, Dep. Tr., 102:18 – 103:9; Sanders, Dep. Exhibit 8.

43.     It was also reported to Ms. Smith, Hospital Administrator that Plaintiff refused offers from other doctors on occasion to let her go home and get rest.  Exhibit 3, Declaration of Cheryl Smith and Exhibits attached thereto (VCA 194, 202).  According to one report that Ms. Smith received, on December 8, 2008, Plaintiff appeared agitated and angry after she was asked to go home and get some rest, and further responded as follows:

> "God forbid I'm tired.  If anybody else is tired, nobody has any issues.  But if I'm tired, it's like I'm the fucking president of the United States being investigated."
> *Id.*

44.     Ms. Smith in fact asked and then directed Plaintiff to go home that day to get some rest.  Exhibit 2, Carrier, Dep. Tr., 167:9 - 170:2; Exhibit 3, Declaration of Cheryl Smith

and exhibits attached thereto (VCA 161 – 162).  Additionally, while talking with Ms. Smith, Plaintiff told her that there was nothing wrong.  *Id*; Exhibit 2, Carrier, Dep. Tr., 178:8 – 180:14; Exhibit 3, Declaration of Cheryl Smith and exhibits attached thereto (VCA 161-162).

**F.      VCA's Termination of Plaintiff's Employment.**

45.      Plaintiff's employment with Defendant was terminated on December 11, 2008 as a result of "unprofessional erratic behavior."  Exhibit 3, Declaration of Cheryl Smith and exhibits attached thereto (Employee Separation Report, VCA 159-160).

46.      Information was reported to Ms. Smith in the days leading up to December 11, 2008, regarding various incidents of what various VCA personnel considered to be troubling, erratic and/or unprofessional behavior on Plaintiff's part.   Reports concerning these various incidents came from Dr. Christopher Byers, Dr. Tina Conway, Dr. Nathan Lippo, Ms. Tovah Glasgow, Ms. Jackie Costlow, Ms. Jessica Edwards, Ms. Melody Mendolson, and Mr. Shane Savannah.  Exhibit 3, Declaration of Cheryl Smith and Exhibits attached thereto (VCA 161 – 162, 194, 199, 202, 395 – 402).

47.      Certain of these issues were the same or similar to issues that had previously been documented on reviews that Plaintiff had previously been given.   *Compare* Exhibit 3, Declaration of Cheryl Smith and Exhibits attached thereto (VCA 161-162, 194, 199, 202, 395-402) *and* Exhibit 9, Declaration of Dr. Nancy Sanders and Exhibit A attached thereto..

48.      After considering this information and after meeting with Plaintiff, VCA personnel (i.e., Ms. Smith and Dr. David Saylor, Medical Director for the hospital, in consultation with Dr. Robert Murtaugh, Vice President and Regional Medical Director, human resources personnel, in-house counsel, and after considering input from Dr. Sanders) concluded that Plaintiff's employment should be terminated.  Exhibit 3, Declaration of Cheryl Smith and

Exhibits attached thereto; Exhibit 11, VCA's Amended Answer and Objection to Plaintiff's First Set of Interrogatories, Interrogatory No. 18.

49.     Subsequent thereto, Plaintiff filed a charge of discrimination with the Maryland Commission on Human Relations, and on October 4, 2010, the Commission issued its finding that no probable cause existed to conclude that VCA had discriminated against the Plaintiff because of her disability.  Exhibit 12, Written Finding of the Maryland Commission on Human Relations.

50.     During the discovery phase of this case, VCA served a document request which requested that Plaintiff produce "All documents relating to any administrative charge, claim, or proceeding previously filed by you in relation to the allegations in the Complaint . . . ."  Exhibit 13, Plaintiff's Responses to Requests for Production of Documents, Request No. 18.  In response thereto, Plaintiff did not produce any documents reflecting the filing of a complaint on her behalf with the Montgomery County Commission on Human Rights.

## II.    <u>STANDARDS GOVERNING SUMMARY JUDGMENT</u>

Pursuant to Federal Rule of Civil Procedure 56(c), a moving party shall be entitled to judgment in its favor if "there is no issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  In deciding a motion for summary judgment, the court "must draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded particular evidence." *See Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  Thus, "all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth

at trial." *Anderson*, 477 U.S. at 249 (quoting *First Nat'l Bank of Ariz. v. Cities Service Co*., 391 U.S. 253, 288-89 (1968)).

The Supreme Court has made it clear, however, that at the summary judgment stage of litigation, the judge should determine if there is a genuine issue for trial, not weigh the evidence and determine the truth of the facts asserted. *See Anderson,* 477 U.S. at 250.   To survive a motion for summary judgment, there must be evidence upon which the jury could reasonably find for the nonmoving party; a scintilla of evidence is not enough. *See id.* at 252.   If the entire record could not allow a rational fact finder to find in favor of the nonmoving party, then there is no genuine issue to be resolved at trial. *See Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The Fourth Circuit has expressly recognized that trial judges have an "affirmative obligation . . . to prevent 'factually unsupported claims and defenses' from proceeding to trial." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (citation omitted). *See also Holley v. Great Atlantic & Pacific Tea Co., Inc.*, No. 05-1324, 2006 WL 306595, at *4 (D. Md. Feb. 8, 2006) (discussing the standards and considerations applicable to summary judgment).

## III.     VCA IS ENTITLED TO SUMMARY JUDGMENT ON ALL COUNTS OF THE COMPLAINT

Count I of Plaintiff's Complaint against VCA has no merit as Plaintiff cannot demonstrate that VCA violated the ADA.  To that end, Plaintiff cannot establish that she was a person with a disability under the ADA while she was employed by VCA or that she was regarded as having a disability.  Even assuming *arguendo* that Plaintiff could demonstrate that she was a person with a disability during that period of time, she cannot demonstrate that she requested a reasonable accommodation from VCA or that VCA failed to fulfill its duties in

relation to any such request.   Finally, Plaintiff cannot demonstrate that VCA discriminated against her because of her alleged disability when it terminated her employment due to her erratic behavior and performance issues.   Rather, Defendant's decision to terminate Plaintiff's employment was based upon legitimate, nondiscriminatory reasons and Plaintiff cannot demonstrate that it was pretextual for the motive to discriminate against her because of her alleged disability.   As a result, VCA is entitled to the entry of judgment on Count I of the Complaint.

In relation to Count II, while the medical condition of epilepsy is listed within the definition a disability under Section 6-201(b)(i) of the Maryland Code,[4] Plaintiff cannot establish that VCA violated the applicable provisions of Maryland law.   First, Plaintiff's claim under Count II is not timely, to the extent that it is based upon an alleged failure of VCA to provide a reasonable accommodation, which is based upon the alleged request for accommodation through Dr. Luban's note dated May 8, 2008, because this lawsuit was not filed until December 3, 2010, more than two years after the note was submitted to VCA.

Assuming *arguendo* that Plaintiff can pursue a claim of failure to provide a reasonable accommodation for the period of December 3, 2008, through December 11, 2008 (i.e., the date of her termination), Plaintiff cannot establish that VCA violated any duty of reasonable accommodation towards her, because VCA never "refused" to provide a reasonable accommodation, in part because Dr. Luban's note did not constitute a request for a reasonable accommodation; furthermore, Plaintiff did not have another seizure after she returned to work on

---

[4] For the same reasons as are set forth in relation to Count I, Plaintiff's medical condition of epilepsy did not constitute a disability under Count III, which alleges a violation of the Montgomery County Code, as the Montgomery County Code does not specifically list epilepsy as a disability.   Since the Montgomery County Code is largely identical to the ADA, its provisions should be interpreted consistently with the ADA and her claims under Count III should be analyzed under the Federal rubric for ADA claims, which was in effect in 2008.   *See Heiko v. Colombo Savings Bank*, *F.S.B.*, 434 F.3d 249, 253 (4th Cir. 2006), *cert. denied*, 548 U.S. 941 (2006).

May 27, 2008, through the date of her termination.   Moreover, VCA provided Plaintiff with several different forms of accommodation during her term of employment.   Finally, Plaintiff's claim that she was wrongfully terminated in violation of Maryland law because of her medical condition of epilepsy must fail, because Plaintiff cannot establish that she was an "otherwise qualified employee" because she was not satisfactorily performing the duties of her position during that time period and because Plaintiff cannot establish that VCA terminated her employment "because of" her epilepsy, as Maryland law requires.

Finally, Plaintiff's claims under Count III must fail because Plaintiff failed to exhaust her administrative remedies when she did not file a complaint of discrimination with the Montgomery County Commission on Human Rights, because her claim of failure to provide a reasonable accommodation is untimely under applicable State law, and for the additional, substantive reasons which warrant the granting of summary judgment in favor of VCA in relation to Counts I and II.

### A.   Plaintiff Cannot Establish a *Prima Facie* Case under the ADA.

### 1.   Plaintiff is not a qualified person with a disability under the ADA. [5]

The ADA prohibits an employer from discriminating "against a qualified individual with a disability."   42 U.S.C. § 12112(a).   An individual has a disability under the ADA if she has "a physical or mental impairment that substantially limits one or more of [her] major life activities." *Id.* § 12102(2)(A).   To proceed under the ADA, Plaintiff must demonstrate that: (1) she has a physical or mental impairment; (2) that implicates a major life activity; and (3) has a substantial

---

[5] Because the allegedly discriminatory events in this lawsuit took place prior to the implementation of the January 2009 amendments to the ADA, Count I is properly analyzed under the law as it applied before the ADA amendments became effective.   *See, e.g., Schneider v. Giant of Maryland, LLC*, 389 Fed. Appx. 263, 267 (4th Cir. 2010) (concluding that Congress did not intend for the ADA Amendments to apply retroactively.).

limitation.  *Heiko v. Colombo Savings Bank, F.S.B.*, 434 F.3d 249, 254 (4th Cir. 2006).  Plaintiff is unable to make this showing.

Major life activities are those "activities that are of central importance to daily life," including walking, seeing, hearing and manual tasks that are "central to daily life."  *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 197 (2002), *overruled due to Legislative Action*, Pub. L. 110-325 (2009). The term "substantially limits" is "to be interpreted strictly to create a demanding standard for qualifying as disabled."  *Id.*  Courts must engage in an individualized inquiry focused on the particular plaintiff's limitations and any effects of corrective mitigation measures.  *Heiko*, 434 F.3d at 258; *see also EEOC v. Sara Lee Corp.*, 237 F.3d 349, 352 (4th Cir. 2001) (explaining that the determination of whether an individual is disabled under the ADA is an "individualized inquiry, particular to the facts of each case").

In *EEOC v. Sara Lee Corp*., the Court of Appeals held that the former employee in question, Vanessa Turpin, was not a person with a disability under the ADA, where she had been diagnosed with complex partial seizure disorder (epilepsy) and where she experienced seizures, both at night while sleeping and during the day time, about once or twice a week.[6]  In reaching its decision, the Court of Appeals explained that "the crucial question in this case is whether Turpin's epilepsy substantially limited one of her major life activities."  *Id*. at 352.  The Court of Appeals held that such was not the case, and in so doing, rejected the EEOC's arguments that Turpin was disabled under an "intermittent manifestation" theory of disability.  To that end, the Court of Appeals explained as follows:

---

[6] Ms. Turpin's seizures during the daytime were milder in nature, and she had four or five of them while at work.  As explained in the Court of Appeals' decision, Turpin's seizures normally lasted a couple of minutes, and during the seizures, she began shaking, her face took on a blank expression, and she became unaware and unresponsive to her surroundings.  After the seizure ended, Turpin was able to return to what work she had been performing before the seizure began, although the seizures sometimes caused her to suffer memory loss.  The Court also noted that Turpin continued to perform her job and take care of her son. *Sara Lee*, 237 F.3d at 351.

"Here, the alleged intermittent manifestation (the seizure) is the disability itself. To hold that a person is disabled whenever that individual suffers from an occasional manifestation of an illness would expand the contours of the ADA beyond all bounds.  An intermittent manifestation of a disease must be judged the same way as all other potential disabilities.  The statute is explicit - - to be disabled under the ADA, a person must have a substantial limitation on a major life activity."  *Id*.

The Court of Appeals also concluded that the EEOC failed to prove that Turpin's "milder form of epilepsy" substantially limited a major life activity (i.e., her sleep, her ability to think, or her ability to care for herself).  *Id*. at 352 – 353.

In determining whether a limitation is "substantial," the Court should consider the nature, severity, and duration of the impairment.  *Pollard v. High's of Baltimore, Inc.*, 281 F.3d 462, 467 - 68 (4th Cir. 2002), *cert. denied*, 537 U.S. 827 (2002).  Moreover, in order to assess whether or not a plaintiff's limitation is "substantial," one must compare it "to the condition, manner, or duration under which the average person in the general population can perform the same major life activity."  *Sara Lee*, 237 F.3d at 352 (citing to 29 C.F.R. § 1630.2(j)(2) (2000)).

Against this backdrop, Plaintiff cannot demonstrate that her medical condition of seizures/convulsions substantially limited a major life activity.  While employed by VCA, Plaintiff's seizures occurred with substantially less regularity than those experienced by Ms. Turpin in *EEOC v. Sara Lee*, who was not found to have a cognizable disability.  *See Sara Lee*, 237 F.3d at 352.  Moreover, from the time that Plaintiff returned to work from her first period of leave in January 2008 through May 2008, the record evidence indicates that Plaintiff only reported experiencing a single seizure, presumably when she locked herself into the bathroom at the hospital and subsequently refused to go with paramedics to the hospital (even though Plaintiff told Dr. Brown while the incident was ongoing that she did <u>not</u> have a seizure and was only having a gastrointestinal problem).  *See* Section I C, Paragraph 22, *supra*.

In total, Plaintiff estimates that she had ten seizures during her 16-month tenure working for VCA.  Exhibit 2, Carrier, Dep. Tr., 149:2 – 7.  Plaintiff described those seizures as lasting between 20 and 30 seconds, and recalled that she regained her bearings within a few minutes after she experienced a seizure.  Exhibit 2, Carrier, Dep. Tr., 115:9 – 116:1.  Additionally, aside from not being able to drive[7] for a three-month period of time after she first began experiencing seizures, Plaintiff explained that in relation to her job and her life, she "really didn't do anything differently," stating in part as follows:

112

24    Q.   And you mentioned you sort of did
25   everything -- you didn't do anything differently.

113

 1   Is that in relation to your job?  Is that what you
 2   were talking about, or --
 3     A.   In relation to my job, my life.  There
 4   wasn't anything, like I didn't have a form where I
 5   walked out and said, okay, I just had a seizure,
 6   whatever, and checked it.  I didn't ask to go home
 7   or anything after I had a seizure.  I didn't -- I
 8   really didn't do anything differently.

*****

13    Q.   And so from your perspective you feel
14   you were still able to do your job, it wasn't
15   interfering with your ability to do your job?
16     A.   Right, once I was coherent.  I don't
17   want you to think that I pop out of it.  It's not
18   that.  I had said that it takes a couple minutes
19   for me to actually kind of get my bearings and

---

[7] VCA is not aware of any Courts of Appeal which have held that driving is a major life activity for purposes of the ADA.  *See Kimble v. Potter*, 390 Fed. Appx. 601, 603 (7th Cir. 2010) (explaining that driving would not constitute a major life activity under the ADA, and collecting cases on the issue), *cert. denied*, ____ U.S. ____, 131 S. Ct. 2116 (2011).

**20   figure out, okay, this is what just happened.  All**
**21   right.**

Exhibit 2, Carrier, Dep. Tr., 112:24 – 113:21 (emphasis added).

Dr. Carrier's own description of the minimal impact of epilepsy on her major life activities is wholly consistent with the testimony of Dr. Yan, who explained that "her seizure is easy to control," that "if she take[s] medicine, she should be okay," and that Plaintiff's seizures occurred infrequently.  Exhibit 1, Yan, Dep. Tr., 34:18 – 35:5.   When viewed as a whole, it is clear that Plaintiff cannot establish that she was substantially limited in any major life activity and as a result, her claim under the ADA must fail.

Furthermore, Plaintiff's alleged disability must be analyzed through the lens of the mitigating measures available to her (i.e., her prescribed, anti-seizure medication) based upon the Supreme Court's decisions in *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999), *overruled due to Legislative Action*, Pub. L. 110-325 (2009) and *Murphy v. United Parcel Service, Inc.*, 527 U.S. 516, 521(1999) (which decisions applied to ADA claims prior to the amendment of the ADA in January 2009).   When viewed through this lens, it is clear that Plaintiff was not a person with a disability under the ADA.

As previously explained, Dr. Yan testified that Plaintiff's seizures were easy to control and "if she take medicine, she should be okay."  Exhibit 1, Yan, Dep. Tr., 34:13 – 35:1. Also, as previously noted, once Plaintiff returned to work on or about May 27, 2008, she did not, through the duration of her employment with VCA, experience another seizure.  Exhibit 1, Yan, Dep. Tr., 26:15 – 31:15; Yan, Dep. Exhibit 6 (noting on this form, which was completed by Dr. Yan on October 13, 2008, on page one, block 3, that the date of the last seizure was May 2008); Exhibit 2, Carrier, Dep. Tr., 138:16 – 140:2 (stating that she reported each seizure she experienced to Dr. Yan, and that she did not know if she had another seizure after she returned from leave in late

May 2008, through the duration of her employment with VCA).   Moreover, Plaintiff did not report having any other seizures to either Dr. Luban or Dr. Yan after she returned to work on or about May 27, 2008, through the duration of her employment with VCA.     Exhibit 4, Luban Dep. Tr., 20:14 – 18; Luban, Dep. Exhibit 1, p. 12; and Exhibit 1, Yan Dep. Tr., 29:4 – 30:12.  It is thus clear that Plaintiff was not a person with a disability and accordingly, her claim of discrimination under the ADA must fail.

Finally, assuming *arguendo* that Plaintiff could establish that she was a person with a disability under the ADA, it is clear that Plaintiff cannot demonstrate that throughout the entirety of her term of employment with VCA she was an "otherwise qualified" person with a disability, because she cannot demonstrate that she was or could have performed the essential functions of her position, either with or without a reasonable accommodation.  *See* Section I C, Paragraphs 17 - 18, and 20; and Section I E, paragraphs 46 - 47, *supra*.  As a result, Plaintiff's claim under Count I must fail.

### 2.      Plaintiff was not "regarded as" having a disability under the ADA.

Under the ADA, a person is regarded as disabled if: "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities."  *Sutton*, 527 U.S. at 489.  When an employee asserts that she was regarded as disabled, the analysis "focuses on the reactions and perceptions of the [employer's] decisionmakers" who worked with the employee.  *Runnebaum v. NationsBank of Md., N.A.*, 123 F.3d 156, 172-73 (4th Cir. 1997), *abrogated on other grounds by Bragdon v. Abbott*, 524 U.S. 624 (1998).

There is no record evidence that VCA's personnel viewed Plaintiff as having a limitation of any major life activity based upon her medical condition of seizures/convulsions.   The knowledge of Plaintiff's medical condition by certain of VCA's personnel does not indicate that VCA regarded her as disabled.  *See Haulbrook v. Michelin North Am., Inc.*, 252 F.3d 696, 703 (4th Cir. 2001). The Fourth Circuit has held that a plaintiff will not have a viable "regarded as" claim where, as here, the employer does not regard the impairment as "'foreclos[ing] generally the type of employment involved.'"  *Rohan v. Networks Presentations LLC*, 375 F.3d 266, 278 (4th Cir. 2004)(citing *Hooven-Lewis v. Caldera*, 249 F.3d 259, 267 (4th Cir. 2001)).

To the contrary, VCA's personnel never regarded Plaintiff as being unable to perform her job duties due to her medical condition of epilepsy, including after she was returned to work by Dr. Yan without restriction.  *See, e.g., Taylor v. Fed. Express Corp.*, No. 03-195, 2004 U.S. Dist. LEXIS 30356, at *37 (D. Md. July 28, 2004), *aff'd by*, 429 F.3d 461 (4th Cir. 2005) (holding that FedEx's requests that Taylor return to his courier position indicated that it perceived Taylor as being unencumbered and fit to resume his normal duties).  Although at various times, Plaintiff's coworkers expressed concern about Plaintiff and encouraged her to leave the hospital or get more rest, none of these actions demonstrate that they viewed her medical condition of seizures as substantially limiting one of her major life activities.  *See, e.g., Pollard*, 281 F.3d at 468; *see also Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 199-200 (4th Cir. 1997) (holding that a former employee's condition was only transitory, and therefore, not disabling within the meaning of the ADA.).   Therefore, Plaintiff cannot be considered "regarded as" possessing a cognizable disability by Defendant.

27

### 3.     Plaintiff did not request a reasonable accommodation.

Even if Plaintiff can be considered a person with a disability under the ADA, her claim must fail because she cannot demonstrate that she made a request for a reasonable accommodation.  Plaintiff contends that her request for a reasonable accommodation was made through the submission of Dr. Luban's note dated May 8, 2008.  *See* Section I C, Paragraphs 24, 25, *supra*.  Only days after this, however, Dr. Luban terminated his professional relationship with Plaintiff, and VCA received notes from Dr. Yan (Plaintiff's treating neurologist to whom VCA personnel had sent a copy of a position description concerning Plaintiff's duties) which returned Plaintiff to work without any restrictions.  Against this backdrop, it is clear that Dr. Luban's note did not constitute a request for a reasonable accommodation under the ADA.

In order to demonstrate a *prima facie* case that Defendant failed to offer Plaintiff a reasonable accommodation, she must show that: (1) she was an individual with a disability within the meaning of the ADA; (2) the employer had notice of her disability; (3) with reasonable accommodation, she could perform the essential functions of the position; and (4) the employer refused to make such accommodations.  *Rhoads v. FDIC*, 257 F.3d 373, 387 n. 11 (4th Cir. 2001), *cert. denied*, 535 U.S. 933 (2002).  Implicit in the fourth element is the ADA requirement that the employer and employee engage in an interactive process to identify a reasonable accommodation.  *See* 29 C.F.R. § 1630.2.  However, to provide notice sufficient to trigger that obligation, an employee must clearly "inform the employer of both the disability and the employee's need for accommodations for that disability."  *Schneider v. Giant of Maryland, LLC*, 389 Fed. Appx. 263, 270 (4th Cir. 2010) (citation omitted).  Plaintiff cannot meet this standard based on the doctors' notes that she submitted to VCA.

The employer is entitled to notice before becoming liable for failure to accommodate, and Dr. Carrier provided no such notice. *See* 29 C.F.R. App. § 1630.9 ("It is the responsibility of the individual with a disability to inform the employer that an accommodation is needed."). The Fourth Circuit Court of Appeals has held that an employer is not on notice that a reasonable accommodation is required when an employee submits a doctor's note stating that "he could resume participation in work and placed no restrictions on his activities," which is precisely what happened here. *Huppenbauer v. The May Department Stores*, No. 95-1032, 1996 U.S. App. LEXIS, at *8 (4th Cir. Oct. 23, 1996). Moreover, "vague or conclusory statements revealing an unspecified incapacity are not sufficient to put an employer on notice of its obligations under the ADA." *Id.* at *18. [W]here the employee will not acknowledge the need for or request an accommodation, or let the employer know that an accommodation is insufficient, the employer cannot be required to guess or read the employee's mind." *Shiflett v. GE Fanuc Automation Corp.*, No. 97-1687, 1998 U.S. App. LEXIS 13186, at *7 (4th Cir. June 19, 1998). Now, with the benefit of hindsight, this is precisely what Plaintiff is asking VCA to do, and such attempt must fail, particularly in light of the content of the notes submitted in May 2008 from Dr. Yan, who reviewed Plaintiff's position description and subsequently returned her to work <u>without</u> <u>restriction</u>.

Assuming *arguendo* that Dr. Luban's note constituted a request for a reasonable accommodation under the ADA, it is clear that VCA did not fail to provide an appropriate accommodation. To that end, Dr. Luban's note was premised upon the notion that Plaintiff had been required to stay up several nights in a row without sleep due to work. However, VCA did not schedule Plaintiff to do this and did not require it. Moreover, VCA personnel encouraged Plaintiff to get rest and not over extend herself at work in terms of her hours of work, in spite of

Plaintiff's clear unwillingness to adhere to such requests.  Finally, the risk identified in Dr. Luban's note – that sleep deprivation caused by required, consecutive overnight shifts (which VCA did not require) could cause Plaintiff to suffer a seizure – was moot as Plaintiff did not suffer another seizure once she returned from leave on May 27, 2008, through the duration of her employment with VCA.  For these additional reasons, Plaintiff's claim of discrimination under the ADA, based upon VCA's alleged failure to provide a reasonable accommodation to her condition of seizures, must fail.

Furthermore, Plaintiff cannot demonstrate that she would have been able with any such accommodation to properly perform the essential functions of her position, as required by the third element of this *prima facie* standard.  Plaintiff repeatedly failed – to follow instructions, to adhere to VCA's policies, to conduct herself in accordance with her employer's expectations, or to respond appropriately to constructive criticism to improve upon these issues.  *See* Section I E, Paragraphs 46 – 47, *supra*.  There is no accommodation that would have changed the circumstances of Plaintiff's unacceptable behavior and her ultimate termination as a result of that behavior.  Rather, these incidents were unrelated to her purported disability.  *See* Sections I C, Paragraphs 17 – 18, and 20; and I E, Paragraphs 46 – 47, *supra*.

Moreover, even if Plaintiff seeks to draw some link between her improper behavior and her alleged disability, Plaintiff's claim must fail.  To that end, regardless of the attributed cause of Plaintiff's misconduct, the fact that she engaged in such behavior and was terminated for that behavior forecloses her right to bring a claim under applicable law.  *See Jones v. Am. Postal Workers Union*, 192 F.3d 417, 429 ("The law is well settled that the ADA is not violated when an employer discharges an individual based upon the employee's misconduct, even if the misconduct is related to a disability."); *see also, Pence v. Tenneco Auto. Operating Co.*, No. 05-

1582, 2006 U.S. App. LEXIS 5734, at *6 (4th Cir. Mar. 7, 2006). "Misconduct – even misconduct related to a disability – is not itself a disability, and an employer is free to fire an employee on that basis." *Martinson v. Kinney Shoe Corp.*, 104 F.3d 683, 686 n.3 (4th Cir. 1997).

        **4.**      **VCA had legitimate and nondiscriminatory reasons for its actions, and Plaintiff cannot show pretext.**

To establish a *prima facie* claim of wrongful discharge under the ADA, Plaintiff must show that (1) she was a "qualified individual with a disability;" (2) she was discharged; (3) she was fulfilling her employer's legitimate expectations at the time of discharge; and (4) the circumstances of her discharge raise a reasonable inference of unlawful discrimination. *Haulbrook v. Michelin N. Am., Inc.*, 252 F.3d 696, 702 (4th Cir. 2001). Even if the Court finds that Plaintiff can be considered a qualified individual with a disability, Plaintiff cannot carry her burden to establish the third and fourth prongs of the required, *prima facie* case. Plaintiff cannot demonstrate that she was fulfilling VCA's legitimate expectations at the time of her discharge, because of the extensive documentation concerning her improper conduct and behavior leading up to her termination. Such behavior includes Plaintiff's failure to adhere to VCA's standards of dress and behavior; flouting established billing procedures and treatment protocols; and failing to appropriately interact with clients and staff members. *See* Sections I C, Paragraphs 17 – 18, and 20; and I E, Paragraphs 46 – 47, *supra*.

There is no evidence upon which to conclude that the circumstances of her discharge raise a reasonable inference of unlawful discrimination based upon her alleged disability of seizures/convulsions. As previously explained, Plaintiff had not experienced a seizure since returning from her second period of leave on May 27, 2008 and as a result, the passage of time from her apparent, last seizure (i.e., April 26, 2008, when she locked herself in the bathroom at

31

the hospital, refused to go to the hospital, and denied that she had in fact had a seizure) serves to defeat any possible, reasonable inference that she was terminated due to her alleged disability more than six months later on December 11, 2008.

Additionally, the number of persons who reported Plaintiff's erratic and improper behavior in the days leading up to her termination serves to defeat any possible, reasonable inference that the termination decision was based upon a discriminatory motive. While Plaintiff has attempted to focus her displeasure through allegations against Ms. Smith, it is simply not possible for Ms. Smith to have "orchestrated" the numerous persons (both doctors and staff members) to fabricate the allegations and observations that they communicated to Ms. Smith about Plaintiff's conduct.

The fact that Ms. Smith and Dr. Saylor made the decision to terminate Plaintiff's employment in conjunction with various other persons, including persons who outranked them in terms of their own position and authority, serves to defeat any reasonable inference that the decision was based upon unlawful discrimination.

Finally, the fact that Plaintiff did not tell Ms. Smith that her alleged, erratic and improper behavior occurred because of her alleged disability, serves to defeat Plaintiff's claim of disability discrimination. By way of example, on or about December 8, 2008, Ms. Smith talked to Plaintiff about what was reportedly occurring in terms of Plaintiff's behavior and conduct, and then asked Plaintiff to go home to get some rest. Rather than accept Ms. Smith's request in a professional manner, Plaintiff told Ms. Smith that there was nothing wrong, became angry and agitated, and said in the presence of one or more other doctors, proclaimed:

> "God forbid I'm tired. If anybody else is tired, nobody has any issues. But if I'm tired, it's like I'm the fucking president of the United States being investigated."

*See* Section I E, Paragraphs 43 – 44, *supra*.

This example typifies the "have my cake and eat it too" theory of this case by Plaintiff. Indeed, despite being encouraged and asked to slow down in terms of her hours at work by various persons at VCA, Plaintiff would not do so.  As Plaintiff explained during her deposition :

112

    24     Q.   And you mentioned you sort of did
    25   everything -- you didn't do anything differently.

113

     1   Is that in relation to your job?  Is that what you
     2   were talking about, or --
     3      A.   In relation to my job, my life.  There
     4   wasn't anything, like I didn't have a form where I
     5   walked out and said, okay, I just had a seizure,
     6   whatever, and checked it.  **I didn't ask to go home**
     7   **or anything after I had a seizure.  I didn't -- I**
     8   **really didn't do anything differently.**

Exhibit 2, Carrier, Dep. Tr., 112:24 – 113:8.  Such gamesmanship by this Plaintiff must not be sanctioned and clearly serves to defeat her claim of disability discrimination.

Finally, assuming *arguendo* that Plaintiff can establish a *prima facie* case of discrimination under the ADA, it is undisputed that VCA had legitimate and non-discriminatory reasons for Dr. Carrier's termination.   Plaintiff was terminated for erratic, unprofessional behavior.  *See* Section I E, Paragraphs 46 – 47, *supra*.

As there is no question that VCA has proffered a legitimate, nondiscriminatory explanation for Plaintiff's termination, the burden shifts back to Plaintiff to establish that VCA's proffered reasons are pretextual.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000).  Plaintiff cannot meet this burden.  In order to prove pretext, plaintiff must show "the proffered reason was not the true reason for the employment decision," by either directly

"persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing the employer's proffered explanation is unworthy of credence." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). Moreover, pretext involves more than just faulty reasoning or mistaken judgment on the part of the employer; it "is a lie" or cover-up, not merely a mistake. *Price v. Thompson*, 380 F.3d 209, 214 n.1 (4th Cir. 2004) (citations omitted). When considering this issue, the Fourth Circuit Court of Appeals has recognized that the key issue "is an unlawfully discriminatory motive for a defendant's conduct, not the wisdom or folly of its business judgment" and as such, courts should not sit as a "super-personnel department that reexamines an entity's business decisions." *Beall v. Abbott Labs.*, 130 F.3d 614, 620 (4th Cir.1997) (citations omitted), *overruled on other grounds*, *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).

For the same reasons referenced above in relation to the fourth element of Plaintiff's *prima facie* case of disability discrimination in relation to her discharge, Plaintiff cannot demonstrate that VCA's legitimate, nondiscriminatory reasons for such were pretext for unlawful discrimination. Plaintiff's unsubstantiated belief is simply insufficient to establish pretext as a matter of law. *See Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 267-268 (4th Cir. 2005); *Evans v. Technologies Applications & Service Co.*, 80 F.3d 954, 960 (4th Cir. 1996); *White v. Hedwin Corp.*, No. 08-1910, 2009 WL 3246953, at *4 (D. Md. Oct. 5, 2009) (concluding plaintiff's "self serving conclusory opinions" did not overcome defendant's legitimate non-discriminatory explanation for Title VII and ADEA claims). As a result thereof, summary judgment should be granted in VCA's favor regarding Count I.

**B.**      **Plaintiff Cannot Establish that VCA Violated the Applicable Provisions of Maryland Law in Relation to Her Claim under Count II.**

In relation to Count II, while the medical condition of epilepsy is listed within the definition a disability under § 6-201(b)(i) of the Maryland Code,[8] Plaintiff cannot establish that VCA failed to fulfill its duties or otherwise violated the applicable provisions of Maryland law towards her.  Plaintiff's claim under Count II is not timely, to the extent that it is based upon an alleged failure of VCA to provide a reasonable accommodation more than two years prior to the filing of this lawsuit, which is the case because the alleged request for accommodation through Dr. Luban's note was submitted to VCA in May 2008, Plaintiff returned to work on May 27, 2008, and Plaintiff did not file this lawsuit until December 3, 2010.

Additionally, even if Plaintiff can pursue a claim of failure to provide a reasonable accommodation for the period of December 3, 2008, through December 11, 2008 (i.e., the date of her termination), Plaintiff cannot establish that VCA violated any duty of reasonable accommodation towards her, because VCA never "refused" to provide a reasonable accommodation, which is required in order for a violation of to occur.  *See Wallace H. Campbell & Company, Inc. v. Maryland Commission on Human Relations*, Nos. 291, 1310, Sept. Term, 2010, 2011 Md. App. LEXIS 171 (Md. Ct. Spec. App. Dec. 22, 2011) (holding that in order for one to violate the provisions of Article 49B § 22(a)(9) – "<u>To refuse to make reasonable accommodations</u> in rules, policies, practices, or services when the accommodations may be

---

[8] For the same reasons as are set forth in relation to Count I, Plaintiff's medical condition of epilepsy did not constitute a disability under Count III, which alleges a violation of the Montgomery County Code, as the Montgomery County Code does not specifically list epilepsy as a disability.  Since the Montgomery County Code is largely identical to the ADA, its provisions should be interpreted consistently with the ADA and her claims under Count III should be analyzed under the Federal rubric for ADA claims, which was in effect in 2008.  *See Heiko*, 434 F.3d at 253.

necessary to afford an individual with a disability equal opportunity to use and enjoy a dwelling . . . ." – a request for a reasonable accommodation had to first be made) (emphasis added).[9]

To that end, Dr. Luban's note did not constitute a request for a reasonable accommodation.  Furthermore, Plaintiff did not have another seizure after she returned to work on May 27, 2008, through the date of her termination on December 11, 2008.  Moreover, VCA provided Plaintiff with several different forms of accommodation during her term of employment, to include the granting of two periods of leave to allow her to try and get help for the problems that she was apparently experiencing, as well as encouragement and requests that she get sufficient rest and that, at times, she go home in order to do so.  The fact that Plaintiff elected not to avail herself of such efforts by VCA is fatal to her claim.

Additionally, Plaintiff's claim that VCA violated Maryland law by failing to provide her with a reasonable accommodation must fail because Plaintiff cannot demonstrate that she was an "otherwise qualified employee" because she was not satisfactorily performing the duties of her position in the days immediately preceding the termination of her employment.  *See* Section 1 E, Paragraphs 46 – 47, *supra*.

Finally, Plaintiff's claim that VCA violated Maryland law in relation to her termination must fail because Plaintiff cannot demonstrate that in the days immediately preceding the termination decision, she was satisfactorily performing her job duties or that some sort of reasonable accommodation (which she never requested) would have allowed her to do so.  *See Maryland Comm'n on Human Relations v. Mayor of Baltimore*, 586 A.2d 37 (Md. Ct. Spec.

---

[9] Although in 2008, Md. Ann. Code Art. 49B, § 16, did not contain an explicit requirement for covered employers to provide reasonable accommodations to employees who had a disability, the Maryland Court of Special Appeals had interpreted Art. 49B "to contain such a requirement."  *See Martin Marietta Corp. v. Maryland Comm'n on Human Relations*, 38 F.3d 1392, 1398 (4th Cir. 1994) (citing to *Maryland Comm'n on Human Relations v. Mayor & City Council of Baltimore*, 586 A.2d 37, 42 (Md. Ct. Spec. App. 1991), *cert. denied*, 593 A.2d 668 (Md. 1991)).

App. 1991), *cert. denied,* 593 A.2d 668 (Md. 1991). (Explaining, "This article prohibits discharge only if a reasonable accommodation would enable the handicapped person to perform the essential functions of the position the person was hired to perform.").

To that end, according to one report that Ms. Smith received, on December 9, 2008, Plaintiff appeared agitated and angry after she was asked to go home and get some rest, and further responded as follows:

> "God forbid I'm tired.  If anybody else is tired, nobody has any issues.  But if I'm tired, it's like I'm the fucking president of the United States being investigated."

Exhibit 3, Declaration of Cheryl Smith and Exhibits attached thereto.  Moreover, Ms. Smith in fact asked and then directed Plaintiff to go home that day to get some rest and in response, Plaintiff said that there was nothing wrong.  Exhibit 2, Carrier, Dep. Tr., 167:9 - 170:2; Exhibit, Declaration of Cheryl Smith and exhibits attached thereto (VCA 161 – 162).

Finally, for the reasons previously explained in relation to Plaintiff's claim under the ADA, Plaintiff cannot demonstrate that the decision to terminate her employment was made because of her alleged disability, which is required under Maryland law.  *See* Md. Code Ann. Art. 49B, § 16(a)(1) ("It shall be an unlawful employment practice for an employer to . . . discharge any individual . . . because of such individual's . . . disability unrelated in nature and extent so as to reasonably preclude the performance of employment . . . ."); *see also*,   *Brandon v. Molesworth*, 655 A.2d 1292 (Md. Ct. Spec. App. 1995), *aff'd as modified*, 672 A.2d 608 (Md. 1996) (concluding that in order to prevail, the plaintiff must prove that he or she is a member of a class protected by this article and that the employer's decision to discharge was made <u>because of</u> the employee's membership in that class.).  As a result, Plaintiff's claims that VCA violated the provisions of Maryland law under Count II must fail.

**C.      Plaintiff's Claims of Disability Discrimination under the Montgomery County Code are Not Viable and Must Fail.**

Under Maryland law, one may bring a civil action, alleging violations of the Montgomery County Code's provisions which prohibit employment discrimination.  Md. Code Ann., State Government § 20-1202(b).  However, one may not commence such civil action "sooner than 45 days after the aggrieved person files a complaint with the county unit responsible for handling violations of the county discrimination laws," which in this case would be the Montgomery County Commission on Human Rights.  *Id.*, § 20-1202(c)(1); *see also, Rachel-Smith v. FTData, Inc*., 247 F. Supp. 2d 734 (D. Md. 2003) (construing Maryland Code, Art. 49B, § 42(c) – which was substantively identical to § 20-1202(b) – and granting summary judgment in favor of the defendant regarding plaintiff's claim of employment discrimination based upon alleged violations of the Prince George's County Code, where the plaintiff had never filed a complaint of discrimination with the Prince George's County Commission on Human Rights, even though the plaintiff had filed a charge of discrimination with the Maryland Commission on Human Relations).

During the discovery phase of this case, VCA served a document request which requested that Plaintiff produce "All documents relating to any administrative charge, claim, or proceeding previously filed by you in relation to the allegations in the Complaint . . . ."  Exhibit 13, Plaintiff's Responses to Requests for Production of Documents, Request No. 18.  In response thereto, Plaintiff did not produce any documents reflecting the filing of a complaint on her behalf with the Montgomery County Commission on Human Rights.  It is thus clear that no such complaint was ever filed.  As a result, the requirements for filing a civil action based upon alleged violations of the Montgomery County Code have not been satisfied and VCA should be granted summary judgment regarding Count III of the Complaint.

38

Additionally, if Count III is deemed to be viable, then Plaintiff's claim that VCA violated the County Code by allegedly failing to provide a reasonable accommodation to Plaintiff should be dismissed because the claim was not filed within two years of the date of the allegedly discriminatory event.   Md. Code Ann., State Government § 20-1202(c)(1) ("An action under subsection (b) of this section shall be commenced in the circuit court for the county in which the alleged discriminatory act occurred within 2 years after the occurrence of the alleged discriminatory act.")

Plaintiff is contending that VCA failed to provide her a reasonable accommodation in relation to a note from Dr. Luban, dated May 8, 2008 and, in relation to her return to work on May 27, 2008.  However, Plaintiff did not file this lawsuit until December 3, 2010, in the Circuit Court for Montgomery County.  As a result, Plaintiff's claim that VCA violated the Montgomery County Code under Count III was not timely filed, to the extent that it is based upon VCA's alleged failure to provide a reasonable accommodation.

Finally, Section 27-19 of the Montgomery County Code has been construed in a manner that is consistent with the construction given to the ADA, because of their closely similar provisions.  *See Heiko*, 434 F.3d at 254 (noting that the definition of "disability" under the Montgomery County Code "is virtually identical to the ADA's definition of the terms," and that the parties agreed that the Montgomery County Code "tracks the ADA in all relevant respects"); and *Cohen v. Montgomery County Department of Health and Human Services, et al.*, 817 A.2d 915 (Md. Ct. Spec. App. 2003) (noting that the Montgomery County act's provisions concerning disability discrimination were modeled after the ADA).  As a result, for the same reasons that support the granting of summary judgment in favor of VCA regarding Plaintiff's claims under the ADA, VCA should be granted summary judgment on Count III because it did not violate the

Montgomery County Code by failing to provide a reasonable accommodation to Plaintiff and because it did not discriminate against her based upon her alleged disability in relation to the termination of her employment.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, Defendant VCA Animal Hospitals, Inc. respectfully requests that its motion be granted and that summary judgment be entered in its favor on Counts I, II, and III of the Complaint, and that the Court grant it any other relief that it deems to be appropriate.

VCA respectfully requests oral argument on this Motion.

A draft Order is attached hereto for the Court's consideration.

Respectfully submitted,


_____/s/ John B. Flood_____
John B. Flood, Bar No. 27925
Joleen R. Okun, admitted *pro hac vice*
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
1909 K Street, N.W., Suite 1000
Washington, DC 20006
Tel: 202-887-0855
Fax: 202-887-0866
Email: John.Flood@odnss.com; Joleen.Okun@odnss.com
*Counsel for Defendant*


Dated: January 4, 2011