# Exhibit 2

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

DR. AMIE CARRIER,                *

      Plaintiff,            *

                            *

   vs.                          * CASE NUMBER:

                            * 8:11-cv-00129-DKC

VCA ANIMAL HOSPITALS, INC.,      *

      Defendant.            *

* * * * * * * * * * * * * * * * * * * * * * * * *

      The Videotaped Deposition of AMIE L. CARRIER, D.V.M., was taken on Tuesday, September 20, 2011, commencing at 10:40 a.m. at the law offices of Ogletree, Deakins, Nash, Smoak & Stewart, P.C., 1909 K Street, N.W., Suite 1000, Washington, D.C., 20006 before Cappy Hallock, Registered Professional Reporter, Certified Realtime Reporter, Certified Livenote Reporter, and Notary Public in and for the District of Columbia.

* * * * * * * * * * * * * * * * * * * * * * * * *

Reported by:

      Cappy Hallock, RPR, CRR, CLR

Page 2

1  APPEARANCES:
2
3  On behalf of the Plaintiff:
4        NEIL S. HYMAN, ESQUIRE
5        LAW OFFICE NEIL S. HYMAN LLC
6        4416 East West Highway, Suite 400
7        Bethesda, Maryland 20814
8        301-841-7105 (P)   301-986-1301 (F)
9        neil@neilhymanlaw.com
10
11 On behalf of the Defendant:
12       JOHN B. FLOOD, ESQUIRE
13       OGLETREE, DEAKINS, NASH, SMOAK &
14       STEWART, P.C.
15       1909 K Street, N.W., Suite 1000
16       Washington, D.C. 20006
17       202-887-0855 (P)   202-887-0866 (F)
18       john.flood@odnss.com
19
20 Also Present:
21       Cheryl Smith, VCA
22       Ron Meek, Videographer
23
24
25

Page 3

1         P R O C E E D I N G S
2
3         THE VIDEO OPERATOR:  I will make a
4  brief introduction and then the court reporter
5  will swear in the witness.
6         This is Disk 1 in the video deposition
7  of Dr. Amie Carrier, in the matter of Dr. Amie
8  Carrier versus VCA Animal Hospital, Incorporated,
9  filed in the United States District Court for the
10 District of Maryland.
11        Today's date is September 20, 2011.
12 The time is 10:40 a.m.  We are located at the Law
13 Offices of Ogletree Deakins, 1909 K Street,
14 Northwest, Washington, D.C.
15        Will counsel please identify
16 themselves, beginning with the attorney giving
17 notice.
18        MR. FLOOD:  John Flood from Ogletree
19 Deakins, Nash, Smoak & Stewart on behalf of the
20 defendant, and with me is Cheryl Smith, a business
21 representative from VCA.
22        MR. HYMAN:  Neil Hyman, on behalf of
23 the plaintiff.
24        THE VIDEO OPERATOR:  Also present are
25 the court reporter, Cappy Hallock, and the

Page 4

1  videographer, Ron Meek, representing Al Betz &
2  Associates.
3         Will the court reporter please swear
4  the witness.
5
6  Whereupon --
7         AMIE L. CARRIER, D.V.M.,
8         A Witness called for examination, having
9  been first duly sworn, was examined and testified
10 as follows:
11        EXAMINATION BY MR. FLOOD:
12    Q.   Dr. Carrier, good morning.
13    A.   Good morning.
14    Q.   And you understand you are here for a
15 deposition and it's part of the lawsuit you filed?
16    A.   Correct.
17    Q.   And can you just state your full name
18 for the purposes of the transcript.
19    A.   Sure.  It's Amie, A-i-m-e, L. Carrier,
20 C-a-r-r-i-e-r, and then you can either do comma
21 D.V.M., or sometimes at the beginning it's just
22 Dr. Amie Carrier.
23    Q.   And D.V.M. means?
24    A.   Doctor of Veterinary Medicine.
25    Q.   And I'm planning to call you

Page 5

1  Dr. Carrier, if that's all right with you?
2     A.   Yeah.  You can call me Amie, that's
3  fine.
4     Q.   I appreciate your flexibility.  I may
5  slip and go from one to the other, too.
6     A.   That's fine.
7     Q.   I know you sat in part of the
8  deposition with Ms. Smith and so you saw how that,
9  you know, proceeded, if you will.  I want to give
10 you just a few, the lawyers typically refer to
11 them as guidelines, so it's just some things that
12 we will try to operate under today that I think
13 will help us go more quickly, and make sure it is
14 clear, and that you understand what is going on.
15        The first would be, if you could please
16 let me finish answering -- asking my question
17 before you start to answer.  I will try to do the
18 same to you when you're answering a question
19 because that way it will be more clear for our
20 court reporter.  Okay?
21    A.   Um-hmm.
22    Q.   Yes?
23    A.   Yes.
24    Q.   That's guideline number two.
25        The counsel are laughing because we

Page 42

1   A.  Yes.
2   Q.  And is there anything about taking that
3   that you think would impact your memory, your
4   ability to recall past events, other than I know
5   you described sort of the memory issues that were
6   occurring at the time.
7   A.  No.  No.  Keppra has been fantastic for
8   me.
9   Q.  Okay.
10  A.  It doesn't have -- I haven't had any
11  side effects that I know of.
12  Q.  Have you consumed any other medicine
13  this morning?
14  A.  Yes.  I am hypothyroid, and I am on .01
15  milligrams of Synthroid every morning.
16  Q.  Synthroid?
17  A.  Yes.
18  Q.  To your knowledge, does that impact
19  your memory?
20  A.  No.
21  Q.  Anything else?
22  A.  I take a bunch of vitamins for my
23  immune system, hair, nails, women's calcium, that
24  kind of thing, but no medication.
25  Q.  Did you take anything last night to

Page 43

1   help you sleep?
2   A.  Last night, no, actually I didn't.
3   Usually I will take at least like a Benadryl
4   because I have been having this post-nasal drip,
5   but actually last night I didn't because I was so
6   exhausted I fell asleep with my son before I was
7   able to.
8   Q.  I saw in some of the records you
9   provided there were issues relating to your
10  sleeping and difficulty going to sleep.
11  A.  Right.
12  Q.  How long has that been a problem for
13  you?
14  A.  That has been forever.  And it's not a
15  simple story --
16  Q.  Can you define forever?
17  A.  Sure.  That's why I say it was not a
18  simple story.
19     When I was a kid I used to talk in my
20  sleep and walk in my sleep.  My dad does that as
21  well, and you will see the significance of that in
22  a second.  And then throughout all of high school,
23  undergrad, vet school, internship, I had always
24  gotten maybe about two to four hours of sleep a
25  night, and it wasn't a big deal to me, and I was

Page 44

1   actually proud that I could function on just a
2   couple hours of sleep.
3      When I was diagnosed with epilepsy, one
4   thing that both the neurologists that I went to
5   wanted to know was, did I have a history of
6   walking in my sleep, talking in my sleep, and I
7   said, yes, I did, and my dad did.  And so they
8   felt that that was significant.
9      I guess somehow -- it all somehow ties
10  in together, this sleep thing and epilepsy, and
11  they also said it was imperative that I get a good
12  eight hours of sleep at night.
13     So at that point the whole two to four
14  hours of sleep and no big deal became a big deal
15  to me.  It panicked me that if I didn't get enough
16  sleep that I was going to start having seizures.
17  So that's when they had to start prescribing
18  medication.  But I think part of the medication
19  was -- in my own -- I don't know, my own feeling,
20  I thought that some of it was I was partially
21  psyching myself out, because I would sit there and
22  think, okay, I have to go to sleep, I have to go
23  to sleep, and when I didn't fall to sleep I would
24  get really nervous.
25     So I have been to therapists, sleep

Page 45

1   therapists.  I have gone to sleep doctors.  I have
2   had several different doctors prescribe different
3   things, using lavender candles, spraying on
4   lavender and chamomile scents onto my pillowcases.
5   Q.  Who all have you -- you used the term
6   therapists.
7   A.  Yes.
8   Q.  Who all have you seen?
9   A.  Kathy Wallens, who I --
10  Q.  Can you spell her last name?
11  A.  It's W-a-l-l-e-n-s.  And I've been
12  seeing her since January of 2010.
13  Q.  What type of therapy does she provide,
14  sleep therapy?
15  A.  She kind of focuses -- yeah, sleep
16  therapy.  She focuses on all types of therapy, but
17  her thing is kind of like meditation, trying to
18  meditate yourself into a comfortable spot where
19  you are able to be relaxed enough to just fall
20  asleep.
21     And then there is Dr. Yan, and he is a
22  sleep doctor and he is also a neurologist.  And
23  then there is Dr. Luban, who is also a
24  neurologist, and he would probably kill me if he
25  knew I was saying this.  I had said to him, well,

### Page 98

1  certification yet.
2  Q.  Anyone else you recall talking to about
3  that issue?
4  A.  No.
5  Q.  Did you call up anyone back at Auburn,
6  for example, and talk to them; any of your prior
7  references?
8  A.  No.  I was pretty -- there was -- no.
9  I had a --
10 Q.  Okay.
11 A.  You know, just --
12 Q.  And talk to anyone back at the
13 University of Tennessee?
14 A.  No.  I'm trying to make sure I'm
15 telling you correctly, but I didn't talk to -- I
16 didn't tell any of my friends.  I didn't tell any
17 of my professors.
18 Q.  Okay.
19     Now, you mentioned, I wrote down before
20 you mentioned something about a blog.  Do you keep
21 a blog?  What is that about?
22 A.  On my Facebook -- actually, it's not
23 even Facebook, it was Myspace back then.  I had
24 written a blog about coming down to Maryland and
25 meeting all the doctors and how awesome it was,

### Page 99

1  and how everyone was so cool, and everyone was
2  young and happy and up for doing, you know, stuff.
3      I tend to be a little kind of do
4  whatever I can to make somebody laugh, like do
5  something stupid, like pretend to walk into a wall
6  or whatever, and, you know, they liked it.  They
7  laughed at things like that.  So I had blogged it
8  out how the people I was going to be working with
9  were really cool.
10 Q.  That is referring to when you came for
11 the visit --
12 A.  Um-hmm.
13 Q.  -- in 2007?
14 A.  Um-hmm.
15 Q.  Yes?
16 A.  Yes, sir.
17 Q.  Okay.  And so did you do any blogs
18 after that regarding any issues relating to VCA?
19 A.  No.
20 Q.  Nothing, no blogs about this lawsuit?
21 A.  No.
22 Q.  Okay.
23 A.  I haven't told anyone about this
24 lawsuit.
25     MR. HYMAN:  Can we take a short break?

### Page 100

1     MR. FLOOD:  Yes.  And I don't know what
2  we -- I have got a ways to go still so I'm not
3  sure in terms of the lunch break.
4     MR. HYMAN:  Is now good?
5     MR. FLOOD:  I think now is fine.
6  Forty-five minutes?
7     MR. HYMAN:  Sure, yes.
8     THE VIDEO OPERATOR:  We are now going
9  off the video record.  The time is 1:12 p.m.
10    (Recess taken -- 1:12 p.m.)

### Page 101

1         AFTERNOON PROCEEDINGS
2             (2:09 P.M.)
3     THE VIDEO OPERATOR:  We are now back on
4  the video record.  The time is 2:09 p.m.
5  BY MR. FLOOD:
6  Q.  Dr. Carrier, while you were working at
7  VCA, you had -- you took a couple of periods of
8  leave, and I don't know if you -- if you formally
9  called them medical leave or some other sort of
10 leave; is that right?
11 A.  Yeah.  We called it medical leave.
12 Q.  Okay.  And do you remember when that
13 was?
14 A.  I don't have any exact dates.
15 Q.  Was it generally late December on into
16 January 2007 to 2008?
17 A.  Say that again.
18 Q.  Late December '07 until sometime in
19 January 2008?
20 A.  Yes.
21 Q.  And then a second time, was it in May
22 of 2008?
23 A.  Correct.
24 Q.  Were there times when employees at VCA
25 encouraged you to take time off if you needed it?

Page 110

1    A.  It was after my second leave.
2    Q.  After.  Do you remember when it was?
3    A.  No.  You mean when my seizure -- when
4  that happened?
5    Q.  Right.
6    A.  I don't remember.
7    Q.  What -- what do you recall happening
8  then?
9    A.  Really -- I mean really nothing.  To be
10 honest with you, I don't recall anything about my
11 seizures.  It's just I will wake up and have this
12 feeling of I just had a seizure.  And it's kind of
13 like, okay, I woke up in the bathroom and, you
14 know, my back really hurt, or the back of my head.
15 I think one time I had, you know, banged my hand
16 really good.  One time I had -- the back of my
17 head I had split open, it was bleeding.
18   Q.  At work?
19   A.  Yeah.
20       And, you know, so there is a lot of
21 things that -- you know, and I would assume okay,
22 I just had a seizure.
23   Q.  When you were -- that last incident
24 you're recalling in the bathroom --
25   A.  Yeah.

Page 111

1    Q.  -- did someone come and talk to you?
2  Did someone see you?
3    A.  No.
4    Q.  No.
5    A.  Just got up -- I mean, the only thing
6  that I did differently -- there is two things.
7        One thing that's a problem is that as I
8  was rotating between doing these different shifts,
9  the medication that they had me on I was supposed
10 to take before I went to bed, so sometimes that
11 was 10 o'clock at night, sometimes that was 2
12 o'clock in the morning.  So that presented a
13 problem, as far as the consistency with which you
14 take your antiepileptics.
15       And the other thing, the other thing
16 about having these seizures was that I just didn't
17 drive, I walked everywhere.  But I didn't do
18 anything differently.  I had my dogs.  My dogs.  I
19 had a dog from Alabama that was an epilepsy dog,
20 that I pretty much kept -- tried to keep with me.
21   Q.  The dog had epilepsy?
22   A.  No.  The dog would tell me when I was
23 going to have a seizure.
24   Q.  Oh, okay.
25       And so the condition, your medical

Page 112

1  issue with epilepsy, it impacted your driving for
2  at least a period of time?
3    A.  Yeah, I mean --
4    Q.  Is that right?
5    A.  Yeah.  I wouldn't feel -- I still
6  don't, even though I haven't had a seizure in over
7  a year, I still am nervous about driving.
8    Q.  Are you legally permitted to drive?
9    A.  Yes.  Yes.
10   Q.  Was there a time when you were not
11 legally permitted to drive?
12   A.  Yes.
13   Q.  When was that?
14   A.  When I first had my seizure, there is a
15 three-month period where I wasn't supposed to
16 drive, and that's it.  So if I have the chance to
17 drive the car or I'm going to take a ten-mile run
18 and go to the store, I will run and go to the
19 store and come back.
20   Q.  So aside from the three-month period
21 you mentioned, you haven't been legally precluded
22 or prohibited from driving?
23   A.  Right.
24   Q.  And you mentioned you sort of did
25 everything -- you didn't do anything differently.

Page 113

1  Is that in relation to your job?  Is that what you
2  were talking about, or --
3    A.  In relation to my job, my life.  There
4  wasn't anything, like I didn't have a form where I
5  walked out and said, okay, I just had a seizure,
6  whatever, and checked it.  I didn't ask to go home
7  or anything after I had a seizure.  I didn't -- I
8  really didn't do anything differently.
9        The only thing now, now when I know
10 that a seizure is coming on, I can take some
11 Gabapentin and Klonopin to try to prevent that
12 from happening.
13   Q.  And so from your perspective you feel
14 you were still able to do your job, it wasn't
15 interfering with your ability to do your job?
16   A.  Right, once I was coherent.  I don't
17 want you to think that I pop out of it.  It's not
18 that.  I had said that it takes a couple minutes
19 for me to actually kind of get my bearings and
20 figure out, okay, this is what just happened.  All
21 right.
22   Q.  And so it may be -- has anyone
23 described for you -- let me back up.
24       It sounds like you don't really recall
25 any particular seizure, in the sense of being able

Page 114

1  to tell us how long the seizure itself lasted.
2      A.   I can tell you -- I can tell you
3  about -- when Dave witnessed my first seizure.
4      Q.   Okay, that's what I'm getting to.
5      A.   Which he witnessed from beginning to
6  end.
7      Q.   That's what I'm getting to.  You
8  yourself can't describe that based on your own
9  awareness?
10     A.   No.  There is no awareness when you
11 have a seizure.
12     Q.   So the first one that you're aware of
13 was December of 2007?
14     A.   Um-hmm.
15     Q.   Yes?
16     A.   Yes.
17     Q.   And Dave, being Dave Silbert, described
18 it for you?
19     A.   Correct.
20     Q.   And do you recall how he described it
21 to you?
22     A.   I do.  He said that I all of a sudden
23 turned my head, very quickly, all the way over to
24 the right, and I stopped breathing, I turned blue,
25 and I was extremely stiff, and I fell down onto

Page 115

1  the bed.  And he grabbed me and shook me, and I
2  just was extremely stiff and not breathing for
3  about 30 seconds.  And he called 911, tried doing
4  CPR on me, and then as I started to come out of it
5  I kind of started to flail like get off me.  I was
6  a little, I guess, not combative, but I didn't
7  want anyone in my private area, like, just get
8  away from my face.  You know what I mean?
9      Q.   Did he describe for you how long
10 that -- part of it was about 30 seconds?
11     A.   He said it was 30 seconds.
12     Q.   Has anyone else described for you sort
13 of how long what they thought was a seizure
14 lasted?
15     A.   Carlos said that he had witnessed it
16 and it had taken about 20 seconds.
17     Q.   Okay.  And then sort of after, I think
18 you described earlier that, you know, once you're
19 starting to get your awareness back -- those are
20 my words -- that it would take a couple of
21 minutes -- I don't know, how long would it take
22 for you to sort of --
23     A.   Yeah, a couple minutes to be completely
24 clear minded and understand exactly what happened
25 and be back on, you know, the same page I was on

Page 116

1  prior to that happening.
2      Q.   While you were at VCA did you have
3  scheduled hours?
4      A.   Yes.
5      Q.   Okay.  What were those, and I'm asking
6  it understanding that it may have varied at times.
7      A.   7 o'clock rounds, 7 a.m. rounds, and
8  then depending on whatever you're on in the
9  morning.  If you're on internal medicine or
10 neurology or whatever, that was typically 8 to 6,
11 and then if you were on emergency critical care
12 and you came in at 2 you were there until 12.
13 And, you know, it just kind of depended on what
14 came through the door as to what time you left.
15          There is a ton of paperwork that needed
16 to be done, so for every patient that came in you
17 needed to talk to -- you needed to have
18 communications with the RDVM, with the owners,
19 with the seniors on your rotation, with the
20 technicians that need to do work on that patient,
21 with the people that are taking care of that
22 patient in the ward, and then have an official
23 transfer for that patient.
24          So with each patient you probably have
25 two or three hours of paperwork and phone calls to

Page 117

1  make, and that's if they are stable.  If they are
2  not stable, you're basically staying by this
3  animal's side until you can get something figured
4  out.  So sometimes you don't get back into your
5  office and even start some of the paperwork until
6  3 o'clock in the morning.
7           And so by the time -- this has happened
8  to me so many times I can't even count -- where I
9  would just start the paperwork at about 3 o'clock
10 in the morning and finally be dragging myself out
11 of the hospital as the next day's rounds were
12 starting at 7.
13     Q.   And so you wouldn't -- if your shift
14 was ending you wouldn't -- if you were ending at
15 midnight, for example, you wouldn't transfer the
16 patient over to an intern who was there?
17     A.   Only if your patient was completely
18 stable would you transfer it, and you wouldn't
19 transfer it until you were getting ready to leave
20 the building.  And that's because they are going
21 to call you, whoever -- if it's an ICU or an
22 immediate care ward, they would call you.  They
23 are not going to call the intern on duty to make
24 decisions about your case if you're in the
25 hospital.  So even though I might be in the

Page 130

1  After they discussed this more the father was
2  actually concerned that Amie would kill herself
3  after such a confrontation so they now are against
4  this."
5       (Interruption by the reporter.)
6       MR. FLOOD: I apologize. I am going to
7  read this again so it's clear.
8       Q. Paragraph 1: "I spoke with her mother
9  over the weekend for quite a bit. The parents
10 have changed their minds and are not up for any
11 sort of intervention. After they discussed this
12 more the father is actually concerned that Amie
13 would actually kill herself after such a
14 confrontation so they now are against this."
15      And, again, I guess like the prior
16 e-mail, sort of similar, neither of your parents
17 ever talked to you along the lines of expressing
18 concerns, whether you would harm yourself?
19      A. No.
20      MR. FLOOD: Let's mark this.
21      (Carrier Deposition Exhibit No. 5,
22 2-25-08 e-mail, Austin to Smith, VAC000405, was
23 marked for identification.)
24      THE WITNESS: Thank you.
25 BY MR. FLOOD:

Page 131

1       Q. This appears to be an e-mail, Margaret
2  Austin to Cheryl Smith, February 25th, 2008. You
3  have had a chance to review it now?
4       A. Um-hmm.
5       Q. Yes?
6       A. Yes.
7       Q. And do you recall this incident?
8       A. Vaguely.
9       Q. What do you recall about this incident?
10      A. I don't remember the cat's name,
11 Precious, but I do remember that there was an
12 animal in isolation, and that their owners that
13 kept wanting to talk to me kept showing up every
14 couple of minutes, having me paged, and isolation
15 was basically right outside of my office so I was
16 barely able to do anything because they were
17 always right there.
18      I don't recall -- I'm not going to say
19 that I didn't say the F word. I probably did if I
20 was really annoyed.
21      Q. And I --
22      A. I don't know what you want me to say.
23      Q. I mean, this is -- you're referring
24 to -- there is a reference to a sentence here
25 where she said, Margaret apparently said, "When I

Page 132

1  said no, they had left, she started screaming and
2  cussing, asking if they were fucking idiots."
3  That's what you are referring to?
4       A. I would like to know exactly what that
5  means, that I started screaming and cussing and
6  asking if they were fucking idiots. Screaming at
7  who? Just cussing, like, what does that even
8  mean?
9       Q. Do you recall that happening?
10      A. No.
11      Q. You don't recall.
12      A. And I have to say that a lot of this
13 stuff that is always reported by the front desk
14 is -- there is a lot of hearsay that happened at
15 VCA where one person would do one thing and pick
16 up a piece of paper, and by the time it got to the
17 front desk people were gossiping about how you
18 were having intercourse with someone in the
19 bathroom. Like, I'm not joking. That's how
20 things got contrived and went back and forth.
21      Q. Okay.
22      Do you recall, was -- did you have a
23 seizure that day?
24      A. I don't believe so.
25      Q. And is there anything about -- and I

Page 133

1  understand, I guess you're saying you don't recall
2  whether you reacted this way or not. I mean,
3  would there be anything about the medicine that
4  you were taking that you think would have caused
5  you to act this way --
6       A. No.
7       Q. -- if this is true?
8       A. No.
9       Q. Okay.
10      (Carrier Deposition Exhibit No. 6,
11 4-30-08 letter, Brown to Smith, VCA00130, was
12 marked for identification.)
13 BY MR. FLOOD:
14      Q. Have you had a chance to look at that?
15      A. (Indicating.)
16      Q. You have to keep saying yes or no.
17      A. Yes.
18      Q. I know it's a long day.
19      A. That's fine.
20      Q. This appears to be a letter or memo or
21 note from Sara Brown referring to an incident on
22 April 26.
23      Do you recall this incident?
24      A. Yes.
25      Q. What do you recall about it?

Page 138

1  A. Um-hmm.
2  Q. If I can just clarify. You remember
3  having to, or you're not sure or --
4  A. I think I had two.
5  Q. You think so.
6  A. I remember hearing Nicole.
7  Q. Okay.
8  A. And I remember hearing Sara. You have
9  to understand, I mean, when you're having a
10 seizure you -- it's not just you have a seizure
11 and you don't have a seizure. It's a very -- all
12 of your senses are different, your awareness is
13 different, everything is -- time is different.
14 You don't understand exactly what is going on.
15 There is a lot of confusion.
16 Q. And so from -- do you recall, did you
17 call Dr. Yan and let -- is it her?
18 A. Him.
19 Q. Him. Did you let him know this had
20 occurred?
21 A. Um-hmm. I told him after each one.
22 Q. And do you know the last time, while
23 you were working at VCA, you called Dr. Yan to
24 report a seizure?
25 A. The last time I was at VCA?

Page 139

1  Q. Frame of reference. This April
2  incident was before the second medical leave,
3  right?
4  A. Correct.
5  Q. If we look at the date, it's the end of
6  April?
7  A. Right.
8  Q. And so do you recall the last time,
9  while you were working for VCA, that you called
10 Dr. Yan to report a seizure?
11 A. I think this might have been -- this
12 might have been either the last or the
13 second-to-last episode that I had.
14 Q. This April incident?
15 A. Yes, I think so, because I went on
16 medical leave, like, a few days after that, I
17 think. And I had gone and spoke -- I had an exam
18 and I had spoken with Dr. Yan shortly after that.
19 Q. While you were on medical leave?
20 A. While I was on medical leave, sure.
21 Q. Do you recall -- and I know maybe time
22 frame is hard to pin down -- do you recall, did
23 you have what you believe to be another seizure
24 after that second medical leave?
25 A. After the second medical leave?

Page 140

1  Q. At work, yes.
2  A. I honestly don't know. I don't know.
3  Q. Okay.
4     Now, at some point -- well, let me just
5  show you the e-mail because I think it's more
6  clear if I show it.
7     (Carrier Deposition Exhibit No. 7,
8  e-mail chain, 3-5-08 e-mail, Sanders to Smith,
9  VCA00128-129, was marked for identification.)
10    THE WITNESS: Thank you.
11 BY MR. FLOOD:
12 Q. We have handed you Exhibit 6, and, Dr.
13 Carrier, the first part of the e-mail is really --
14 there is at least one reference to you on the
15 first page.
16    MR. HYMAN: I think this is Exhibit 7.
17    MR. FLOOD: I'm sorry. You're right,
18 thank you. It is Exhibit 7.
19 Q. On Page 1, the second paragraph, if you
20 will, at the top, it says, "Just between you and
21 I, and I cannot remember if I told you this
22 already, Nicole sent me an e-mail that Amie has
23 moved out of the boyfriend's, she is back in her
24 apartment and that she is getting therapy,
25 although she did not know what kind of therapy."

Page 141

1     Did you move out from sharing a place
2  with David around this point in time, if you
3  recall? So this is -- just my understanding, this
4  is after that Hawaii trip?
5  A. Yeah.
6  Q. So early March, after that time.
7  A. I never completely moved out of Dave's
8  house, and I never really completely moved in with
9  Autumn. I was helping Autumn pay rent, and if I
10 needed to I could go over to her place. It was --
11 it was not that I moved in with her. Maybe she
12 would say that I did, I don't know.
13 Q. Okay. And so there is a mention also
14 "she" is getting therapy. Although it says "she,"
15 I think that's Nicole, didn't know what kind.
16 A. Yeah.
17 Q. Were you getting any type of therapy
18 around this time?
19 A. The only people I saw with any
20 regularity at this point is really Dr. Yan.
21 Q. Okay.
22    (Carrier Deposition Exhibit No. 8,
23 2-11-08 e-mail, Brown to Smith, with attachment,
24 VCA00121-123, was marked for identification.)
25    THE WITNESS: Thank you.

Page 146

1  And I was, like, okay.
2  Q.  Was there a time when Dr. Sanders came
3  to your house and found you in bed?
4  A.  Yes.
5  Q.  Tell us about that.
6  A.  I was sleeping, really out of it on the
7  bed, just been started on trileptal.
8  Q.  So what time frame is this?
9  A.  It was in the afternoon.
10 Q.  No, the month and year.  If you recall.
11 A.  January.
12 Q.  2008?
13 A.  Um-hmm.
14 Q.  Yes?
15 A.  Yes.  2008.
16 Q.  Okay.
17 A.  And I believe that she came in and I
18 think she spoke to Dave for a little bit.  I
19 don't -- I don't know what the conversation was
20 about.  But I do remember hearing a knock on the
21 door, and then probably about five to ten minutes
22 later, so there was a little period of time before
23 she came up the stairs and she laid down on the
24 bed next to me.  And she said your residency is in
25 jeopardy, and you're going to be okay.

Page 147

1  It was just very comforting, and, you
2  know, I was so drugged I couldn't even move my
3  mouth to say thank you or, I know, or -- I
4  couldn't communicate with her because I was
5  literally that drugged up on the new antiepileptic
6  medication.  And I thought that was very nice of
7  her.
8  Q.  Do you know, was there any, like, an
9  alcohol bottle in the room near your bed?
10 A.  Oh, no, I'm sure there wasn't.  Why do
11 you ask that?
12      I'm sorry, can't ask.  Sorry.  Sorry.
13 Q.  Did you ever overdose on any substance?
14 A.  I overdosed on Dilantin, per my
15 neurologist's order.
16 Q.  When was that?
17 A.  I had gone to the ER, maybe April or
18 May, I'm not sure, but there should be
19 documentation from when I had gone to the ER.
20 Basically, what happened was my neurologist had
21 bumped me up from taking three Dilantins to four
22 Dilantins a day, and --
23 Q.  Is this Dr. Yan or Dr. Luban?
24 A.  Dr. Luban did this.  And then I started
25 acting very erratic and drunk, tripping, falling,

Page 148

1  and I went to the hospital.  And I believe -- I
2  want to say the high end of Dilantin is maybe like
3  12 or 15, and then toxic is anything greater than
4  20, I believe, and I was at 42.  So I had
5  activated charcoal and IV fluids.  And, I mean,
6  I -- that was bad.  That was a bad experience.
7  Q.  So that wasn't while you were at work?
8  A.  Wasn't while I was at work?
9  Q.  You taking too much of the medicine and
10 then the symptoms you were describing, acting
11 erratic and so on, was not while you were at work?
12 A.  No.  This all happened, I think it
13 was -- I want to say it was on a weekend or
14 something.
15      MR. FLOOD:  Let's take a short
16 five-minute break, or ten's fine.
17      THE VIDEO OPERATOR:  We are now going
18 off the video record.  The time is now 3:31 p.m.
19 and ending Disk 2.
20      (Recess taken -- 3:31 p.m.)
21      (After recess -- 3:52 p.m.)
22      THE VIDEO OPERATOR:  We are now back on
23 the video record.  The time is 3:52.  This is the
24 start of Disk 3 in the continuing deposition of
25 Dr. Amie Carrier.

Page 149

1  BY MR. FLOOD:
2  Q.  Dr. Carrier, to the best you can, can
3  you tell us the number of seizures you believe you
4  experienced while you were at work -- I will ask
5  it a couple different ways -- while you were
6  actually at work at VCA?
7  A.  I'm going to guess about ten.
8  Q.  Okay.
9      And why do you think ten?
10 A.  I'm just trying to think of the times
11 where I had gone to the bathroom and someone said,
12 well, I was looking for you, you know, and I knew
13 I was in the bathroom.  And then the times -- the
14 time when I was actually -- when Carlos saw me.
15 Q.  Carlos, you described that.  There was
16 that one, there is the April incident with Sara
17 Brown.  We have gone over her memo.  And I thought
18 you said you think maybe two -- you sort of
19 experienced two in that same incident?
20 A.  I don't know if it was like one long
21 one, I don't know exactly.
22 Q.  But you think there were --
23 A.  Because at one point during one of my
24 reviews someone had said something to me about I
25 disappear and I go places and people don't know

Page 166

1  Q.  Okay.
2      I've seen reviews, as I understand it,
3  relating to your performance as a resident.  Did
4  you get a copy of those?  I mean --
5  A.  Yes, sir.
6  Q.  -- I assume at some point someone would
7  sit down with you as you got them and talk to you
8  about them?
9  A.  Correct.
10 Q.  Do you recall if any of the reviews
11 included a comment about, you know, wanting you to
12 take time off if you needed it or have rest if you
13 needed it, that sort of thing?
14 A.  I think if it wasn't actually written
15 down that that was the -- that was the doctors'
16 entire feeling was that if you need something,
17 please let us know.  It was the doctors in the
18 emergency, critical care and internal medicine
19 department.
20 Q.  Okay.
21     (Carrier Deposition Exhibit No. 16,
22 12-10-08 e-mail, Byers to Smith, VCA00194, was
23 marked for identification.)
24     THE WITNESS:  Thank you.
25     MR. FLOOD:  This is Exhibit 16?

Page 167

1      THE REPORTER:  Correct.
2  BY MR. FLOOD:
3  Q.  When you finish looking at it, let me
4  know.
5  A.  Okay.
6      So can I talk or you want --
7      MR. HYMAN:  Let him ask you a question.
8  BY MR. FLOOD:
9  Q.  The entry for 12-9-08 --
10 A.  Yeah.
11 Q.  -- there is various comments there, you
12 know.  Apparently this is from Chris Byers?
13 A.  Correct.
14 Q.  And so later, let's see, one -- about
15 the third sentence up from the bottom of that
16 paragraph -- well, the fourth sentence up, it
17 says, "After she was asked to go home to rest she
18 came into the residents' office where I was
19 speaking with Dr. New."  Do you see that?
20 A.  Correct.
21 Q.  "She was clearly angered, agitated, put
22 on her coat and picked up her backpack.  She said
23 something to the effect of God forbid I'm tired.
24 If anybody else is tired nobody has any issues,
25 but if I'm tired it's like I'm the fucking

Page 168

1  president of the United States being investigated.
2  She subsequently stormed out of the office,
3  presumably went home."
4      Do you recall that --
5  A.  Yes.
6  Q.  -- that incident?
7  A.  That is the same exact incident that we
8  have talked about several times today, where
9  during rounds I was falling asleep.  They had just
10 started me on a new medication.  I went back to
11 the residents' office.  Nicole talked to me, Nate
12 talked to me, Cheryl talked to me, and then I
13 left, walked home and went back to Dave's house.
14 It's the same thing.
15 Q.  And so do you recall when you met with
16 Cheryl?
17 A.  Do I recall that day?
18 Q.  Do you recall meeting with Cheryl --
19 A.  Yes.
20 Q.  -- that day?
21 A.  Yes.
22 Q.  And did she ask you if your hand was
23 shaking?
24 A.  I don't think so.
25 Q.  And did she ask you or comment about if

Page 169

1  your speech was slurred?
2  A.  I don't believe that she did at that
3  time.  She told me that other people were
4  concerned about it, and that she was concerned
5  because they were concerned.  I don't know if she
6  said I was shaking, but I know it was said that I
7  was shaking, but at this point I don't know if it
8  was from, you know, someone that said it during
9  rounds or someone that witnessed it in the hall or
10 heard or what.
11 Q.  What, to the best you can, what do you
12 specifically recall about any conversation with
13 Cheryl where you're talking with Cheryl?
14 A.  She told me that I had to go home.
15 Q.  And do you recall what, if anything,
16 you said to her?
17 A.  I don't remember specifically saying
18 anything.  I just remember being really upset, and
19 I remember feeling like my resident mates had gone
20 behind my back and said something to her to get me
21 to leave.
22 Q.  And you don't recall anything else you
23 may have said to her?
24 A.  I don't.  And --
25 Q.  Okay.

Page 170

1   A.  I'm not saying that I didn't, I just
2   don't remember.
3       (Carrier Deposition Exhibit No. 17,
4   12-11-08 memo, Conway to file, VCA00202, was
5   marked for identification.)
6       THE WITNESS:  Thank you.
7   BY MR. FLOOD:
8   Q.  We have handed you Exhibit 17.
9   A.  Yes.
10  Q.  And you didn't write this yourself,
11  right?
12  A.  That's correct.
13  Q.  Okay.  On its face it appears to be a
14  memo from Tina Conaway -- Conway, I'm sorry --
15  talking about something that occurred on December
16  9th?
17  A.  Correct, it does.
18  Q.  Okay.  The last paragraph reads, "As
19  Amie was discussing the current problem she was
20  speaking very slowly and at times not clearly, and
21  I asked her what was wrong.  She said she was on
22  cold medicines.  I offered to take over the case
23  so that she could go home, rest, and get better
24  for tomorrow, but she declined the offer at that
25  time."

Page 171

1   A.  Um-hmm.  Yes.
2   Q.  You see that, right?
3   A.  Yes.
4   Q.  Do you recall that discussion occurring
5   with Dr. Conway?
6   A.  I don't remember this at all.  I do
7   remember myself having the flu for probably, like,
8   a solid three months during this time, and I was
9   constantly taking some kind of either
10  antihistamine or decongestant or something, but I
11  do not recall this particular incident.
12      I can tell you that all of Dr. Conway's
13  patients have very lengthy histories, though.  I'm
14  not surprised by that.
15  Q.  Oh, the comments relating to the
16  history?
17  A.  Yes.  That's definitely something
18  that -- that would be Tina's.
19  Q.  Okay.  So just to make sure it's clear,
20  you don't recall this particular conversation with
21  Dr. Conway?
22  A.  Correct.
23  Q.  Okay.
24      (Carrier Deposition Exhibit No. 18,
25  undated letter, Lippo to To Whom It May Concern,

Page 172

1   VCA00203, was marked for identification.)
2       THE WITNESS:  Thank you.
3   BY MR. FLOOD:
4   Q.  Okay, I have handed you a memo,
5   Exhibit 18.  You have had a chance to look at
6   that?
7   A.  Yes.
8   Q.  Dr. Lippo says that, the latter part of
9   the first paragraph, "On two occasions the problem
10  was so bad that I had asked Dr. Carrier to leave
11  the hospital and get some rest, as I felt she
12  could not perform the duties required of her, and
13  I did not want to endanger the hospitalized
14  patients that would be under her care."
15      Do you recall a couple of times when he
16  asked you or encouraged you to go home?
17  A.  The one time was the one we keep going
18  back to where I had left and walked back to
19  Dave's.  The second time I have no idea what he
20  is -- what that is in reference to.  And I
21  don't -- when was this actually written?  What was
22  the date on this?  I don't have that on here.
23  Q.  To tell you, I don't have a dated copy
24  myself.
25  A.  Okay.

Page 173

1   Q.  So we are not hiding something from
2   you, just so you understand that.
3       So you had what -- I mean, you used the
4   term the flu.  You had a flu-type illness for a
5   pretty extended period of time?
6   A.  We all -- actually, all of us did.
7   Q.  In 2008?
8   A.  Yeah.
9   Q.  Okay.
10  A.  We would get something, someone else
11  would get it.  It would go from, like, one floor
12  to another floor, to another room to another room.
13  People were sick.  Like, they would get rid of it
14  and they would get it in two weeks.
15  Q.  Were you taking medicine at times to
16  try to help you with that, those symptoms?
17  A.  Oh, yeah.
18  Q.  What kinds of things would you take?
19  A.  Sudafed, sometimes I would take
20  Dayquil, sometimes I would take NyQuil, Benadryl,
21  Tavist, sometimes I would do the salt water thing
22  up your nose.
23  Q.  Saline solution?
24  A.  Yes.  No, actual -- did I use an
25  antitussive?  I don't believe I used an

Page 178

1   A.  Um-hmm.
2   Q.  And, as I understand it, you had taken
3   some cold medicine?
4   A.  Okay.
5   Q.  Is that correct, that day, do you
6   recall?
7   A.  I'm sorry?
8   Q.  The day when Cheryl basically said you
9   need to go home.
10  A.  Oh.  The day that Cheryl said I needed
11  to go home was when I had been switched onto
12  trileptal.  I had not had any medication other
13  than the trileptal that morning.  That was purely
14  my antiepileptic medication.
15  Q.  Okay.  And you didn't -- you don't
16  recall telling Cheryl that you had switched to a
17  new medication that morning, or you had taken that
18  medication that morning?
19  A.  No, because she knew that I was on
20  medication for my seizures, and I hadn't -- that
21  wasn't the first day that I was on that
22  medication.
23  Q.  Okay.  But let me be specific.  When
24  you talked with Cheryl and she was telling you to
25  go home --

Page 179

1   A.  Yes.
2   Q.  -- you did not tell her you were on
3   that medicine and that that could be impacting,
4   for example, how tired you were?
5   A.  I had mentioned -- no, I didn't say it
6   to Cheryl because when Cheryl told me to go home
7   that's what I did.
8   Q.  Okay.
9   A.  I did mention it to Nate, and Nate had
10  said, you know what, when we do this to dogs they
11  are in a coma for four days, why do you think
12  you're any different.  Go home, get some sleep.  I
13  was, like, okay.  It didn't matter to me why.  In
14  retrospect I know that I was completely out of it.
15  I should have never gone to work that day but --
16  Q.  Okay.  So if Cheryl said she perceived
17  you, saw you shaking, your hand shaking that
18  day --
19  A.  Um-hmm.
20  Q.  -- you think that could be true?
21  A.  If she said that?
22  Q.  Yes.
23  A.  Sure.
24  Q.  And if Cheryl said she understood,
25  perceived that your words were slurring as you

Page 180

1   spoke that day, you would agree that could be
2   true?
3   A.  Sure.
4   Q.  Okay.
5      And when you talked with Cheryl and she
6   was telling you she wanted you to go home, you did
7   not tell her that you had taken trileptal that
8   morning, that that could somehow be affecting how
9   you were acting that day, correct?
10  A.  Correct.
11  Q.  Okay.
12  A.  I just heard her -- she told me to go
13  home and that's what I did.
14  Q.  Thank you.
15  A.  I didn't --
16     (Carrier Deposition Exhibit No. 21,
17  undated handwritten memo, Tovah to file, VCA00198,
18  was marked for identification.)
19     MR. FLOOD:  What time is it?  I'm
20  getting close to getting done.
21     Famous last words.  One more question,
22  Your Honor.
23     MR. HYMAN:  I am not going to hold you
24  to that, I will just start making faces,
25  eventually, rolling my eyes with every additional

Page 181

1   question.
2   BY MR. FLOOD:
3   Q.  Have you had a chance to review this?
4   A.  I have.
5   Q.  Okay.  So a handwritten note from
6   someone named Tovah?
7   A.  Correct.
8   Q.  Do you know who that is?
9   A.  Yes, I do.
10  Q.  Who is Tovah?
11  A.  Tovah is an ER nurse.
12  Q.  And, you know, it appears to be
13  describing an event on 12-6-08?
14  A.  Correct.
15  Q.  Do you recall this incident with the
16  pitbull?
17  A.  Yes.
18  Q.  What do you recall about it?
19  A.  This was the hit-by-a-car puppy that we
20  had talked about earlier, and this is the one
21  where they said that I didn't go and talk to the
22  owners for an hour, but I really had gone and
23  talked to the owners, and there is a whole
24  confusion as to whether or not to treat or not to
25  treat, and the people, they don't look like they

Glacier

**Cheryl Smith**

Page 1 of 1


Carrier 5
@ 9-20-11

From: Margaret Austin [margaret.austin@vcamail.com]
Sent: Monday, February 25, 2008 9:57 AM
To: Cheryl Smith

On Sunday, the Flints came in to visit their cat "Precious" whom was is isolation. While at the front desk they asked if they could speak with Dr. Carrier so they could determine her prognosis and decide what to do. Bess paged Dr. Carrier who told her that she was too busy doing paper work to talk to the Flints and would call them later. The clients weren't very happy about this. They visited their pet and left. I paged Dr. Carrier and asked her to please call them as soon as she got a chance as they were trying to decide if they should put the cat down or what they should do. She asked if the clients were any where that they could hear her. When I said no they had left she started screaming and cussing asking if they were fucking idiots. The Flints came back a short time later and said they had just come from the Humane Socitey, where they apparently had gotten Precious from and they spoke with them and decided to take her back to the Humane Socitey.

Margaret Austin
Office Manager
VCA VRA #181
15021 Duffief Mill Road
Gaithersburg, MD 20878
Phone: (301)340-3224 Fax: (301)738-8845