# APPENDIX OF
# CITED DECISIONS
# NOT REPORTED IN
# WESTLAW OR
# WEST'S FEDERAL OR
# REGIONAL REPORTS

**TABLE OF CONTENTS**

1. *Huppenbauer v. The May Department Stores Co.,* No. 95-1032, 1996 U.S. App. LEXIS 27480 (4th Cir. Oct. 23, 1996)

2. *Pence v. Tenneco Automotive Operating Co. Inc.*, No. 05-1582, 2006 U.S. App. LEXIS 5734 (4th Cir. March 7, 2006)

3. *Shiflett v. GE Fanuc Automotion Corporation*, No. 97-1687, 1998 U.S. App. LEXIS 13186 (4th Cir. 1998)

4. *Taylor v. Federal Express Corp.*, No. 03-195, 2004 U.S. Dist. LEXIS 30356

5. *William H. Campbell & Company, Inc. v. Maryland Comm'n on Human Relations*, Nos. 291, 1310, Sept. Term, 2010, 2011 Md. App. LEXIS 171 (Md. Ct. Spec. App. Dec. 22, 2011)

**1**



**DIETER HUPPENBAUER, Plaintiff-Appellant, v. THE MAY DEPARTMENT STORES COMPANY, Defendant-Appellee.**

No. 95-1032

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

*1996 U.S. App. LEXIS 27480*

**December 4, 1995, Argued**
**October 23, 1996, Decided**

**NOTICE:** [*1] RULES OF THE FOURTH CIR-CUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:** Reported in Table Case Format at: *99 F.3d 1130, 1996 U.S. App. LEXIS 40534.*

**PRIOR HISTORY:** Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Claude M. Hilton, District Judge. (CA-94-635).

**DISPOSITION:** AFFIRMED.

**COUNSEL:** ARGUED: John Wyeth Griggs, GRIGGS & ADLER, Reston, Virginia, for Appellant.

Ronald John Dolan, THE MAY DEPARTMENT STORES COMPANY, St. Louis, Missouri, for Appellee.

ON BRIEF: Debra B. Adler, GRIGGS & ADLER, Reston, Virginia, for Appellant.

Mary V. Schmidtlein, Office of Legal Counsel, THE MAY DEPARTMENT STORES COMPANY, St. Louis, Missouri; David D. Hudgins, Jacqueline E. Bennett, HUDGINS, CARTER & COLEMAN, Alexandria, Virginia, for Appellee.

**JUDGES:** Before WIDENER, ERVIN, and WILKINS, Circuit Judges. Judge Ervin wrote the opinion, in which Judge Widener and Judge Wilkins joined.

**OPINION BY:** ERVIN

OPINION

OPINION

ERVIN, Circuit Judge:

Deiter Huppenbauer, a former shoe salesperson in the Hecht's Department Store ("Hecht's") (owned by the May Department Stores Company), claims that Hecht's failed to honor his request for reasonable accommodation, [*2] in violation of the Americans with Disabilities Act ("ADA"), *42 U.S.C. § 12101 et seq.* He also claims that Hecht's did not pay him what he was owed under his employee compensation contract. At trial, after Huppenbauer's case-in-chief, the district court found insufficient evidence to support a reasonable jury verdict in his favor and entered judgment against him on both claims. Huppenbauer now challenges that dismissal and certain related evidentiary rulings. We affirm.

I.

Deiter Huppenbauer, in his late 50's, suffers from a number of health problems, including coronary artery disease, cirrhosis of the liver, gout, and arthritis. In 1984, he had a heart attack and underwent coronary artery bypass surgery. After the surgery, the heavy trays and late nights of his restaurant job became too taxing, and Huppenbauer found a job as a furniture salesman. He was later fired by the furniture store and remained unemployed for a time before being hired to work in the ladies' shoe department of Hecht's in July 1990.

At the outset, Huppenbauer assured the Hecht's interviewer that his "health was good," and that he was able to do the job. He also signed an application form stating that he [*3] had no condition which would im-

pede his job performance. However, Huppenbauer found the position strenuous. As many as 200 times per day, Hecht's shoe salespeople must go in and out of the stock room to retrieve shoe samples, often from high or low shelves, and must get on their knees to try shoes on customers. The salespeople spend most of their day on their feet and must walk quickly on busy sales days. In addition to serving customers on the sales floor, Hecht's requires the sales associates to spend about an hour per day performing "normal stock work," that is, carrying shipping cartons into the stock room, unpacking them, organizing and stocking the shelves, and cleaning the stock room. At times, the commissioned salespeople are assigned "special stock work," which takes them away from the sales floor for extended periods.

Huppenbauer claims to have spent an inordinate amount of time doing stock room duties, which he found to be very demanding. He carried heavy cartons of shoes to his assigned section on the stock room's second floor and often had to reach up high or get on his knees to restock the shelves. He claims that "expediters," employees assigned to assist with heavy lifting, [*4] were generally not available to help him. [1] He describes the stock room as poorly ventilated and permeated with chemical and other foul odors.

> 1   There is no evidence that Huppenbauer ever sought increased access to or special assistance from these "expediters."

Huppenbauer claims that, although his health was good when he came to Hecht's, the stock room work made him sick. During the early period of employment, Huppenbauer performed well, even earning the company's highest "diamond star" sales award. During 1992, however, his performance declined and his absences increased. Huppenbauer claims that the heavy lifting and fumes caused him chest pain, headaches, dizziness, and difficulty breathing. He began visiting doctors more frequently, and was diagnosed with arthritis, gout, and cirrhosis of the liver. In April 1992, he was admitted to Reston Hospital with chest pain. During June, July and August of 1993, he missed a significant amount of work. In September 1993, he was threatened with termination for low [*5] sales and his "diamond star" commendation pin was taken from him.

Huppenbauer claims that the Hecht's management knew about his condition and his difficulties with stock room work. He claims that his condition was common knowledge and that he discussed his health problems and his need for accommodation with Hecht's management. In contrast, Hecht's denies that it was aware of Huppenbauer's claimed disability.

From September 15, 1993, through October 7, 1993, and from October 14, 1993, to October 20, 1993, Huppenbauer was excused from work by his medical clinic. On October 14, 1993, Huppenbauer's physician diagnosed a hernia, purportedly caused by lifting heavy boxes in the stock room. After that visit and upon the doctor's recommendation, Huppenbauer filed an application for extended medical leave. Huppenbauer never returned to work after October 12, 1993; however, according to Hecht's, Huppenbauer was never fired and is still considered an employee. [2]

> 2   Paragraph 16 of Huppenbauer's Amended Complaint conceded his total disability: "Mr. Huppenbauer has been rendered totally disabled and has been unable to work in any capacity." (J.A. at 38). On February 7, 1994, his attending physician [Dr. Nguyen] wrote a letter stating that in his opinion "Mr. Huppenbauer is no longer capable to carry out the current physical activities that were required for his job as a shoe salesman" at Hecht's. (J.A. at 436). He has not worked anywhere since taking his medical leave in mid-October, 1993.

[*6]   On October 20, 1993, Huppenbauer brought eight causes of action against Hecht's in the district court. After two of those claims were dismissed, he filed an amended complaint alleging six causes of action. In addition to the ADA and contract claims, he alleged Fair Labor Standards Act violations, national origin discrimination, age discrimination, and intentional infliction of emotional distress. The national origin discrimination claim was dropped before trial. At trial, the district court excluded evidence of Huppenbauer's hernia and evidence pertaining to a front pay remedy. At the conclusion of Huppenbauer's case-in-chief, the May Company moved for a judgment as a matter of law under *Fed. R. Civ. P. 50(a)*. The court granted the motion as to all five active claims, and dismissed the case. This appeal followed.

II.

The granting of motions under *Fed. R. Civ. P. 50(a)(1)* is reviewed *de novo. Malone v. Microdyne Corp., 26 F.3d 471, 475 (4th Cir. 1994)*. The reviewing court must examine--viewing the evidence in the light most favorable to the non-moving party--whether the record as a whole presents a sufficient evidentiary basis for a reasonable jury to find in favor of the [*7] non-moving party. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*.

III.

Huppenbauer claims that Hecht's violated the ADA by denying his request for reasonable accommodation

that would have allowed him to continue working as a salesman. The ADA prohibits discrimination

> against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

*42 U.S.C. § 12112(a).* As construed in the ADA, "discrimination" includes:

> not making reasonable accommodations to the *known* physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee . . . .

*42 U.S.C. § 12112(5)(A)* (emphasis added). After Huppenbauer presented his evidence, the district court concluded that he had failed to show that he made an actual claim for accommodation, so that his disability and need for accommodation fairly could be said to be "known" by Hecht's. We agree.

When asked if he had ever supplied any documentation to Dorsey [*8] Lilley, the Director of the Human Resources Department, or to anyone else in that Department, specifically explaining his health problems, Huppenbauer conceded that he had not. Huppenbauer also concedes that, although his main treating physician was aware of his stock room work, over his three years of employment no doctor ever wrote a note for him to give to Hecht's that said that he could not perform his duties at work until his final leave of absence. In fact, notes written from his doctors stated that he could resume participation in work and placed no restrictions on his activities. Nevertheless Huppenbauer argues that he gave sufficient notice to Hecht's of his "disability" on a number of occasions. We address each of his assertions to this effect in turn.

A. *Initial Employment Interview*

Huppenbauer claims that he informed Hecht's about his disability during his job interview.

> I told Miss King that I left the restaurant business because of my heart condition, I could not any longer do heavy lifting, trays and so forth and work until 2 and 3

and 4 in the morning, and that's why I changed and went first into sales as a furniture salesperson and that's why I was looking [*9] at this point for a sales position.

(J.A. at 103).

> It was my belief that at the time when I talked to Miss King that I mentioned, because of my heart, because of my heart surgery, it wouldn't prevent me from working. In fact, the doctor recommended certain movements, which doesn't mean heavy lifting. I don't know if I faced this the right way, but I thought I told Miss King that I had a heart condition five years ago. And I was under the impression that Miss King had somebody in her family who had a similar problem. Miss King apparently denies it. It was just my impression. I put a little bit heart and feeling in and said, I have been a year unemployed, I can work, I performed a nice, excellent job as a salesperson, I don't see much difference between selling larger items as furniture or selling beautiful small shoes.

(J.A. at 118-119). Huppenbauer alleges that King failed to adequately explain the job requirements to him. Eager to be employed again, he assured King that he was willing and able to do the job, and he signed an application form stating that he had no disabling condition that would impede his job performance. Had he known of the strenuous stock room [*10] duties involved, Huppenbauer claims, he would not have applied for the job.

Huppenbauer cannot reasonably be found to have made his disability known to Hecht's during the interview. Most obviously, such a finding conflicts with Huppenbauer's testimony that his "health was good" and he "did not have anything that prevented [him] from taking the job at Hecht's." (J.A. at 117). Huppenbauer's theory of the case is that the stock room work caused him to require accommodation. His description of the interview reveals that he was eager to be hired and to convince the interviewer that he would be able to do the job. In that context, the mere statement that he "had a heart condition five years ago" cannot constitute notice that he had a disability requiring accommodation.

B. *General Knowledge Among Hecht's Employees and Management*

Huppenbauer contends his "heart condition" was common knowledge at Hecht's:

> At one point or the other I am sure that 100 percent of the people that worked over there, unless they were only there one or two days or one week, I am sure that everybody knew that I had a heart condition.

(J.A. at 119). Of course, even if "everyone" knew that Huppenbauer **[*11]** "had a heart condition," such knowledge would not equal notice to Hecht's that the condition imposed limitations on Huppenbauer requiring special accommodation.

C. *Emergency Room Incident*

Huppenbauer contends that Hecht's was put on notice of his disability when, in 1991, he collapsed on duty and was rushed to the hospital. In support, Huppenbauer submitted emergency room records. (J.A. 490-92). But those records do not support Huppenbauer's argument. In fact, they indicated that he had no chest pain, that he smelled strongly of alcohol, and that he had a blood alcohol level of .12. Huppenbauer denied that he had been drinking that day. (J.A. at 122). He does not dispute that he was released and returned to work the same day. Certainly, the incident did not constitute valid notice to Hecht's that Huppenbauer had heart disease requiring accommodation.

D. *Requests to Kofteci*

Huppenbauer claims that he went to his immediate supervisor, Serra Kofteci, and asked her to lighten or alter his stock room duties.

> Some times in 1993 I showed Miss Kofteci a letter from Dr. Schufler (sic) from Reston Hospital . . . . I went to Miss Kofteci, and to her office and I told her, Miss **[*12]** Kofteci, I am not feeling well, this stock room is killing me. I said, I got a letter here, I don't think you are interested in all four pages, why don't you read just this here. And then maybe you give me a part-time job or easier job where I can do that. And I showed her specifically, five, six lines, here . . . . He (Dr. Shukla) attributes this dizzy spells and angina to this work environment.

(J.A. at 124-25).

Huppenbauer testified that shortly afterward, Kofteci assigned him to "lighter, different janitorial work in the stock room and on the sales floor since the cash registers are on the sales floor." However, about eight or ten days later, Huppenbauer was returned to his regular stock room work. (J.A. at 124-26).

In July 1993, after Huppenbauer returned one week late from a vacation, Kofteci assigned him a larger section of the stock room.

> Well, I told her it keeps me away from the sales floor, it hurts my health, and I would really like to be transferred either to men's shoe department perhaps at the same store or to the furniture department. And I did this on two occasions. And my request was denied.

(J.A. at 127).

> So, I did more and more stock room work. **[*13]** And I complained to Miss Kofteci. And I told Miss Kofteci because of that stock room work, you know I am selling less. And it makes me more sick and I am taking more days off than I am supposed to be off that sales floor.

(J.A. at 130).

This testimony simply does not indicate that Huppenbauer made a request for accommodation based on a disability. First, the statement indicates Huppenbauer's primary concern with being taken from the sales floor, rather than with the stock room's effect on his health. Second, by asking to be transferred to the men's shoe department, Huppenbauer undermines his entire claim. Presumably, the men's shoe department also has a stock room, filled with even heavier boxes of shoes. An offhanded reference to his health cannot rescue this request for Huppenbauer.

E. *Conversations With Upper Management*

Huppenbauer claims that he also approached Hecht's managers about changing his job assignments, transfer or part-time status.

One day I approached a manager who was above Miss Kofteci, her name was Andrea Rosenfeld. And I talked to one other person, but first I think I went to Miss Rosenfeld . . . . It was in September I think . . . . I asked her [*14] [Rosenfeld] if she could help perhaps being transferred or getting part-time job at the ladies' shoe department . . . . Her reply was since it was past 10 o'clock in the evening, I think the store was open until midnight that day, she said, Erich, I am too busy at this point, I ask you a favor, please, we are short already and I know you have problems, I showed her some medication I was taking that day, she said, I know you have problems, but please stay to the end and tomorrow or if Serra Kofteci is off tomorrow, the day after, I will talk to her and see if I can help you to get an easier position with this company. However, I never got any reply.

(J.A. at 131-32).

I talked to Miss Lilley . . . Director of Human Resources . . . around the same time. Everything must have happened in August, September or shortly before I was forced to leave. . . . I first explained the problems I was having with my health on a daily basis, especially chest pain and especially gout. And I explained that I, that more and more I have this gout and arthritis. And we had a quite friendly conversation. She recommended a medication, some shots that she probably had before, it is called cortisone [*15] I think. You get it for muscle relations, for strong pain. I said maybe I do it, maybe I don't. I don't like needles and shots too much.

And I said, what can I do to probably get a transfer. As far as I know, Miss Lilley informed me that it would mean a drop in salary to approximately $ 7.50. As far as I know, I said, I am going to think about it. When I talked about transfer--I mean, I talked about part-time, I again got referred to Miss Kofteci.

(J.A. at 132-33).

When asked if he ever presented any evidence to Lilley or the Human Resources Department concerning his health, Huppenbauer replied:

Only documents which showed that I was excused for I think six or seven days or so forth to further evaluations were made, but not directly saying that -- . . . . No, just general excuses for some days I may have missed.

(J.A. at 134). Huppenbauer's testimony indicates that his conversations with the Hecht's managers cannot reasonably constitute notice of his limitations and requests for accommodation. During their conversation at 10:00 p.m., Rosenfeld clearly indicated to Huppenbauer that it was not a good time and she was unable to discuss the matter. While Lilley [*16] discussed the possibility of transfer, Huppenbauer admits that he told her that he would think about it. That conversation cannot be considered an actual request for accommodation.

F. *Request for Medical Leave*

From September 15, 1993, through October 7, 1993, and from October 14, 1993, to October 20, 1993, Huppenbauer was excused from work by his medical clinic. On October 14, Huppenbauer's physician diagnosed a hernia, purportedly caused by lifting heavy boxes in the stock room. After that visit and upon the doctor's recommendation, Huppenbauer filed an application for extended medical leave. In his opinion accompanying the request for medical leave, Dr. Nguyen stated that Huppenbauer was still able to work, but "only as a sales associate." Huppenbauer never returned to work after October 12, 1993. He claims that because his personal effects were cleared from the stock room when he went to deliver his medical leave form, he concluded that he had been terminated.

When Huppenbauer requested medical leave in October 1993, he checked on the form that the purpose of the leave he was requesting was because he was unable to perform the essential functions of his job due to his own [*17] serious health condition.

He agreed that at that time he was unable to continue working.

Yes. And I think so stated my doctor, because I could not any longer move upstairs. I could hardly get on public transportation. I could hardly get into a car. I could hardly move because I had a serious

hernia, not a small thing that you can walk around with for years. That thing, I am sorry there are ladies here, so far this thing was showing, it was that big.

(J.A. at 183).

To establish a valid claim under the ADA, Huppenbauer was required to submit evidence that (1) he had a recognized disability; (2) that he was otherwise qualified for the job; and (3) that his employer failed to reasonably accommodate his disability. *Tyndall v. National Educ. Ctrs., 31 F.3d 209, 212 (4th Cir. 1994).* Assuming without deciding that Huppenbauer met his burdens of proof in establishing that he did have a recognized disability and that he was otherwise qualified for the job, it is clear that he failed to show either that he had made a request for an accommodation or that Hecht's had actual or constructive knowledge of his disability or of his need for an accommodation. "Vague or conclusory statements [*18] revealing an unspecified incapacity are not sufficient to put an employer on notice of its obligations under the ADA." *Morisky v. Broward County, 80 F.3d 445, 448 (11th Cir. 1996).*

As the Seventh Circuit explained:

However, unlike with race or sex discrimination, there are situations in alleged disability discrimination cases where an employer clearly did not know and could not have known of an employee's disability. We think that an employer cannot be liable under the ADA for firing an employee when it indisputably had no knowledge of the disability. This is supported both by simple logic and by the conclusions of other courts that have considered analogous issues.

At the most basic level, it is intuitively clear when viewing the ADA's language in a straightforward manner that an employer cannot fire an employee "because of" a disability unless it knows of the disability. If it does not know of the disability, the employer is firing the employee "because of" some other reason.

*Hedberg v. Indiana Bell Telephone Co., Inc., 47 F.3d 928, 932 (7th Cir. 1995).* The Sixth Circuit reached

a similar result in *Landefeld v. Marion General Hospital, 994 F.2d 1178* [*19] *(6th Cir. 1993).*

The same should be true where an employee failed to make a clear request for an accommodation and communicate it to his employer. *Lyons v. Legal Aid Soc., 68 F.3d 1512, 1515 (2nd Cir. 1995). Morisky v. Broward County, 80 F.3d 445, 447, 448 (11th Cir. 1996). Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 562 (7th Cir. 1996). Larson v. Koch Refining Company, 920 F. Supp. 1000, 1004 (D. Minn. 1996).* (holding providing accommodation is only appropriate where the employer knows that the Plaintiff is disabled and is in need of accommodation).

For these reasons, the district court did not err in granting Hecht's motion for judgment as a matter of law on Huppenbauer's ADA claim.

IV.

Huppenbauer also contends that the district court erred in directing a verdict against him on his breach of contract claim. We disagree.

Huppenbauer asserts that he worked over 2,000 hours in the stock room for which he was unpaid. As a result, he lost time working on the sales floor, which at the average hourly rate equals approximately $ 21,000. He bases this figure on a log which he prepared in January 1994, three months after he stopped working at Hecht's. (J.A. [*20] at 187). He admits that the log was prepared from "calendars from Hallmark, United Virginia Bank, other banks, sales slips, piece of papers, [and] cash register readings," all of which he subsequently destroyed. (J.A. at 175-6).

This breach of contract claim is based solely on Hecht's Commission Compensation Information Sheet, which provides for payment for "special stock work assigned by senior management." (J.A. at 393). Huppenbauer, however, offered no proof that his 2,000 hours consisted of "special work" or that it was assigned by "senior management." He simply says that the hours were for normal stock room duties and that they caused him to be off the sales floor, thereby adversely affecting his ability to earn more commissions. Hence, Huppenbauer has failed to show that he was not paid precisely as he should have been. There is no evidence to suggest that Hecht's did not properly compensate Huppenbauer or that Hecht's breached any employment contract with him. The district court acted correctly in rejecting this cause of action.

V.

Finally, Huppenbauer challenges two of the district court's rulings on evidence. These determinations are to

be reviewed for abuse of discretion. **[*21]** *Martin v. Cavalier Hotel Corp., 48 F.3d 1343, 1357 (4th Cir. 1995).*

A.

Huppenbauer argues that the district court should have allowed evidence concerning his hernia, which he says was caused by the strenuous stock room duties. At trial, Huppenbauer argued that the hernia showed that the stock room work was onerous and had adverse health effects on him. The judge excluded the evidence, finding that it was irrelevant to the issue of whether Huppenbauer had a disability requiring accommodation. (J.A. at 195). The judge viewed the hernia as an injury on the job, not a disability for which Huppenbauer was entitled to relief on the ADA claim.

We agree that the hernia evidence was irrelevant to the ADA claim. Huppenbauer never claimed that his hernia was a disability requiring accommodation. Evidence concerning hernia might be relevant to a negligence or worker's compensation claim, but does not assist in the analysis of an ADA claim. The district court correctly ruled that:

> You have got to have a condition for which you put people on notice that they have to accommodate you. That is what the law is about. This is not a law that prevents you from being injured on the job.

**[*22]** (J.A. at 196).

In his brief, Huppenbauer newly argues that evidence pertaining to his hernia--when it occurred and that it was surgically corrected-should have been admitted as relevant to Huppenbauer's status as a qualified individual prior to October 12, 1993. That argument, which was never presented to the trial court, feebly supports the admission of some hernia-related evidence. But because the connection is extremely weak and because Huppenbauer did not focus on his status as a qualified individual at trial, he could not possibly have been prejudiced by the exclusion of the evidence.

B.

Huppenbauer contends that the trial court improperly excluded the testimony of Dr. Richard J. Lurito, an economic expert scheduled to testify regarding Huppenbauer's future lost earnings. The equitable remedy of front pay is generally available when an employer unlawfully terminates an employee. *Duke v. Uniroyal, Inc., 928 F.2d 1413 (4th Cir. 1991).* Front pay is awarded in place of reinstatement because of residual

hostility. The court correctly found that Huppenbauer had failed to establish any evidentiary basis for a front pay remedy.

> I don't have any evidence of that in this **[*23]** case. I don't have any evidence of hostility. In fact, he testified as to how he was doing on the job. And I don't see any animosity or any problem of him going back to the job. I don't see any of that in this case. (J.A. at 271).

> . . . if somebody is now disabled and you are talking about front pay, he isn't entitled to front pay all through his disability since they didn't assuming they didn't accommodate him back in whatever date you allege. I am not sure what date you allege in this whole process that they refused to accommodate him. But if they had accommodated him and now he comes up and he is disabled, you are only talking about pay between the date they didn't accommodate him and the time he became disabled, aren't you? (J.A. at 272).

> The ADA remedy is not a gift. It is to compensate somebody who is able to work and has been prevented from working. You have got evidence here that your man now can't work. You can't get pay when you can't work. (J.A. at 273).

> I don't think that you have got anything in this case right now that gives you pay except from the time that you allege that he was not accommodated and the time that he became disabled, **[*24]** because that's what you have shown as his working period. I find that there is not evidence in the case that his working caused his disability. (J.A. at 264).

The district court did not abuse its discretion in excluding either the hernia or the "front pay" evidence on the facts of this case.

VI.

1996 U.S. App. LEXIS 27480, *

The decision of the district court dismissing all of Huppenbauer's causes of action should be and it is hereby

*AFFIRMED.*

2



**RICHARD B. PENCE, Plaintiff - Appellant, versus TENNECO AUTOMOTIVE OPERATING COMPANY, INCORPORATED, a Delaware Corporation, t/a Walker Manufacturing Company, t/a Tenneco Automotive, Defendant - Appellee.**

No. 05-1582

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

*169 Fed. Appx. 808*; *2006 U.S. App. LEXIS 5734*

**February 2, 2006, Argued**
**March 7, 2006, Decided**

**NOTICE:** [**1] RULES OF THE FOURTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** Appeal from the United States District Court for the Western District of Virginia, at Harrisonburg. Samuel G. Wilson, District Judge. (CA-04-75-5).
*Pence v. Tenneco Auto. Operating Co., 2005 U.S. Dist. LEXIS 7299 (W.D. Va., Apr. 26, 2005)*

**DISPOSITION:** AFFIRMED.

**COUNSEL:** ARGUED: Timothy Earl Cupp, CUPP & CUPP, P.C., Harrisonburg, Virginia, for Appellant.

Thomas J. Brunner, BAKER & DANIELS, South Bend, Indiana, for Appellee.

ON BRIEF: Alison G. Fox, BAKER & DANIELS, L.L.P., South Bend, Indiana; Thomas E. Ullrich, WHARTON, ALDHIZER & WEAVER, P.C., Harrisonburg, Virginia, for Appellee.

**JUDGES:** Before WIDENER, LUTTIG, and KING, Circuit Judges.

**OPINION**

[*809] PER CURIAM:

Richard Pence appeals the district court's grant of summary judgment for Tenneco on Pence's claims under the Americans With Disabilities Act, *42 U.S.C. § 12101 et seq.*, and the Family and Medical Leave Act, *29 U.S.C. § 2611 et seq.* For the reasons that follow, the judgment of the district court is affirmed.

I.

Richard Pence had worked for Tenneco for over 30 years before his termination in 2003. [**2] J.A. 552. Despite having somewhat "eccentric" views about federal taxation and Tenneco's treatment of him, *see* J.A. 436, 555, 561-67, 626, Pence was considered by his bosses to be a "good performer," J.A. 434-35, and prior to October 2003, it is undisputed that Tenneco had no reason to terminate Pence, J.A. 512.

However, on Friday, October 17, 2003, Pence had a conversation with Nurse Evelyn Burner. J.A. 163. Burner e-mailed Human Resources Manager Rod Little the following Monday, October 20, 2003, claiming that during the course of this conversation Pence had made threatening remarks. Specifically, her e-mail stated that Pence said that "when he leaves here that he will be taking a bunch of people with him" and that when she "asked him if he meant here [*810] at [Tenneco] or at the court house downtown," he "responded by stating both places and that he has AK's and more ammo than Rockingham County." J.A. 163. In addition to e-mailing Little on Monday, Burner had alerted the FBI to Pence's statements over the weekend. J.A. 119, 132.

After talking to Burner, Little immediately contacted a superior, as well as the legal department. J.A. 101, 105, 115. In addition, Tenneco contacted [**3] the local police, J.A. 137-40, as well as its security consultant, J.A. 102, 105, 116. The next day, October 21, 2003, Pence was removed from work, ordered not to return until noti-

fied, put on paid disability leave, and mandatorily re-
ferred to Tenneco's Employee Assistance Program, J.A.
105-07. Tenneco's EAP referred Pence to a psychologist
who, on November 3, 2003, concluded that, based only
on Pence's selfreporting, he was "unable to provide an
opinion one way or another" on whether Pence had a
mental condition. J.A. 224. On November 21, 2003, a
conference call was held in which several EAP employ-
ees, Tenneco's legal counsel, and Little participated. J.A.
383. Little's notes from the call state that an EAP em-
ployee told him that "everyone should be cautious of
safety not only at the immediate time but in the future,"
that "Pence demonstrates a high level of paranoia," that
Pence "does not have a condition that would be respon-
sive to counseling," and that "it is not a treatable condi-
tion with continued counseling." J.A. 519.

Tenneco thereafter had its security consultant con-
duct a safety evaluation of Pence's plant, made improve-
ments to the plant on the basis of this evaluation, [**4]
and then terminated Pence on December 22, 2003, when
the plant was largely empty due to a holiday shut-down.
J.A. 108-09. Pence was terminated on the formal ground
that his threatening statements violated workplace rule
29, J.A. 72, which in substance "prohibits threatening,
intimidating, coercing, or harassing co-workers," J.A. 66,
72.

II.

We first address Pence's argument that the district
court improperly granted summary judgment to Tenneco
on his claim of wrongful termination under the ADA.
We conclude that summary judgment was proper be-
cause, even assuming that Pence established his prima
facie case, Pence failed to demonstrate that Tenneco's
asserted non-discriminatory justification for his termina-
tion was pretextual and that a rational factfinder could
conclude that his termination was the result of disability
discrimination. *See Rowe v. Marley Co., 233 F.3d 825,
829 (4th Cir. 2000).*

Tenneco asserted that Pence was fired because it be-
lieved that he had made threatening remarks in violation
of a workplace rule. Unrefuted evidence demonstrates
that Tenneco believed that Pence had threatened the lives
of other employees: Burner sent an e-mail to Little [**5]
alleging that Pence had said "when he leaves here that he
will be taking a bunch of people with him" and that "he
has AK's and more ammo than Rockingham County,"
J.A. 163, and Little and Burner, rightly or wrongly, con-
strued those statements as death threats, calling the FBI,
the local police, and Tenneco's security consultant within
days of learning of the statements, J.A. 105, 119, 132,
137-40. [1]

1   Although Pence was never asked about the
threatening statements, J.A. 453, this fact at most
demonstrates that Tenneco jumped to conclusions
by inadequately investigating Burner's allega-
tions. But even thus construed in the light most
favorable to Pence, this fact alone is insufficient
to demonstrate that Tenneco did not actually be-
lieve that Pence had threatened the lives of other
employees.

[*811]   Pence puts forth three reasons why Ten-
neco's reliance upon its belief that he had made threaten-
ing remarks in violation of a workplace rule is merely a
pretext for disability discrimination. None of the reasons
is sufficient [**6] to meet his burden under *Rowe.*

First, Pence repeatedly insists that he did not make
any threat and that Burner misconstrued what he said.
This is entirely immaterial. Just as "the law is well set-
tled that the ADA is not violated when an employer dis-
charges an individual based upon the employee's mis-
conduct, even if the misconduct is related to a disability,"
*Jones v. American Postal Workers Union, 192 F.3d 417,
429 (4th Cir. 1999)*, it also follows that the ADA is not
violated when an employer discharges an employee be-
cause of a mistaken perception of misconduct, even if the
misconduct would have been related to a disability. As
the district court correctly recognized, J.A. 714-15, it
makes no difference if the employee was in fact guilty of
misconduct; as long as the employer discharged the em-
ployee because it honestly believed that the employee
had engaged in misconduct, then the employer has not
discriminated on the basis of disability.

Second, Pence attempts to demonstrate pretext by
proffering evidence showing that similarly situated em-
ployees were not fired. However, none of his evidence
demonstrates that Tenneco ever failed to fire an em-
ployee who it [**7]   believed had threatened to kill other
employees. In other words, none of the employees whom
Pence relies upon are actually similarly situated. *See
King v. Rumsfeld, 328 F.3d 145, 151-52 (4th Cir. 2002)*
(rejecting an attempt to demonstrate pretext based upon
the defendant's conduct toward an employee who was
not similarly situated to the plaintiff). Two of the em-
ployees Pence cites are not alleged to have threatened to
kill anyone, *see* J.A. 630-32 (David Cathell); J.A. 643,
646 (Dwight Hensley), and nothing in the record refutes
Little's testimony that he had not found any evidence that
supported *an anonymous allegation* that a third em-
ployee, Vernon Parker, had threatened to kill other em-
ployees, *see* J.A. 504-07, 547-49, 643-44. [2]

2   Moreover, Tenneco affirmatively tendered
evidence that it had terminated employees who it
believed had made death threats, J.A. 109, and
Pence's argument that those employees were al-

lowed to give their side of the story, J.A. 73-75, once again proves at most only that Tenneco reached a rash decision in his case, not that Tenneco did not actually base his termination on its belief that he had made a death threat.

[**8] Third, Pence argues that summary judgment was improper by relying upon Little's notes from the conference call, which, construed in the light most favorable to Pence, could raise the inference that Tenneco believed that Pence suffered from an untreatable mental condition of paranoia. See J.A. 519. However, even given that inference, no reasonable factfinder could conclude that Tenneco's asserted reason for Pence's termination was a pretext. Cf. Rowe, 233 F.3d at 830 (recognizing that even when a plaintiff demonstrates a prima facie case and pretext, summary judgment for the defendant is required when no rational factfinder could conclude that the challenged action was discriminatory). [3] Based on the record, no rational factfinder could conclude that this passing reference to a belief that Pence was paranoid was the reason for his termination, as opposed to evidence that Tenneco thought the death threat was caused by paranoia. And to repeat, because of [*812] Jones, Tenneco's belief that Pence had made a death threat was a permissible nondiscriminatory reason for his termination, even if Tenneco believed that a mental condition had caused Pence to make the threat. [**9]

  3 Alternatively, Little's notes could be viewed as direct evidence of disability discrimination. But even so viewed, summary judgment would still be appropriate for the same reason discussed above.

Because Pence cannot demonstrate that Tenneco's nondiscriminatory reason for his termination was pretextual and that his termination was the result of unlawful disability discrimination, summary judgment was properly granted on Pence's claim of wrongful termination under the ADA. [4]

  4 For the same reason, the district court's grant of summary judgment to Tenneco on Pence's ADA retaliation claim is also affirmed. See J.A. 716-17.

III.

Next, we turn to Pence's claim that he was forced to undergo a mental examination in violation of the ADA. We conclude that the district court did not err in granting summary judgment to Tenneco on this [**10] claim because the psychological examination was permitted under the ADA, as it was "job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). [5]

  5 We therefore have no need to decide whether, as the parties appear to have assumed, an individual who is not disabled under the ADA can nevertheless bring a claim under section 12112(d). See Armstrong v. Turner Indus., Inc., 141 F.3d 554, 558 (5th Cir. 1998) (recognizing the difficulty of the statutory interpretation question).

As a threshold matter, we note that whether a mental examination was "job-related and consistent with business necessity" is an objective inquiry. See Tice v. Centre Area Transportation Authority, 247 F.3d 506, 518 (3d Cir. 2001). We therefore do not resolve any dispute about what Tenneco's subjective motivations were for having Pence examined by the EAP. Rather, we need only decide whether Tenneco's decision to have Pence examined, after it was alleged [**11] that he had made death threats against other employees, was "job-related and consistent with business necessity."

Analyzing the issue thus framed, we conclude that the ADA does not prevent an employer from psychologically evaluating an employee who has been alleged to have made death threats against other employees. It is undoubtedly "job-related and consistent with business necessity" to ascertain whether such an employee poses a danger to the workplace, to investigate how best to deal with any security risk that exists, and to determine whether the termination of the problem employee could potentially trigger the threatened actions or instigate a violent reprisal against the employee who informed the employer that the threatening statements were made.

Pence argues that such an examination is not "consistent with business necessity" because an examination is unnecessary until the employer verifies that a threat was actually made. He therefore argues that his examination was unnecessary because he did not actually make any threats and if Tenneco had simply asked him for his side of the story, it would have realized this as well. We reject this argument because it implies that employers [**12] must either alert a potentially dangerous employee that his colleagues have reported him and take the risk that retaliation will occur or forgo a psychological examination and take the risk that the security threat will not be resolved in the safest way possible. The phrase "business necessity" need not, and should not, be interpreted to require such a result. Instead, we believe that the ADA is satisfied provided the employer has a good faith belief that an employee has made death threats, which Tenneco did. [6]

  6 Pence, relying only upon an EEOC guidance document, also argues that in order for an examination to be "job-related and consistent with business necessity," the employer must have had a reasonable belief that the employee was im-

paired *by a medical condition*. This argument is flawed for two reasons. First, the fact that the EEOC advises that an examination will "generally" be permissible when there is "objective evidence" that "an employee's ability to perform essential job functions will be impaired by a medical condition" does not require the negative inference that an examination is necessarily prohibited when the employer is uncertain whether the employee is impaired by a medical condition. Second, and more fundamentally, such an interpretation would be absurd in this context since, in the face of perceived death threats, employers need to determine whether there is a substantial security risk and how most safely to deal with such a risk if it exists, questions that a psychological examination helps answer regardless of whether the threatening employee actually suffers from a mental condition or is "merely" dangerous and violent.

[**13]   [*813] IV.

Finally, we turn to Pence's claims under the Family and Medical Leave Act. We conclude that the district court correctly granted summary judgment because Pence does not have a "serious health condition," which is a threshold requirement for entitlement to FMLA leave for Pence. *See 29 U.S.C. § 2612(a)(1)(D)*; *see also* J.A. 718. As relevant to this case, the FMLA defines a "serious health condition" as an "illness, injury, impairment, or physical or mental condition that involves . . . continuing treatment by a health care provider." *29 U.S.C. § 2611(11)(B)*. There is no evidence that Pence has a mental condition or impairment, J.A. 224, and in any event, Pence has repeatedly insisted that he does not suffer from any mental condition or impairment, thereby admitting that he does not have a "serious health condition." Pence tries to evade this concession by relying upon *29 C.F.R. § 825.114(b)*, which states that "treatment" includes "examinations to determine if a serious health condition exists." But Pence fails to recognize that under *section 2611(11)(B)*, "treatment," however defined, must be for [**14] a mental condition or impairment, and so his concession that he does not have one is fatal.

CONCLUSION

For the reasons stated herein, the judgment of the district court is affirmed.

*AFFIRMED*

**3**



FRANK D. SHIFLETT, Plaintiff-Appellant, v. GE FANUC AUTOMATION COR-
PORATION; GE FANUCAUTOMATION NORTH AMERICA, INCORPO-
RATED; DONALD BORWHAT; LAWRENCE PEARSON; THOMAS
MCGINNIS; KEITH CHAMBERS; SHERON LAMB, Defendants-Appellees.

No. 97-1687

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

*1998 U.S. App. LEXIS 13186; 8 Am. Disabilities Cas. (BNA) 703*

March 5, 1998, Argued
June 19, 1998, Decided

**NOTICE:** [*1] RULES OF THE FOURTH CIR-
CUIT COURT OF APPEALS MAY LIMIT CITATION
TO UNPUBLISHED OPINIONS. PLEASE REFER TO
THE RULES OF THE UNITED STATES COURT OF
APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:** Reported in Table Case
Format at: *1998 U.S. App. LEXIS 24368.*

**PRIOR HISTORY:** Appeal from the United States
District Court for the Western District of Virginia, at
Charlottesville. James H. Michael, Jr., Senior District
Judge. (CA-95-73-C).

**DISPOSITION:** AFFIRMED.

**COUNSEL:** ARGUED: Hope B. Eastman, PALEY,
ROTHMAN, GOLDSTEIN, ROSENBERG & COO-
PER, CHARTERED, Bethesda, Maryland, for Appellant.

Robert Craig Wood, MCQUIRE, WOODS, BATTLE &
BOOTHE, L.L.P., Charlottesville, Virginia, for Appel-
lees.

ON BRIEF: David M. Rothenstein, Daniel S. Koch,
PALEY, ROTHMAN, GOLDSTEIN, ROSENBERG &
COOPER, CHARTERED, Bethesda, Maryland, for Ap-
pellant.

James M. Johnson, MCQUIRE, WOODS, BATTLE &
BOOTHE, L.L.P., Charlottesville, Virginia, for Appel-
lees.

**JUDGES:** Before MURNAGHAN, Circuit Judge,
KEELEY, United States District Judge for the Northern
District of West Virginia, sitting by designation, and
MOON, United States District Judge for the Western
District of Virginia, sitting by designation.

**OPINION**

**OPINION**

PER CURIAM:

Frank D. Shiflett appeals the district court's grant of
summary judgment in favor [*2] of GE Fanuc Automa-
tion Corporation, ("Fanuc") and several individual em-
ployees of Fanuc, on his claims pursuant to the Ameri-
cans with Disabilities Act, *42 U.S.C. § 12101 et seq.*
("ADA"). He argues that the district court erred in find-
ing (1) that the defendants did not fail to reasonably ac-
commodate his disability; (2) that the workplace was not
intolerably hostile and abusive, and did not constitute
disability based harassment under the ADA; (3) that
there were no issues of material fact as to the misconduct
for which he was terminated; (4) that the reason for the
termination was not pretextual and was not premised on
his disability; and (5) that individual employees are not
liable for violations of the ADA.

We agree that there are no genuine issues of material
fact and affirm the judgment of the district court.

I.

Beginning in 1980 and continuing until his termina-
tion in 1994, Shiflett was employed at Fanuc as a printer
and, later, as a computer operator. He has suffered from a

severe sensorineural hearing loss in both ears since childhood, and wore hearing aids during the entire period of his employment. Fanuc knew of this disability since at least 1984, when Shiflett's [*3] performance review included the statement that "Frankie is very willing to assist all users in solving their problems, though he is somewhat less effective with his hearing impairment." Shiflett, however, did not self-identify as having a disability until March 12, 1991.

In his work in the print shop and as a computer operator, Shiflett worked for several years without problems. He received good performance evaluations, and had limited interaction with others. Then, in 1988, he was moved from the first shift to the second shift to learn a different system, a move he believed would be temporary. Because of training needs and the needs of the business, however, all of the first shift positions were filled, leaving no openings except in Product Development, an opportunity that Shiflett declined. The employment relationship deteriorated after that, with Shiflett believing that Fanuc had denied him the first shift position because of his hearing loss. He also believed that he had not been given the option of using the company's appeals process.

On April 27, 1990, Fanuc warned Shiflett about actions described as disorderly conduct and insubordination. He was told that any recurrence of [*4] the use of demeaning language, yelling and physically intimidating a supervisor, would result in immediate suspension, even discharge. Shortly afterward, Shiflett received a performance evaluation which was satisfactory, but later that summer he was suspended for a day for inappropriate behavior with female colleagues and several incidents of working unapproved overtime. He was warned that recurrence of either problem would result in termination.

In the summer of 1992, Shiflett was given an unsatisfactory performance rating, and told that he needed to correct his attitude, behavior, professionalism, and willingness to follow directions. He was put on 90-day performance reviews and reassigned temporarily to first shift.

During all of this time, Shiflett was working in the computer room, which housed four printers and was very noisy. These conditions made it difficult for him to hear the telephone ring and to answer users' questions over the telephone. In spite of this, by January, 1993, he had improved his performance to satisfactory in many areas; by April, 1993, he had improved to satisfactory in all areas.

On March 1, 1994, however, Shiflett approached his supervisor, Sheron Lamb, [*5] about a problem with his hourly schedule and pay. Ms. Lamb states that Shiflett's behavior on this occasion was "abusive, intimidating, threatening and generally insubordinate." Consequently,

he was suspended on March 2, and, after investigation, terminated on March 8, 1994.

Shiflett then brought suit against Fanuc and several of its individual employees under the Americans with Disabilities Act as well as several state causes of action. His complaint sought equitable and monetary relief to redress unlawful harassment and other employment discrimination in the workplace based on his disability. Specifically, Shiflett alleged that the defendants (1) subjected him to a hostile environment on the basis of his disability; (2) failed to make reasonable accommodation for his disability; (3) adversely limited and classified him on the basis of his disability; and (4) terminated his employment for alleged "misconduct" that resulted directly from its failure to accommodate his disability in violation of the ADA.

Early on, the district court affirmed in part the Magistrate Judge's Recommended Disposition, dismissing certain of the state law claims, including wrongful termination, intentional [*6] infliction of emotional distress and breach of contract, and dismissing Shiflett's ADA claims against the individual defendants. Shiflett then pursued his remaining claims under the ADA against the corporate defendant, and also litigated his claim for negligent infliction of emotional distress against all defendants.

Following discovery, the district court affirmed the Magistrate Judge's Recommended Disposition and granted summary judgment on the remaining claims.

II.

Summary judgment should be granted if there are no genuine disputes of material fact and the moving party is entitled to judgment as a matter of law. *Fed.R.Civ.P. 56*. This Court reviews the district court's grant of summary judgment *de novo*, drawing reasonable inferences and taking all evidence in the light most favorable to Shiflett. *Porter v. U.S. Alumoweld Co., 125 F.3d 243 (4th Cir. 1997)*. The party bearing the burden of proof on a specific issue must provide "significant probative evidence tending to support the complaint" or provide "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*.

III.

[*7] A. *Failure to Accommodate*

Shiflett asserts that he sought accommodations for his disability, including a louder telephone ringer and adequate telephone amplifier for the printer room. He also requested that each person should get his attention before speaking, and speak slowly and that each person

1998 U.S. App. LEXIS 13186, *; 8 Am. Disabilities Cas. (BNA) 703

should tell him when he was speaking too loudly. He acknowledges that an amplifier was provided, although he now claims it was not sufficient, but he asserts that none of the other accommodations were provided.

In his deposition, Shiflett testified that, when he first was hired at Fanuc, he told individuals named Thurston and Lotts that they would need to get his attention when they spoke to him, but since he worked "pretty much" by himself on the press and bindery, there was no problem. When he was moved to the computer room, he requested a better telephone amplifier than the one already available. The old one was cleaned, and Shiflett did not complain again until the litigation.

Indeed, in his self-identification form, in which he asked to be considered under the affirmative action program for the handicapped, he answered the request for suggestions for accommodations as follows: **[*8]** "I use a telephone with an amplifier on it to help understand calls better, especially in a noisy area such as the computer area. I wear a hearing aid to correct my hearing loss." In his affidavit supporting his EEOC complaint, he stated that he made no other requests for accommodation, and he confirmed that fact in his deposition. Shiflett did not self-identify as disabled until March, 1991. Prior to that date, the company knew that he wore a hearing aid, but had no duty to inquire further after Shiflett had declined to go to the Health Center to participate in the interactive process of identifying reasonable accommodations. Further inquiry would have come dangerously close to violating the ADA, which directs that an employer "shall not make inquiries of an employee as to whether ... an employee is an individual with a disability, unless such examination or inquiry is shown to be job related and consistent with business necessity," *42 U.S.C. § 12112(d)(4)(a).*

Where the employee is performing the job satisfactorily, as was Shiflett during most of his employment, and where the employee will not acknowledge the need for or request an accommodation, or let the employer know that an **[*9]** accommodation is insufficient, the employer cannot be required to guess or read the employee's mind. As the district court noted, "Defendants should not suffer ADA liability because plaintiff was unduly reticent in communicating his problem, however 'natural' his timidity might be." This record reflects that Shiflett was neither reticent nor timid about other issues with his employer and certainly knew how to complain. The employer is entitled to notice before becoming liable for failure to accommodate. *See 29 C.F.R. App. § 1630.9* ("It is the responsibility of the individual with a disability to inform the employer that an accommodation is needed.").

B. *Harassment and Hostile Workplace*

To make out a claim of disability harassment, Shiflett must show that the acts of Fanuc's employees were severe and pervasive enough to create a hostile working environment, *and* that some basis exists to impute liability to the employer. *See Amirmokri v. Baltimore Gas and Electric Co., 60 F.3d 1126, 1130 (4th Cir. 1995)* (discussing national origin harassment); *Paroline v. Unisys Corp., 879 F.2d 100, 105 (4th Cir. 1989), vacated in part on other grounds, 900 F.2d 27 (4th Cir.* **[*10]** *1990) (en banc)* (sexual harassment); *Dwyer v. Smith, 867 F.2d 184, 187 (4th Cir. 1989)* (sexual harassment). Although the question whether harassment is sufficiently severe or pervasive is quintessentially a question of fact, *Beardsley v. Webb, 30 F.3d 524, 530 (4th Cir. 1994),* where the conduct is neither sufficiently severe nor pervasive to create an environment that a reasonable person would find hostile or abusive, summary judgment is appropriate. *See Hopkins v. Baltimore Gas and Electric Co., 77 F.3d 745, 753 (4th Cir. 1996).*

Shiflett complains that Sheron Lamb, his immediate supervisor in the computer room, often made fun of his hearing loss by saying: "You're not paying attention to me; you didn't hear what I said;" "Pay attention;" "Didn't you hear the phone ring?" "Is your hearing aid turned up?" "Do you need a new battery?" "Why do you want to go to meetings, you can't hear anyway?" He asserts Lamb made these statements in a mean way, and accompanied them by stomping her feet and making ugly faces.

The record is clear that Shiflett was having difficulty with his job during the period after he was denied a return to first shift, and would not listen to instruction, **[*11]** would not take the time to understand, would not act as a team member and would not trouble shoot with the users. All of these were tasks he was capable of doing, and Ms. Lamb's comments were those of a supervisor trying to work with a recalcitrant employee. To be sure, some remarks may have been insensitive, particularly the remark about the meetings, but they were not so pervasive or severe and mean that a reasonable person would find the workplace abusive. In fact, Shiflett could not remember a single incident of harassment after March, 1993, when his performance evaluation had improved. Moreover, similar remarks had to be directed at Shiflett by the attorney and the court reporter during his deposition, when he was not listening or waiting for the whole question, or was talking too fast to be understood. At best, as the district court pointed out, the plaintiff established "conduct that sporadically wounds or offends" but does not affect performance, citing *Henry v. Guest Services, Inc., 902 F. Supp. 245, 252 n.9 (D.D.C. 1995),* quoting *DeAngelis v. El Paso Mun. Police Officers Ass'n, 51 F.3d 591, 593 (5th Cir.), cert. denied, 516 U.S. 974, 133 L. Ed. 2d 403, 116 S. Ct. 473 (1995).*

C. *Termination*

[*12]   The plaintiff argues that the district court erred in applying the proof scheme of *Ennis v. National Assoc. of Business and Educational Radio, Inc., 53 F.3d 55, 58 (4th Cir. 1995)*, which is patterned on the burden shifting framework established by *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)*. He insists that the Court should utilize the direct proof paradigm of *Tyndall v. National Education Centers, 31 F.3d 209, 212 (4th Cir. 1995)*, under which the plaintiff must establish 1) that he has a disability; 2) that he was qualified for the job; and 3) that his termination constituted discrimination based on disability.

The plaintiff in *Tyndall* had been fired for missing too much work due to her own disability and the disability of her son. Thus, the reason for the discharge was directly related to the disability. Here, however, as in *Ennis*, the employer has offered a reason for the termination unrelated to the disability, i.e., misconduct. *Ennis* held that in a typical discharge case brought under the ADA, a plaintiff must prove by a preponderance of the evidence that

> (1) she was in the protected class; (2) [*13] she was discharged; (3) at the time of the discharge, she was performing her job at a level that met her employer's legitimate expectations;
>
> and (4) her discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination.

*53 F.3d at 58.*

The district court found that Shiflett is in the protected class, as a disabled person under the ADA, and that he was discharged, thus establishing the first two prongs of the *Ennis* test. The district court then held that Shiflett was not meeting the reasonable expectations of the employer in the performance of his job, because of the documented incidents of misconduct. Except for the March 1, 1994 incident, however, these incidents had all occurred in 1990 and 1991, after which Shiflett was given satisfactory performance ratings, and he had been disciplined or warned for these incidents, but not discharged. Nevertheless, this Court affirms the district court's grant of summary judgment because the plaintiff cannot establish the fourth prong of *Ennis*, that is, that his discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination.

Shiflett was discharged because, [*14] on March 1, 1994, he went into his supervisor's office, upset because she would not approve one hour of overtime pay. While there, he loudly requested that she explain her denial, would not allow her to speak and approached her too closely. Fanuc suspended Shiflett the next day, and its Manager of Human Resources, Marybeth Sullivan-Rose, started an investigation.

The actual details of the confrontation are disputed, a classic "he said . . . she said" situation. Ms. Sullivan-Rose reported that the supervisor, Ms. Lamb, described Shiflett as "yelling, screaming, very irrational, very angry, over talking," positioning himself to block her only exit, pointing his finger at her, coming too close to her, not permitting her to speak, and putting her in fear of being hit. According to other witnesses, she was crying after the incident, and crying and upset the next day. Shiflett denied that he acted like this and argues that, if he was loud and pointed his finger, it was a result of his deafness, in that he cannot hear his own voice to modulate it and uses his hands for language.

An employer is free to discharge a disabled person for misconduct, even if the misconduct is related to his disability. [*15]  *Martinson v. Kinney Shoe Corp., 104 F.3d 683, 686 n.3 (4th Cir. 1997); Little v. F.B.I., 1 F.3d 255 (4th Cir. 1993)*. Shiflett had been given several opportunities to correct inappropriate and insubordinate behavior, and had been warned that further similar conduct would result in termination. The actual decision to terminate him for the March 1 conduct was preceded by a two week investigation, including interviews of numerous witnesses, by a human resources person with little prior knowledge of Shiflett, and who was not in his operational line of authority. In addition, there is no evidence that Sheron Lamb would have concocted the story or exaggerated it, given the fact that she protected and assisted Shiflett during 1991-92, when she had worked with him to bring his performance back to his previously high levels.

In *Ennis*, the Fourth Circuit held that the plaintiff must present affirmative evidence that disability was a determining factor in the employer's decision. *53 F.3d at 59*. Shiflett has presented only speculation, and has not met his burden of rebutting the employer's stated, legitimate reason for termination. *See St. Mary's Honor Center v. Hicks, 509 U.S. [*16] 502, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993).* D. *Individual Liability*

Shiflett also sued Donald Borwhat, Lawrence Pearson, Thomas McGinnis, Keith Chambers and Sheron Lamb, each of whom was in a supervisory position or involved in employee relations. He argues that, acting within the scope of their employment, they violated the ADA. The district court dismissed these individuals, declining to extend ADA liability to individuals, citing *Mason v. Stallings, 82 F.3d 1007, 1009 (11th Cir. 1996)*, and *U.S.E.E.O.C. v. AIC Security Investigations Ltd., 55*

1998 U.S. App. LEXIS 13186, *; 8 Am. Disabilities Cas. (BNA) 703

*F.3d 1276, 1279-82 (7th Cir. 1995)*. Both of these cases held that the ADA only provides for employer liability. Because we have found that no violation of the ADA occurred, the individual defendants cannot be liable, and dismissal was appropriate.

IV.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*

4



ANDRE TAYLOR, Plaintiff, v. FEDERAL EXPRESS CORP., Defendant.

CIVIL ACTION NO: RDB-03-195

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND,
SOUTHERN DIVISION

*2004 U.S. Dist. LEXIS 30356*

**July 28, 2004, Decided**

**SUBSEQUENT HISTORY:** Affirmed by *Taylor v. Fed. Express Corp., 429 F.3d 461, 2005 U.S. App. LEXIS 24602 (4th Cir. Md., 2005)*

**COUNSEL:** [*1] For Andre Taylor, Plaintiff: Bruce M Bender, LEAD ATTORNEY, Van Grack Axelson Williamowsky Bender and Fisherman PC, Rockville, MD.

For Federal Express Corporation, Defendant: Robert P. Floyd, III, LEAD ATTORNEY, Constangy Brooks and Smith LLC, Fairfax, VA.; Michael E. Gabel, Federal Express Legal Department, Memphis, TN.

**JUDGES:** Richard D. Bennett, United States District Judge.

**OPINION BY:** Richard D. Bennett

**OPINION**

MEMORANDUM OPINION

Plaintiff Andre Taylor ("Taylor") has brought forth claims pursuant to the Americans with Disabilities Act ("ADA"), *42 U.S.C. §§ 12101-12213 (2004)*, against his former employer, Defendant Federal Express Corporation ("FedEx"). Taylor states that he has a back and shoulder injury that qualifies him as disabled under the ADA. He complains that FedEx "failed to accommodate" his alleged disability by not selecting him for various positions within the company, and, eventually, terminated him because of his alleged disability. Discovery has been completed, and multiple motions are pending. First, both parties have moved for summary judgment. Second, Taylor has moved to strike the affidavit of Samuel Matz, M.D., which is attached to FedEx's [*2] memorandum in support of its motion for summary

judgment. Third, FedEx has moved to strike portions of Taylor's memorandum in support of his motion for summary judgment. Lastly, FedEx has moved to strike portions of Taylor's memorandum in opposition to its motion for summary judgment. The issues have been fully briefed and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2001). For the reasons that follow, Taylor's motion to strike the affidavit of Samuel Matz, M.D. is DENIED, both of FedEx's motions to strike portions of Taylor's memoranda are DENIED, Taylor's motion for summary judgment is DENIED, and FedEx's motion for summary judgment is GRANTED.

BACKGROUND

Taylor began working as a courier with Federal Express on November 17, 1988. [1] As a courier, Taylor frequently had to lift and maneuver, without assistance, packages weighing over 75 pounds. Taylor suffered a work-related injury to his back and shoulders when he drove over a pothole in a customer's parking lot on March 23, 2000. Subsequently, Taylor's personal physician, Dr. Brian Kahan, decreed that Taylor should be permanently precluded from lifting greater than 30 pounds, and that his time spent sitting, standing, [*3] climbing stairs and reaching overhead should be restricted. [2] (Complaint, P 16.).

    1  FedEx is a Tennessee corporation that provides courier services throughout the World.
    2  Despite his physician's statement, Taylor testified that he has been able to lift 50 pounds on occasion while working for FedEx after his back injury. (Deposition of Andre Taylor at 336-337.) He further asserted that he cannot sit for over two hours at a time, cannot hold his hands over his head indefinitely, cannot stand for more than 20

to 30 minutes without changing positions and can climb 80 stairs in 21.5 minutes. (Deposition of Andre Taylor at 113-117.)

In April of 2000, FedEx temporarily assigned Taylor to its customer service department in Crofton, Maryland, essentially placing him on light duty because of his injury. Under the supervision of Nina Jones, Taylor worked in such a capacity for 90 days, the maximum amount of time that a FedEx employee is permitted to work on a temporary "return to work" assignment. Taylor understood **[*4]** that the position was temporary and could not last more than 90 days pursuant to company policy. However, during this period, he applied for a permanent position in the customer service department, but his application was denied. He also filed a workers' compensation claim regarding his injury. Joe Luongo ("Luongo"), an employee of Sedgwick Claims Management Service, FedEx's third-party workers' compensation adjuster, administered Taylor's claim. The Maryland Workers' Compensation Commission initially denied Taylor's claim, but, following a hearing, found him eligible to receive benefits. Accordingly, Taylor sought vocational rehabilitation assistance, which is a benefit allowed under Maryland workers' compensation law.

On June 14, 2000, Taylor began receiving short-term disability insurance benefits for his injury. On October 10, 2000, Taylor began receiving long-term disability benefits, at which time his short-term disability benefits ceased. On February 13, 2001, the administrator of Taylor's long-term disability insurance informed him that his benefits were being stopped as of January 25, 2001, because Taylor failed to present significant, objective clinical information substantiating **[*5]** any ongoing disability.

On February 28, 2001, Bob Pihlaja ("Pihlaja"), the FedEx manager responsible for monitoring medical leaves of absence in the Chesapeake District, sent Taylor a letter upon being notified that Taylor's long term disability payments had ended. (Def.['s] Summ. J. Mem., Ex. 2, Att 8.) Pursuant to company policy, the letter provided Taylor with two options. First, Taylor could return to his former position as a courier and was given 72 hours to elect this choice. Second, if he refused the first option, Taylor could request a 90-day Personal Leave of Absence to apply and compete for positions which he was qualified to perform. If Taylor failed to "secure a position by the end of the Personal Leave of Absence period, [his] employment [would] be terminated." *Id.* Finally, the letter noted that Taylor could appeal the denial of his long-term disability benefits, which was an endeavor that Taylor promptly undertook.

On March 6, 2001, Pihlaja sent Taylor a follow-up letter to the February 28, 2001 correspondence. In the

letter, Pihlaja confirmed that Taylor had selected the second option previously presented to him, the 90-day Personal Leave of Absence. Significantly, **[*6]** at the end of the letter, Pihlaja reminded Taylor that "'[i]f you are unable to secure a position by the [(end)] of the Personal Leave of Absence period, your employment will be terminated." (Def.['s] Summ. J. Mem., Ex. 2, Att 9.)

On May 31, 2001, just prior to expiration of the 90 day period, Taylor applied for a Human Resources Senior Personnel Representative position with FedEx. The position had been posted by FedEx on May 18, 2001, and applications were required to be submitted by May 25, 2001. It is undisputed that Taylor did not possess a degree in Human Resources or two years of related experience as required to fill the position. FedEx did not select Taylor for this position.

On July 15, 2001, Taylor received notice that his long term disability insurance appeal had been denied, as the disability review board found "no significant objective findings that would preclude [Taylor] from performing the essential function of [his] job duties beyond 1/25/01." (Pl.['s] Opp'n. Mem., Ex. 3.) On that date, Pihlaja specifically indicated to Taylor that he had 90 days to find a job within FedEx or he would be terminated. [3] While Taylor argues in his submissions to this Court **[*7]** that the 90 day leave of absence began on that date, it is clear that this discussion was a continuation of the communications between Taylor and FedEx resulting from the aforementioned March 6, 2001 letter.

> 3  *See* Revised Supplemental Affidavit of Andre Taylor (Pl.['s] Opp'n. Mem., Ex. 1).

On August 31, 2001, after the expiration of another six weeks, Taylor expressed interest in a Customer Service Research Assistant position with FedEx. FedEx had posted the position on August 24, 2001, and the final date that applications were accepted was August 31, 2001. As a prerequisite for the position, all applicants were required to have a typing test on record with FedEx. Taylor did not have a typing test on record as of August 31, 2001. The position also required two years of clerical experience, which Taylor did not possess. Consequently, FedEx did not select Taylor to fill the post.

At this time, Luongo informed Pihlaja that on September 11, 2001, Dr. Samuel Matz would be performing an independent medical **[*8]** evaluation of Taylor as a result of Taylor's ongoing effort to secure certain workers' compensation benefits for his back injury. Dr. Matz previously had performed a similar exam on Taylor in June of 2000. FedEx received one page of the September 11th evaluation, in which Dr. Matz stated that Taylor could return to work without restrictions. Thus, FedEx wrote to Taylor on September 25, 2001 and again indi-

cated to Taylor that he could return to a courier position. The letter further stated that if Taylor refused to return to a courier post, his employment would be terminated because he had exceeded his Personal Leave of Absence time allotment. (Def.['s] Summ. J. Mem., Ex. 2, Att 11.)

Taylor refused to return to a courier position, and instead applied for a Dispatcher position with FedEx on September 27, 2001. On October 15, 2001, FedEx informed Taylor that a more qualified candidate had been selected for the job. Consequently, on that same day, Pihlaja sent Taylor a letter that reviewed his leave history, noted that "[i]n an effort to accommodate your needs, you were allowed to apply for a promotional position of Dispatcher," and stated that he had exceeded the maximum duration [*9] of his Personal Leave of Absence. (Def.['s] Summ. J. Mem., Ex. 2, Att. 12.) Pihlaja further noted that FedEx believed Taylor to be able to return to his courier post. Id. The letter concluded by stating that as Taylor's leave of absence period had expired without him finding other employment within FedEx, he must be terminated per company policy. Id.

Two weeks later, on October 31, 2001, the Maryland Workers' Compensation Commission of Maryland ("Commission") issued a letter directing that Federal Express provide Taylor with rehabilitation services and pay him compensation benefits in the amount of $ 524 a week during his rehabilitation period. (Pl.['s] Opp'n. Mem., Ex. 16-18.) The Commission noted that FedEx did not contest the vocational rehabilitation plan it had received for Taylor. Id. Despite the approved rehabilitation services, Taylor did not secure employment during the next several months. As a result, he submitted an amended rehabilitation plan, which requested that FedEx pay for the costs of his education at Wilmington College. Eventually, the Commission approved Taylor's amended plan. Id.

Taylor filed a Charge of Discrimination with the Equal Employment [*10] Opportunity Commission and Prince George's County Human Relations Commission ("EEOC Charge") on March 21, 2002. (Def. ['s] Summ. J. Mem, Ex. 27.) According to Taylor's EEOC Charge, he made FedEx aware of his medical status multiple times from May of 2000 through March of 2001. His Charge further states that on May 31, 2001, he applied for a "Human Resources Manager position," but was informed on June 8, 2001 that he "was not qualified for this position." Similarly, Taylor's Charge provides that on September 17, 2001, he applied for a "vacant Dispatcher position," but on October 15, 2001 received notification that he did not "meet the needs of this particular position." Finally, his Charge states that FedEx did not honor his request to meet with his rehabilitation counselor, and unlawfully terminated him. On August 21, 2002, the EEOC issued Taylor a right to sue letter, which

stated that "upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes." (Def.['s] Mem., Ex. 28.)

Subsequently, Taylor filed a complaint in the Circuit Court for Prince George's County, Maryland on or about December 31, 2002. [4] Taylor's Complaint [*11] consists of two counts under the ADA, both of which allege that: (1) FedEx failed to accommodate him by not transferring him to a vacant position within his disability limitations; and (2) unlawfully terminated him. [5] On January 21, 2003, FedEx duly removed the case to this Court pursuant to federal question jurisdiction based upon Taylor's ADA claims, or, in the alternative, diversity jurisdiction. The pending motions followed.

4    At the time that he filed his Complaint, Taylor was 37 years old.
5    Count I is entitled "Violation of ADA -- Actual Disability," while Count II is entitled "Violation of ADA -- Perceived Disability."

DISCUSSION

I. Taylor's Motion to Strike the Affidavit of Samuel Matz, M.D.

Taylor believes that the affidavit of Samuel Matz, M.D. ("Dr. Matz"), which is attached to FedEx's memorandum in support of its motion for summary judgment, should be stricken because FedEx did not designate Dr. Matz as an expert pursuant to *Rule 26(a) of the Federal Rules of Civil Procedure.* [*12] However, it is clear from both parties' submissions that Dr. Matz is a fact witness as well as an expert witness. *Rule 26(a)* does not apply to an expert witness who is a "hybrid" fact/expert witness, as opposed to an expert witness specifically retained for the purposes of litigation. *See Sullivan v. Glock, Inc., 175 F.R.D. 497, 500 (D. Md. 1997)* (finding that expert testimony not previously disclosed under *Rule 26(a)* should not be stricken where the expert had not been specifically retained for the purposes of litigation, but was a hybrid fact/expert witness who had obtained his knowledge through the normal course of events and whose expertise would permit him to give expert testimony); [6] *Fed. R. Civ. P. 26(a)(2).*

6    In *Glock,* Magistrate Judge Grimm of this Court noted that the most frequent example of a "hybrid" fact/expert witness is a treating physician in a personal injury case, but "that any witness with expertise in an area of scientific, technical or specialized knowledge which would be helpful to the fact finder would fit into this category as well." *Glock, 175 F.R.D. at 500 n.2.*

[*13] Dr. Matz is the physician who performed independent medical evaluations of Taylor for purposes of Taylor's ongoing workers' compensation claim. He plainly is a fact witness in addition to being an expert witness. Indeed, Dr. Matz was not retained specifically for purposes of the instant litigation, and gained his knowledge of Taylor's injury through the routine course of events. Moreover, the potential import of Dr. Matz's knowledge is obvious, and FedEx also noted Dr. Matz's relevance in its answers to Taylor's interrogatories. (*See, e.g.,* FedEx's Responses to Taylor's First Set of Interrogatories, PP 1 and 17.) Thus, Taylor cannot claim that he was "prejudicially surprised" by Dr. Matz's affidavit. Finally, Taylor does not contest Dr. Matz's credentials as a physician capable of rendering an opinion as to Taylor's medical condition. Accordingly, this Court sees no basis for striking Dr. Matz as a witness, and, therefore, Taylor's motion to strike is DENIED.

II FedEx's Motions to Strike Portions of Taylor's Memoranda

FedEx has filed two motions asking that significant portions of Taylor's memoranda in support of his motion for summary judgment and in opposition to FedEx's [*14] motion for summary judgment be stricken. Specifically, FedEx contends that parts of Taylor's memoranda contain inadmissible hearsay, contain affidavits that conflict with prior depositions, and contain facts from a declarant lacking personal knowledge.

This Court "is loathe to simply strike" multiple portions of Taylor's memoranda, *Murray v. Dillard Paper Co., 1999 U.S. Dist. LEXIS 22631, *1 (D. Va. August 4, 1999),* and finds there to be little efficiency in conducting a line-by-line critique of Taylor's memoranda prior to engaging in the substantive analysis of the parties' summary judgment motions. Instead, this Court "[will endeavor] to consider [the memoranda] for what they are worth," *id.,* taking notice of the points raised by FedEx, and any opposition of Taylor thereto, and, if necessary, appropriately addressing such issues within the context of the following analysis of the parties' summary judgment motions. Therefore, FedEx's blanket motions to strike will be DENIED.

III. The Parties' Motions for Summary Judgment

A. Standard of Review

*Rule 56 of the Federal Rules of Civil Procedure* provides that summary judgment "shall be rendered [*15] forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no *genuine* issue as to any *material* fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)* (emphasis added). In *Anderson v. Liberty Lobby, Inc.,*

*477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986),* the Supreme Court explained that only "facts that might affect the outcome of the suit under the governing law" are material. *Anderson, 477 U.S. at 248.* Moreover, a dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court further explained that, in considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence supporting a claimed factual dispute exists to warrant submission of the matter to a jury for resolution at trial. *Id. at 249.* In that context, a court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).* [*16]

However, "[w]hen the moving party has met its responsibility of identifying the basis for its motion, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *White v. Rockingham Radiologists, Ltd., 820 F.2d 98, 101 (4th Cir. 1987)* (quoting *Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); Fed. R. Civ. P. 56(e)).* Thus, *Rule 56* mandates summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp., 477 U.S. at 322.* If the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, summary judgment must be granted. *Anderson, 477 U.S. at 249-50.* Similarly, the existence of a mere "scintilla" of evidence in support of the nonmoving party's case is insufficient to preclude an order granting summary judgment. *Id. at 252.* Furthermore, District courts have an "affirmative obligation . . . to prevent 'factually unsupported claims and defenses' from proceeding [*17] to trial." *Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987)* (citing *Celotex Corp., 477 U.S. at 323-24).*

B. FedEx's Motion for Summary Judgment

FedEx's motion for summary judgment will be analyzed first, so the pertinent facts will be viewed in the light most favorable to Taylor. In its motion, FedEx contends that the date Taylor filed his EEOC Charge renders his claims untimely under the appropriate limitations period. In the alternative, FedEx asserts that Taylor's instant action must be strictly confined to those claims raised in his EEOC Charge. FedEx also states that Taylor's alleged injury does not qualify him as disabled under the ADA, that Taylor was not qualified for any of the positions for which he applied, that FedEx had no knowledge of Taylor's alleged disability, and that Taylor cannot demonstrate a discriminatory pretext. Further-

more, FedEx contends that Taylor fails to state a *prima facie* case for failure to accommodate under the ADA, and that punitive damages would not be appropriate in this case.

1. Timeliness of Taylor's EEOC Charge

The ADA prohibits discrimination by certain private employers [*18] against qualified individuals with a disability. Specifically, the ADA provides that no covered employer "shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge employees, employee compensation, job training, and other terms, conditions, and privileges of employment." [7] *42 U.S.C. § 12112(a)*. The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *42 U.S.C. § 12111(8)*.

> [7] Pursuant to *42 U.S.C. 2000e-5(b)*, the term "employer" means persons engaged in an industry affecting commerce with 25 or more employees for the first two years of application of the statute; thereafter, the term is applicable to employers with 15 or more employees. The parties do not dispute that FedEx qualifies as an "employer" under the statute.

[*19] As a precursor to pursuing a private claim in state or federal court, the ADA requires plaintiffs to file timely administrative charges of discrimination. [8] *See 42 U.S.C. § 2000e-5(e)(1)*; *Edelman v. Lynchburg College, 228 F.3d 503, 506 (4th Cir. 2000)*. Pursuant to the statute, this administrative charge must be filed within 180 days of the alleged discrimination, unless the state in which the discrimination has taken place has its "own law prohibiting discrimination and an agency enforcing the law." *Nye v. Roberts, 159 F. Supp. 2d 207, 210 (D. Md. 2001)*. In such an instance, the state is deemed to be a "deferral state," and the plaintiff has 300 days after the alleged act of discrimination to file a claim with the EEOC. *Skipper v. Giant Food, Inc., 187 F. Supp. 2d 490, 492 (D. Md. 2002)*. Maryland is a deferral state. *EEOC v. Hansa Products, Inc., 844 F.2d 191, 192 n.3 (4th Cir. 1988)* (citing *29 C.F.R. § 1601.74 (1987)*). Accordingly, Taylor's Charge must have been filed within 300 days of the alleged discriminatory act. *See 42 U.S.C. § 2000e-5(e)(1)*.

> [8] The ADA expressly adopts and incorporates the administrative procedures specified in Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e-5*, and compliance with those procedures

must occur before a federal court may entertain a suit that seeks recovery for an alleged violation of the ADA. *See 42 U.S.C.A. § 12117(a)*.

[*20] Notably, the 300-day administrative deadline operates like a statute of limitations as to any later judicial proceeding. *See Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393, 102 S. Ct. 1127, 71 L. Ed. 2d 234 (1982)*. "The burden of proving that the limitations period has been satisfied falls on the plaintiff . . . ." *Williams v. Enterprise Leasing Co. of Norfolk/Richmond, 911 F. Supp. 988, 993 (E.D. Va. 1995)*. Taylor filed his EEOC Charge on March 21, 2002; thus, he cannot prevail on any ADA claim based upon misconduct alleged to have occurred before May 25, 2001.

"A disabled plaintiff's employment discrimination cause of action accrues on the date that the alleged unlawful employment practice occurs . . . ." *Martin v. Southwestern Virginia Gas Co., 135 F.3d 307, 310 (4th Cir. 1998)* (citations omitted). Moreover, when a charge of discriminatory discharge is alleged, only the original decision to let the employee go is subject to analysis under the anti-discrimination laws. *Chardon v. Fernandez, 454 U.S. 6, 8, 102 S. Ct. 28, 70 L. Ed. 2d 6 (1981)* (citing *Delaware State College v. Ricks, 449 U.S. 250, 257, 101 S. Ct. 498, 66 L. Ed. 2d 431 (1980)* (holding that the statute of limitations starts [*21] on date employee receives notice of imminent discharge because "the proper focus is on the time of the discriminatory act, not the point at which the consequences of the act become painful"). Thus, "a discharge with a deferred effective date entails only one discriminatory decision," which occurs when the employee receives notice of the discharge. *Graehling v. Village of Lombard, Ill., 58 F.3d 295, 297 (7th Cir. 1995)*; *accord English v. Whitfield, 858 F.2d 957, 961 (4th Cir. 1988)* ("The proper focus . . . is on the time of the challenged conduct and its notification rather than the time its painful consequences are ultimately felt . . . ."); *Price v. Litton Business Systems, Inc., 694 F.2d 963, 965 (4th Cir. 1982)* ("The filing period runs from the time at which the employee is informed of the allegedly discriminatory employment decision, regardless of when the effects of that decision come to fruition.") (citations omitted).

The Supreme Court established that a discharge with a deferred effective date entails only one discriminatory decision in *Delaware State College v. Ricks, supra*. In *Ricks*, a state college [*22] denied the plaintiff tenure, which the plaintiff immediately appealed. *Ricks, 449 U.S. at 252-55*. During the pendency of the appeal, the plaintiff received a one-year grace period to find other employment within or outside of the college, after which time his employment would be terminated. *Id*. The plaintiff did not sue immediately, but waited to bring his discrimination action until his employment ended. *Id*. Rea-

soning that Ricks' termination was the inevitable consequence of the earlier denial of tenure, the Court found that the limitations period began to run when the plaintiff received notice of the "terminal contract," rather than when the effects of that decision were felt. *Id. at 255-258.*

Later, the Fourth Circuit addressed a similar issue in *English v. Whitfield, supra.* In that case, a nuclear safety employee was notified that she would be laid off, but was given a 90-day grace period in which to find another position at the nuclear facility where she was employed. *English, 858 F.2d at 958-59.* The plaintiff waited until the 90-day period had expired before filing a claim of retaliation with the Department [*23] of Labor. *Id.* Attempting to distinguish *Ricks,* the plaintiff argued that the decision to discharge her was not final until her employment actually ended, because the effects of that decision might never be felt. As an example, she argued that she might have found another job before the expiration of the ninety-day period, and, therefore, never would have suffered the effects of unemployment. *Id. at 961.* The Fourth Circuit rejected this argument, holding that the plaintiff's ability to avoid the harsh effects of a discriminatory decision "would not have erased or made non-actionable" her employer's discriminatory action. *Id. at 962.* Thus, the court held that the original notification date of termination was the date on which the discriminatory action took place. *Id. at 959-61.*

More recently, the Fourth Circuit again addressed this principle in *Emmert v. Runyon, 1999 U.S. App. LEXIS 8264 (4th Cir. April 29, 1999),* an unpublished opinion affirming the decision of Judge Alexander Williams of this Court. In *Emmert,* a postal worker was notified on September 25, 1992 that he would be removed from his position [*24] in 30 days for failure to meet the attendance requirements of his position. *Emmert, 1999 U.S. App. LEXIS 8264, *3.* The plaintiff contended that his absences were due to a disability. *Id. at *2.* Under a November of 1992 agreement, the postal service agreed to hold the September 25 notice of removal in abeyance for one year. *Id. at *3.* After the plaintiff's absenteeism continued, the postal service issued the plaintiff a final notice of removal on February 22, 1994, with an effective date in March 1994. *Id. at *4.* Rejecting the plaintiff's contention that the September 25 notice was revoked when he entered into the November agreement, the Fourth Circuit found that the plaintiff's limitations period commenced no later than November 1992, as notice of his possible termination was readily apparent by that date. *Id. at *11-12.*

In the present case, viewing the facts in the light most favorable to the Plaintiff Taylor, this Court concludes that Taylor plainly received notification of FedEx's alleged discriminatory termination no later than

March 6, 2001. On February 28, 2001, FedEx notified Taylor that he must return to his courier position, or choose a 90-day [*25] temporary medical leave, during which time he could seek other employment within the company. However, it was clear that after the expiration of the temporary absence, if Taylor had not obtained a new job, he would be terminated. Taylor refused to return to his prior job, deciding instead to attempt to find other employment while on leave. Taylor's decision was commemorated in a letter of March 6, 2001, in which FedEx reemphasized that his failure to secure a new job while on temporary leave would result in his termination. Thus, FedEx transparently conveyed its decision regarding Taylor's employment status twice within a seven day span, and, at the latest, by March 6, 2001.

Taylor argues that the February and March of 2001 termination notifications should be disregarded, and that the September 25, 2001 letter he received from FedEx should be considered the original notice of termination. However, as previously indicated, the clear weight of the applicable case law holds that "a discharge with a deferred effective date entails only one discriminatory decision." *Graehling, 58 F.3d 295, 297.* Here, the September 25, 2001 letter simply reaffirmed the termination decision [*26] communicated to Taylor on March 6, 2001. The delay pending Taylor's long term disability insurance appeal and September of 2001 independent medical evaluation does not eviscerate the fact that FedEx clearly notified Taylor of its decision to terminate him no later than March 6, 2001. Indeed, to hold otherwise would undercut the limitations period, would have a chilling effect on employers delaying adverse employment actions pending administrative appeals and independent evaluations, and would erroneously transform a discrete act of alleged discrimination into a continuing violation. *See National Railroad Passengers Ass'n v. Morgan, 536 U.S. 101, 114, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002)* (rejecting the continuing violation theory for discrete acts of discrimination such as employment termination). Thus, since Taylor filed his administrative complaint more than 300 days after March 6, 2001, his claim of a discriminatory employment termination is time-barred.

Similarly, Taylor cannot prevail on any of his "failure to accommodate" claims (i.e., failure to hire him for an alternate position) that arose before May 25, 2001. That is, each of these claims plainly comprise "a cause of action [(which)] [*27] accrues on the date that the alleged unlawful employment practice occurs . . . ." *Martin, 135 F.3d at 310.*

Nonetheless, Taylor contends that the "continuing violations" doctrine would save any of his untimely claims by extending the ordinary limitations period. However, as the Fourth Circuit noted in *Williams v. Giant Food, Inc., 370 F.3d 423, 429 (4th Cir. 2004),* such

an "argument [has been] foreclosed" by the Supreme Court's ruling in *National Passenger Railroad Corporation v. Morgan, supra.* In *Morgan,* the Court "makes clear that unless the plaintiff alleges a hostile work environment . . ., each instance of discrimination is a discrete act." *Szedlock v. Tenet, 61 Fed. Appx. 88, 93 (4th Cir. 2003).* The Court held that discrete acts of discrimination "are not actionable if time-barred, even when they are related to acts alleged in timely filed charges." *Morgan, 536 U.S. at 113.* Taylor's termination claim and "failure to accommodate" claims, which are in the form of refusing to hire him for alternate positions, are claims that the Supreme Court explicitly found to be "easy to identify" discrete [*28] acts. *Id. at 114.* Thus, the continuing violation theory is not applicable to any of Taylor's claims, and, therefore, only those "failure to accommodate" claims that arose within the appropriate administrative time period, i.e., after May 25, 2001, remain viable. *Id.*

2. Scope of Taylor's EEOC Charge

As previously noted, before a plaintiff has standing to file suit under the ADA, he or she must exhaust his or her administrative remedies by filing a timely charge with the EEOC. *See Smith v. First Union Nat'l Bank, 202 F.3d 234, 247 (4th Cir. 2000).* The EEOC charge defines the scope of the plaintiff's right to institute a civil suit. *Id.* "An administrative charge of discrimination does not strictly limit a . . . suit which may follow; rather, the scope of the civil action is confined only by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination." *Chisholm v. United States Postal Serv., 665 F.2d 482, 491 (4th Cir. 1981).* Accordingly, Taylor's EEOC Charge must be evaluated in terms of any administrative investigation that could have reasonably resulted from his [*29] complaint.

Taylor's EEOC Charge filed on March 21, 2002, essentially alleges unlawful termination because of his disability and a failure to provide reasonable accommodation because of that disability, which references a failure to hire him for alternate jobs and to meet with his rehabilitation counselor. [9] While Taylor's termination claim is time-barred, as discussed above, his "failure to accommodate" claims in his March 21, 2002 EEOC Charge describe two particular "failure to hire" matters. Specifically, Taylor references his May 31, 2001 application for a human resources position and his September 17, 2001 application for a dispatcher position. Under this Court's previous analysis, both of these claims were administratively filed in a timely manner. (i.e., they occurred within 300 days of Taylor's EEOC Charge).

[9]   Taylor does not, and cannot, assert a claim based on the lack of said meeting, because "'an employee cannot base a reasonable accommodation claim solely on the allegation that the employer failed to engage in an interactive process." *Scott v. Montgomery County Gov't, 164 F. Supp. 2d 502, 508 (D. Md. 2001)* (quoting *Walter v. United Airlines, 2000 U.S. App. LEXIS 26875, *11 (4th Cir. 2000)).*

[*30] FedEx contends that Taylor's "failure to accommodate" claims should be limited to these two events, since they were the only ones described in his EEOC Charge. However, the standards set forth by the Fourth Circuit in *Chisholm v. United States Postal Serv., supra,* do not support such a narrow analysis. All of Taylor's "failure to accommodate" claims stem from the same alleged disability and pursuit of alternate jobs following his refusal to return to a courier post. Thus, his current suit will not be strictly confined to only the two specific "failure to accommodate" claims described in his EEOC Charge, as any similar claims surely would have fallen within the scope of the investigation reasonably expected to follow his administrative charge. Accordingly, this Court next turns to the substantive analysis of Taylor's three remaining "failure to accommodate claims": (1) failure to be hired for the human resources position he applied for on May 31, 2001; (2) failure to be hired for the customer service research assistant position he applied for on August 31, 2001; and (3) failure to be hired for the dispatcher position he applied for on September 17, 2001.

3.   [*31]   Whether Taylor is Disabled Under the ADA

The law is well-settled that to establish a violation of the ADA in a failure-to-hire claim, Taylor must show (1) that he had a disability; (2) that he was qualified for the jobs in question; and (3) that his disability played a motivating role in FedEx's refusal to hire him. *Martell v. Sparrows Point Scrap Processing, LLC, 214 F. Supp. 2d 527, 528 (D. Md. 2002)* (citing *Baird v. Rose, 192 F.3d 462, 466, 470 (4th Cir.1999)).* "In turn, to prove that he is disabled, [Taylor] must satisfy at least one of the applicable tests set forth in the statute." *Id. at 528-529.* Specifically, "an individual is disabled under the ADA . . . if he or she: (1) has a physical or mental impairment that substantially limits one or more of the individual's major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment." *Davis v. University of North Carolina, 263 F.3d 95, 99 (4th Cir. 2001)* (citations omitted); *42 U.S.C. § 12102(2).* Importantly, "these terms need to be interpreted strictly to create a demanding standard [*32] for qualifying as disabled . . . ." *Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 197, 122 S. Ct. 681, 151 L. Ed. 2d 615 (2002).*

"The determination of whether a person is disabled is an individualized inquiry, particular to the facts of each case." *E.E.O.C. v. Sara Lee Corp. 237 F.3d 349, 352 (4th Cir. 2001)* (citations omitted). Taylor's claimed disability is an impairment to his back and shoulders that precludes him from lifting greater than 30 pounds and hampers his ability to sit, stand, climb stairs and reach overhead. (Complaint, P 16.) It will be assumed, *arguendo*, that Taylor's back and shoulder injury is a physical impairment, *see Williams v. Channel Master Satellite Sys., Inc., 101 F.3d 346, 349 (4th Cir. 1996)* (assuming without discussion that plaintiff's back injury was an impairment), and that working is a major life activity. *See Runnebaum v. NationsBank, 123 F.3d 156, 1997 WL 465301, at \*10 (4th Cir. 1997)* (en banc) (plurality opinion) (noting that "working is one of the major life activities of the ADA"); *Gupton v. Virginia, 14 F.3d 203, 205 (4th Cir. 1994)* (same). [10] Thus, whether Taylor is disabled turns [\*33] on whether his claimed injury substantially limits his ability to work.

> 10   "The Supreme Court has noted 'the conceptual difficulties inherent in the argument that working could be a major life activity,' but declined to "decide this difficult question." *Pollard v. High's of Baltimore, Inc., 281 F.3d 462, 467 n.1 (4th Cir. 2002)* (quoting *Toyota Motor, 534 U.S. at 200*). Similarly, this Court need not engage in an analysis of this question to resolve the instant matter.

The Fourth Circuit has held, "as a matter of law, that a twenty-five pound lifting limitation -- particularly when compared to an average person's abilities -- does not constitute a significant restriction on one's ability to lift, work, or perform any other major life activity." *Williams v. Channel Master Satellite Sys., Inc., 101 F.3d 346, 349 (4th Cir. 1996)* (citation omitted), *cert. denied sub nom., Williams v. Avnet, Inc., 520 U.S. 1240, 117 S. Ct. 1844, 137 L. Ed. 2d 1048 (1997)*. The Fourth Circuit, and district [\*34] courts within the Circuit, have repeatedly reaffirmed this holding. *See, e.g., Pollard v. High's of Baltimore, Inc., 281 F.3d 462, 470 (4th Cir. 2002)* (finding that the plaintiff being restricted to lifting not more than twenty-five pounds or bending repetitively were "mild limitations . . . not significantly restricting"); *Cox v. Cvista Med. Ctr., 16 Fed. Appx. 185, 186 (4th Cir. 2001)* (holding that a twenty pound weight lifting restriction did not constitute a substantial limitation to working); *Stewart v. Weast, 228 F. Supp. 2d 660, 662-63 (D. Md. 2002)* (stating that "a person is not substantially limited in a major life activity because she is limited to lifting ten to fifteen pounds" (citations omitted)); *Washington v. George G. Sharp, Inc., 124 F. Supp. 2d 948, 957 (E.D. Va. 2000)* (holding that a thirty pound lifting restriction did not constitute a significant restriction suf-

ficient to qualify the plaintiff for ADA protection). Numerous other courts similarly have ruled when analyzing the same issue under the ADA. *See, e.g., McKay v. Toyota Motor Mfg., USA, Inc. 110 F.3d 369, 371, 373 (6th Cir. 1997)*; [\*35] *Helfter v. UPS, 115 F.3d 613 (8th Cir. 1997)*; *Zarzycki v. United Technologies Corp., 30 F. Supp. 2d 283 (D. Conn. 1998)*.

Moreover, restrictions in repetitive tasks, such as the moderate bending, reaching, walking and climbing limitations asserted by Taylor, also do not constitute substantial limitations under the ADA. [11] *See, e.g., Pollard, 281 F.3d at 470* (finding that the plaintiff being restricted to lifting not more than twenty-five pounds or bending repetitively were "mild limitations . . . not significantly restricting"); *Thomas v. N. Telecom, Inc., 157 F. Supp. 2d 627, 632 (M.D.N.C. 2000)* (collecting cases holding that engaging in repetitive motions does not amount to a substantial limitation of a major life activity); *Whitfield v. Pathmark Stores, Inc., 971 F. Supp. 851, 857-58 (D. Del. 1997)* (finding that a plaintiff who could not "lift more than 20 lbs, [could not] engage in repeated reaching, bending, and stooping, and [could not] stand in one place for longer than one hour in a four-hour period" without suffering severe pain and muscle spasms that lasted for several days, was not [\*36] substantially limited in the life activities of standing, lifting or reaching); *Horth v. General Dynamics Land Sys., Inc., 960 F. Supp. 873, 878 (M.D. Pa. 1997)* (finding that a plaintiff who could not sit or stand for more than two hours without difficulty, had trouble walking, and could not continually lift objects greater than twenty pounds, had failed to show his limitations were more than moderate restrictions and thus, was not disabled).

> 11   Taylor's admission that he drives over one hour, each way, to college, sits in classes for two to three hour stretches, cuts the grass and operates a leaf blower, camps with his family, plays catch with his children, cleans the house, reaches and bends to get items from shelves and the floor, and has walked long distances (*see Deposition of Andre Taylor at 8, 19, 28, 29, 141-147, 170-181, 254-255*), provides insight into his degree of impairment. *Cf. Tozzi v. Advanced Medical Management, 2001 U.S. Dist. LEXIS 17910, \*29 (D. Md. May 24, 2001)* (finding that an ADA plaintiff's participation on a flag football team was evidence that the continued effects of her surgery were "not substantially limiting on any major life activity").

[\*37] After a thorough review of all of the parties' submissions, and the above noted authority of the Fourth Circuit and this District, this Court concludes as a matter of law that Taylor cannot establish that his alleged inju-

ries constitute a disability under the ADA. Accordingly, his remaining "failure to accommodate" claims must fail, and this Court need not address whether Taylor was qualified for the jobs in question or whether his alleged disability played a motivating role in FedEx's refusal to select him for said jobs. [12] Therefore, for all of the above reasons, FedEx's Motion for Summary Judgement is GRANTED.

> 12  Notably, whether the theory that Taylor proceeds under is that he suffers from an actual impairment, that he has a record of impairment, or that he was regarded by [FedEx] as being impaired, his failure to establish that he is disabled is fatal to his Complaint. *Washington, 124 F. Supp. 2d at 955*. Nonetheless, as to the latter category, Taylor plainly cannot "demonstrate either that [FedEx] regarded [him] as disabled or that [any such] perception caused the adverse employment action." *Haulbrook v. Michelin N. Am., Inc., 252 F.3d 696, 703 (4th Cir. 2001)* (noting an employer's awareness of an alleged limitation, without more, does not state a claim under *subsection (C) of 42 U.S.C. § 12102(2)*) (internal quotation omitted). To the contrary, FedEx's repeated requests that Taylor return to his courier position, which undisputedly required significant lifting and repetitive tasks, indicate that it per-

ceived Taylor as being unencumbered and fit to resume his normal duties.

**[*38]**  C. Taylor's Motion for Summary Judgment

Where, as here, a court is presented with cross-motions for summary judgment, it must "rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the *Rule 56* Standard." *Towne Mgmt. Corp. v. Hartford Acc. & Indem. Co., 627 F. Supp. 170, 172 (D. Md. 1985)*. However, this Court has already determined that Taylor's claims are not viable as a matter of law. Accordingly, Taylor's motion for summary judgment, which is predicated upon the same material facts and legal analysis found in FedEx's motion for summary judgment, will, therefore, be DENIED.

CONCLUSION

For the reasons set forth above, Taylor's motion to strike the affidavit of Samuel Matz, M.D. is DENIED, both of FedEx's motions to strike portions of Taylor's memoranda are DENIED, Taylor's motion for summary judgment is DENTED, and FedEx's motion for summary judgment is GRANTED. A separate Order will follow.

Richard D. Bennett

United States District Judge

Dated: July 28, 2004

**5**



### WALLACE H. CAMPBELL & COMPANY, INC. v. MARYLAND COMMISSION ON HUMAN RELATIONS

Nos. 291, 1310, September Term, 2010

### COURT OF SPECIAL APPEALS OF MARYLAND

*2011 Md. App. LEXIS 171*

December 22, 2011, Filed

**DISPOSITION:** [*1]    JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE ORDER OF THE MARYLAND COMMISSION ON HUMAN RELATIONS AND TO REMAND THIS CASE TO THAT AGENCY WITH INSTRUCTIONS TO DISMISS THE CHARGES. APPELLEE TO PAY COSTS.

**JUDGES:** Meredith, Hotten, Rodowsky, Lawrence F., (Retired, Specially Assigned), JJ. Opinion by Hotten, J.

**OPINION BY:** Hotten

**OPINION**

Opinion by Hotten, J.

Austin Scarlett, who used a wheelchair and resided in one of Wallace H. Campbell & Company, Inc.'s ("the Campbell Company") buildings, became frustrated with the Campbell Company's lack of responsiveness to his concerns and sought to mediate those issues with the Campbell Company. The mediation was unsuccessful. Based on events arising from the mediation, Scarlett filed a complaint with the Maryland Commission on Human Relations ("the Commission"), alleging that the Campbell Company had discriminated against Scarlett by holding the mediation at a wheelchair inaccessible location.

After an eventful history before an Administrative Law Judge and the Commission's appeal board, this matter was heard by the Circuit Court for Baltimore City on the Campbell Company's petition for judicial review. On [*2] April 6, 2010, the circuit court affirmed the Commission's final decision, which ordered the Campbell Company to pay $7,500 in damages and $5,000 as a civil

penalty. On July 27, 2010, the circuit court granted the Commission's petition for judicial enforcement and entered judgment against the Campbell Company for $7,500 in damages and $5,000 as a civil penalty. The Campbell Company timely appealed both circuit court decisions, and we ordered that the appeals be consolidated. The Campbell Company presents the following questions for our review, which we quote:

> 1. Does 49B § 22(a)(9)[1] require that a reasonable accommodation be made where none has been requested?
>
> 2. Was the Campbell Company's participation -- as one of the two disputants -- a "practice" or "service" within the ambit of 49B § 22(a)(9)?

1    Md. Code (1957, 2003 Repl. Vol.), Article 49B § 22(a)(9) has been recodified in substantially the same form in Md. Code (2009), *§ 20-706(b)(4) of the State Government Article ("S.G.")*, and the Legislature intended no substantive change. Section 2 of Chapter 120 of the 2009 Acts.

For the reasons discussed below, we conclude that Md. Code (1957, 2003 Repl. Vol.), Article 49B § 22(a)(9) requires [*3] a request before there can be a refusal to provide a reasonable accommodation, and, therefore, we do not reach the Campbell Company's second question.

**FACTUAL AND LEGAL PROCEEDINGS**

Austin Scarlett lived in Greenhill Housing, a federally subsidized apartment complex in Baltimore City. He suffered from several maladies, including hypertension, depression, morbid obesity, and diabetes, the last of which necessitated the amputation of his left leg above the knee. As a result, Scarlett used a motorized wheelchair for mobility, and the facilities at Greenhill Housing were fully accessible to him.[2]

> 2 Regrettably, Scarlett passed away in November 2008 while the appeal of the Administrative Law Judge Murray's Recommended Decision on Remand was pending before the Commission's Appeal Board.

The Campbell Company managed Greenhill Housing, in addition to approximately 110 other apartment and condominium complexes. R. Bruce Campbell was the president, chair, and chief executive officer of the Campbell Company. Frank Stromyer was a vice president of the Campbell Company and local site manager of Greenhill Housing.

Scarlett had several conflicts with his neighbors in Greenhill Housing, including an 80-year-old [*4] woman who lived directly above his apartment. Scarlett complained that the woman's doors squeaked loudly, yet nothing was done to address the issue. Eventually, the issues with the woman upstairs escalated, and she refused to address the squeaky doors or allow Greenhill Housing into her apartment to repair them. She even resorted to slamming the doors in her apartment at night, knowing that it would disturb Scarlett. Scarlett believed he was being discriminated against because he was in a wheelchair.

Scarlett met with Stromyer on at least three occasions at Greenhill Housing to discuss Scarlett's complaints. Stromyer met with the woman upstairs and sent her several letters, but the issues remained unresolved. Scarlett then contacted the Baltimore City Community Relations Commission ("BCCRC") to mediate and resolve the dispute between Scarlett and Greenhill Housing. BCCRC referred Scarlett's case to Wanda M. Belle, who was a graduate student in negotiation and conflict management at the University of Baltimore and was interning at BCCRC as a volunteer mediator. Scarlett advised Belle that he preferred to conduct the mediation at Greenhill Housing because it was convenient for him. Belle [*5] sent a letter to Campbell, inviting him to mediate Scarlett's complaints through BCCRC. Belle sent the letter to the Campbell Company's office on Meridene Road, which was fully handicapped accessible. The Campbell Company advised that Stromyer, but not Campbell, would mediate with Scarlett. Scarlett only wanted to mediate with Campbell.

Campbell later agreed to attend the mediation if it were held at the Campbell Company's new office at 6212 York Road ("the Campbell Building") because the paperwork concerning Scarlett's complaints was there and it was a more neutral location than Greenhill Housing. Belle informed Scarlett that Campbell agreed to mediate Scarlett's noise and discrimination complaints, and a meeting was scheduled for 5:30 p.m. on January 23, 2003 at the Campbell Building. At no time during Belle's communications with Campbell did she ascertain whether Campbell was aware that Scarlett used a wheelchair or that he wanted the mediation to take place at a handicapped accessible location.

Several months before the mediation, Scarlett was among twenty-five to thirty Greenhill Housing tenants who attended a meeting held by Campbell at Greenhill Housing. Scarlett asked Campbell [*6] a question from several feet away, and Campbell responded to what he characterized to be a "good question." In the month before the scheduled mediation, Scarlett sent Campbell between thirty and fifty e-mails, most of which were copies of e-mails Scarlett previously sent to Stromyer. Campbell received the e-mails and relayed them to Stromyer. Scarlett had never been to the Campbell Building before the mediation, but based on his communications with Belle and Stromyer, he assumed that the building was wheelchair accessible.

The Campbell Company moved into the Campbell Building about a month and a half before the scheduled mediation. The building had one wheelchair accessible restroom, but not a wheelchair accessible entrance. A few days before the mediation, Stromyer advised Campbell that Scarlett used a wheelchair, and Campbell decided that it was better to proceed with the mediation at the Campbell Building rather than postpone it. Campbell thought that he, his son, and Stromyer would be able to help Scarlett into and out of the building.

Scarlett arrived at the Campbell Building around 5:30 p.m. on January 23, 2003 by Maryland Transit Administration Mobility van. The driver advised [*7] that the building was not wheelchair accessible and offered to take Scarlett home after making a stop in nearby Towson. Scarlett had the driver drop him off and approached the steps to the building in his wheelchair. Campbell, his son, and Stromyer hurried out of the building to assist Scarlett enter the building through the rear entrance, which had a three-inch step and a six-inch step. Scarlett stood up, not asking for assistance, but when Campbell, his son, and Stromyer offered help, Scarlett did not object and hopped up the two steps to the entrance. Scarlett entered the building and stood against the wall with his arms outstretched to keep his balance. Campbell stood nearby. Campbell's son and Stromyer carried the wheelchair up the steps, and Scarlett got back into it. At the

time, Scarlett weighed 335 pounds, and the motorized wheelchair weighed at least 100 pounds.

Scarlett, Stromyer, Campbell, Belle, and the co-mediator went to the meeting room and participated in the mediation. The meeting lasted about two hours, but no agreement was reached. After the meeting, Scarlett asked to use the restroom. Stromyer led Scarlett to the nearest restroom, but it was not wheelchair accessible. [*8] Scarlett's wheelchair could not fit through the door, so he got out of his wheelchair and hopped into the restroom. Scarlett used the restroom while Stromyer held the door open. Stromyer was unaware of the existence of a wheelchair accessible restroom in the Campbell Building, and Scarlett did not ask whether there was a wheelchair accessible restroom in the building.

After using the restroom, Scarlett maneuvered his wheelchair to the exit, stood up, and was assisted by Campbell and Stromyer so they could bring the wheelchair down the steps. Scarlett hopped down the steps and held on to a car in the parking lot until Stromyer and Campbell brought the wheelchair to him. Scarlett did not complain about the means of entering and exiting the building, nor did he request special accommodations.

Scarlett continued to express his concerns to the Campbell Company regarding noise and harassment at Greenhill Housing. Scarlett communicated with representatives from the United States Department of Housing and Urban Development ("HUD") and the Commission regarding his complaints with Greenhill Housing and the Campbell Company. On April 11, 2003, Scarlett filed a complaint with the Commission, alleging [*9] that the Campbell Company, Campbell, and Stromyer had discriminated against him and required him to mediate at a wheelchair inaccessible location.

Gregory Logan investigated the matter for the Commission. He visited the Campbell Building on September 30, 2003, at which time the entire building, including the entrances and the restrooms, was now wheelchair accessible. The Campbell Company apparently modified the Campbell Building following the mediation. Campbell advised Logan that it was Belle's idea to hold the mediation at the Campbell Building. Logan prepared a Written Finding of Probable Cause, concluding that the Campbell Company had discriminated against Scarlett on the basis of his disability, in violation of Article 49B. The Written Finding was issued on November 19, 2003 and sent to the parties. Conciliation between the parties failed, and the Commission certified the matter for a public hearing.

On August 1, 2005, the Commission filed a Statement of Charges with the Maryland Office of Administrative Hearings ("OAH"), naming the Campbell Company, Campbell, and Stromyer as respondents.[3] The Commission alleged that the respondents engaged in discriminatory housing practices in [*10] violation of Article 49B § 22(a) by failing to accommodate Scarlett's disability and by discriminating against him because of his disability. The Commission sought compensatory damages for Scarlett in an unspecified amount. The Commission also requested that the respondents be ordered to pay a civil penalty of at least $10,000, in addition to costs and attorney's fees, and be enjoined from any future discrimination against Scarlett based on his disability.

    3    Stromyer and Campbell, individually, were later dismissed as parties.

Administrative Law Judge James T. Murray ("ALJ Murray") dismissed Scarlett's claim for damages in a prehearing ruling concerning the respondents' motion for partial summary judgment. On March 1, 2006, ALJ Murray held a public hearing on the remaining claims. On December 14, 2006, ALJ Murray issued a "Recommended Decision," in which he proposed that the charges be dismissed.[4] The Commission appealed ALJ Murray's decisions to the Commission's appeal board.

    4    In the absence of a timely appeal, the recommended decision of an ALJ becomes the final decision and order of the Maryland Commission on Human Relations, from which no further administrative appeal may be taken. [*11] Md. Code (1957, 2003 Repl. Vol.), Article 49B § 32(g)(2) (recodified without substantive change at *S.G. § 20-1029(a)(2)*); *COMAR 14.03.01.11H(5). COMAR 14.03.01.12A(2)* imposes a thirty day limit to file an administrative appeal of the ALJ's decision to the Commission's appeal board.

On May 8, 2007, the appeal board heard oral argument at a hearing where the Commission and the respondents were represented by counsel. In its August 23, 2007 order, the appeal board reversed both of ALJ Murray's decisions and remanded to OAH for further proceedings. The appeal board found that the respondents violated Article 49B § 22(a)(9) by failing to make reasonable accommodations to afford a disabled person equal opportunity to use and enjoy a dwelling.

On October 12, 2007, ALJ Murray held a second hearing and heard testimony concerning Scarlett's visit to the Campbell Building on January 23, 2003. On February 11, 2008, ALJ Murray issued a "Recommended Decision on Remand," in which he made findings of fact and concluded that the Campbell Company discriminated against Scarlett at the Campbell Building on January 23, 2003. ALJ Murray recommended that the Commission order the Campbell Company to pay $3,500 [*12] to Scarlett for his embarrassment and humiliation as a result

of the discrimination. ALJ Murray found that the violation warranted a civil penalty, but did not order a penalty because he applied an erroneous regulation rather than the governing statute.

On March 10, 2008, the Commission noted an appeal of ALJ Murray's most recent recommendation. The appeal board heard oral argument and issued a "Decision and Order" dated August 27, 2009. In its order, the appeal board increased the damages amount from $3,500 to $7,500 because the original amount was "insufficient to compensate Mr. Scarlett for the significant humiliation and embarrassment he experienced as a result of [the Campbell Company's] discriminatory conduct." The appeal board also held that the Campbell Company's "actions placed Mr. Scarlett's well-being at risk," so it ordered the Campbell Company to pay a civil penalty of $5,000 to "further a primary goal of civil penalties: to deter others from engaging in discriminatory practices."[5]

> 5   The August 27, 2009 "Decision and Order" was the first final order of the Commission. *See COMAR 14.03.01.12F(4).*

On September 28, 2009, the Campbell Company filed a petition for judicial review [*13] in the Circuit Court for Baltimore City, appealing the finding of liability and damages award in the Commission's August 27, 2009 order.[6] On April 6, 2010, the circuit court held a hearing, after which it dismissed the Campbell Company's petition and affirmed the Commission's order. On February 24, 2010, while the Campbell Company's petition was still pending, the Commission filed a petition for enforcement of the judgment in the Circuit Court for Baltimore City, and on July 27, 2010, the circuit court held a hearing on the Commission's petition. The court granted the Commission's petition and entered judgment against the Campbell Company.

> 6   The Campbell Company has not waived any argument against a finding of liability. Because the Commission noted an administrative appeal within thirty days of ALJ Murray's "Recommended Decision on Remand," ALJ Murray's recommendation had not yet become a final order of the Commission. *See COMAR 14.03.01.12A(2); see also COMAR 14.03.01.11H(5).*

The Campbell Company timely appealed both circuit court decisions, and this Court consolidated the two appeals for review. We will provide additional facts as needed for our discussion.

## STANDARD OF REVIEW

"When reviewing [*14] the decision of an administrative agency, . . . we review the agency's decision directly, not the decision of the circuit court." *Comptroller of the Treasury v. Sci. Applications Int'l Corp., 405 Md. 185, 192, 950 A.2d 766 (2008).* Therefore, our evaluation "is not whether the circuit court erred, but rather whether the administrative agency erred." *Classics Chi., Inc. v. Comptroller of the Treasury, 189 Md. App. 695, 705, 985 A.2d 593 (2010)* (internal quotations omitted).

Our "role in reviewing an administrative agency adjudicatory decision is narrow" and "'is limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law.'" *Md. Aviation Admin. v. Noland, 386 Md. 556, 571, 873 A.2d 1145 (2005)* (quoting *United Parcel v. People's Counsel, 336 Md. 569, 576-77, 650 A.2d 226 (1994)); see also S.G. § 10-222(h).* A court "reviewing administrative decisions . . . 'shall apply the substantial evidence test to the final decisions of an administrative agency, but it must not itself make independent findings of fact or substitute its judgment for that of the agency.'" *Md.-Nat'l Capital Park & Planning Comm'n v. Anderson, 395 Md. 172, 180-81, 909 A.2d 694 (2006)* [*15] (quoting *Balt. Lutheran High Sch. Ass'n v. Emp't Sec. Admin., 302 Md. 649, 662, 490 A.2d 701 (1985)).*

"We must also review the agency's decision in the light most favorable to the agency since decisions of administrative agencies are *prima facie* correct[] . . . and carry with them the presumption of validity." *Bulluck v. Pelham Woods Apts., 283 Md. 505, 513, 390 A.2d 1119 (1978)* (internal citations and quotations omitted). Moreover, "not only is it the province of the agency to resolve conflicting evidence, but where inconsistent inferences from the same evidence can be drawn, it is for the agency to draw the inferences." *Id.* (citing *NLRB v. Nev. Consol. Copper Corp., 316 U.S. 105, 106-07, 62 S. Ct. 960, 86 L. Ed. 1305 (1942); Bd. of Cnty. Comm'rs v. Levitt & Sons, Inc., 235 Md. 151, 159-60, 200 A.2d 670 (1964); Snowden v. Mayor & City Council of Balt., 224 Md. 443, 448, 168 A.2d 390 (1961)).* We review questions of fact and mixed questions of law and fact with deference to the agency's decision and presume the decision to be valid. *Charles Cnty. Dep't of Soc. Servs. v. Vann, 382 Md. 286, 296, 855 A.2d 313 (2004); Bulluck, 283 Md. at 512-13* (Mixed questions of law and fact are where "the agency has correctly stated the law and its fact-finding is supported by the record, but the question [*16] is whether it has applied the law to the facts correctly.").

We review an agency's decisions as to matters of law *de novo* for correctness. *Classics Chi., 189 Md. App. at 706* (citing *Schwartz v. Md. Dep't of Natural Res., 385*

*Md. 534, 554, 870 A.2d 168 (2005).* "Determining whether an agency's 'conclusions of law' are correct is always, on judicial review, the court's prerogative, although we ordinarily respect the agency's expertise and give weight to its interpretation of a statute that it administers." *Christopher v. Montgomery Cnty. Dep't of Health and Human Servs., 381 Md. 188, 198, 849 A.2d 46 (2004)* (citations omitted); *see also Md. Aviation Admin., 386 Md. at 573* (quoting *Bd. of Physician Quality Assurance v. Banks, 354 Md. 59, 69, 729 A.2d 376 (1999)*) ("'Even with regard to some legal issues, a degree of deference should often be accorded the position of the administrative agency. Thus, an administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts.'").

Nevertheless, "[i]nterpretation of a statute is a question of law," so we review the agency's decision *de novo. Md.-Nat'l Capital Park & Planning Comm'n, 395 Md. at 181* **[*17]** (citing *Salamon v. Progressive Classic Ins. Co., 379 Md. 301, 307, 841 A.2d 858 (2004)*). Accordingly, even though the circuit court did not review the Commission's decision *de novo* as to potential errors of law, we will do so.

## DISCUSSION

The record reflects that Scarlett never asked the Campbell Company for any special accommodation. Neither Scarlett nor Belle requested a reasonable accommodation for Scarlett's wheelchair prior to the meeting at the Campbell Building. Scarlett never requested a special accommodation when he arrived at the Campbell Building and saw the lack of a handicapped accessible entrance. He did not ask whether there was a wheelchair accessible restroom, even after Stromyer, who was unaware of the existence of a handicapped accessible restroom in the Campbell Building, showed Scarlett to an inaccessible one. Finally, Scarlett did not ask for an accommodation when he exited the Campbell Building.

To establish that the Campbell Company was aware of Scarlett's use of a wheelchair, the Commission points to the question-and-answer forum at Greenhill Housing, during which Campbell interacted with Scarlett, and Stromyer advising Campbell a few days prior to the meeting that Scarlett **[*18]** used a wheelchair. Although Campbell may have been aware that Scarlett used a wheelchair, it appears that neither Scarlett nor Belle asked Campbell, Stromyer, or the Campbell Company for any special accommodation for the January 23, 2003 meeting. Thus, the issue posed by the Campbell Company, which is an issue of first impression for Maryland courts, is whether there must be a prior request for an accommodation before there can be a refusal in violation of Article 49B § 22(a)(9). According to the Campbell

Company, because Scarlett never requested an accommodation, it could not refuse to provide the same in violation of Article 49B § 22(a)(9).

To determine whether the Campbell Company violated Article 49B § 22(a)(9), we must first determine what it prohibits. Article 49B § 22(a) states:

> (a) *Unlawful practice concerning sale or rental of dwelling.* -- Except as provided in § 21 of this subtitle, it is unlawful:
>
> * * *
>
> (9) To refuse to make reasonable accommodations in rules, policies, practices, or services when the accommodations may be necessary to afford an individual with a disability equal opportunity to use and enjoy a dwelling . . . .

Our analysis centers on the statutory interpretation **[*19]** of Article 49B § 22(a)(9), specifically the word "refuse." Our goal when undertaking to interpret a statute is "to ascertain and effectuate the intention of the legislature." *Johnson v. Mayor of Balt. City, 387 Md. 1, 11, 874 A.2d 439 (2005); O'Connor v. Balt. Cnty., 382 Md. 102, 113, 854 A.2d 1191 (2004).* The Court of Appeals has explained that "'[t]o determine that purpose or policy, we look first to the language of the statute, giving it its natural and ordinary meaning.'" *Md.-Nat'l Capital Park & Planning Comm'n, 395 Md. at 182* (quoting *State Dept. of Assessments and Taxation v. Md.-Nat'l Capital Park & Planning Comm'n, 348 Md. 2, 13, 702 A.2d 690 (1997); Montgomery Cnty. v. Buckman, 333 Md. 516, 523, 636 A.2d 448 (1994)).* Generally, that is where "the search for legislative intent begins, and ordinarily ends." *FOP, Montgomery Cnty. Lodge No. 35 v. Mehrling, 343 Md. 155, 174, 680 A.2d 1052 (1996).* This is because "[w]hen the statutory language is clear, we need not look beyond the statutory language to determine the Legislature's intent." *Marriott Emples. Fed. Credit Union v. Motor Vehicle Admin., 346 Md. 437, 445, 697 A.2d 455 (1997).* A court must not "add or delete language so as to 'reflect an intent not evidenced in that language' or construe the statute with 'forced **[*20]** or subtle interpretations' that limit or extend its application." *Jaigobin, 413 Md. at 197* (quoting *Condon v. State, 332 Md. 481, 491, 632 A.2d 753 (1993)).*

If we determine that the statutory language is ambiguous, then we "consider not only the literal or usual meaning of the words, but their meaning and effect in light of the setting, the objectives and purpose of enactment." *Mehrling, 343 Md. at 173-74* (citing *Tucker v. Fireman's Fund Ins. Co., 308 Md. 69, 75, 517 A.2d 730 (1986))*. In our construction, "we seek to avoid constructions that are illogical, unreasonable, or inconsistent with common sense." *Frost v. State, 336 Md. 125, 137, 647 A.2d 106 (1994)*.

"'[T]he meaning of the plainest language is controlled by the context in which it appears.'" *State v. Pagano, 341 Md. 129, 133, 669 A.2d 1339 (1996)* (quoting *Kaczorowski v. Mayor and City Council of Balt., 309 Md. 505, 514, 525 A.2d 628 (1987))*. "Because it is part of the context, related statutes or a statutory scheme that fairly bears on the fundamental issue of legislative purpose or goal must also be considered." *Gordon Family P'ship v. Gar on Jer, 348 Md. 129, 138, 702 A.2d 753 (1997)* (citations omitted). Therefore, "not only are we required to interpret the statute as a whole, but, if appropriate, in the context [*21] of the entire statutory scheme of which it is a part." *Id.*

Nevertheless, the Court of Appeals has cautioned that an inquiry into the statutory history is "'in the interest of completeness . . . to look at the purpose of the statute and compare the result with that which results when the purpose of the statute is taken into account.'" *Jaigobin, 413 Md. at 198* (quoting *Harris v. State, 331 Md. 137, 146, 626 A.2d 946 (1993))*. The statutory history inquiry "'is a confirmatory process; it is not undertaken to contradict the plain meaning of the statute.'" *Id.* (quoting *Mayor and City Council of Balt. v. Chase, 360 Md. 121, 131, 756 A.2d 987 (2000))*. "[A] court may not as a general rule surmise a legislative intention contrary to the plain language of a statute or insert exceptions not made by the legislature." *Coleman v. State, 281 Md. 538, 546, 380 A.2d 49 (1977)*.

Black's Law Dictionary defines a "refusal" as "[t]he denial or rejection of something offered or demanded." Black's Law Dictionary 1394 (9th ed. 2009). Merriam-Webster's Collegiate Dictionary defines "refuse" as "to express oneself as unwilling to accept," "to show or express unwillingness to do or comply with," "to deny," or "to [*22] withhold acceptance, compliance, or permission." Merriam-Webster's Collegiate Dictionary 1047 (11th ed. 2005). The American Heritage Dictionary of the English Language defines "refuse" as "to decline to do, accept, allow, or give something" and states that "[r]efuse is used of a positive, unyielding, sometimes brusque decision not to act, accept, or do something." The American Heritage Dictionary of the English Language 1094-95 (1981). The Campbell Company also

directs our attention to Wiktionary,[7] which defines "to refuse" as "[t]o decline a request or demand."

> 7  Wiktionary, a sister project of Wikipedia, is an open-content dictionary that individuals with access can collaboratively edit to reflect a popular understanding of words. Some courts have turned to Wiktionary to determine a popular understanding of the English language rather than a traditional dictionary definition. *See, e.g., PowerDsine, Inc. v. AMI Semiconductor, Inc., 591 F. Supp. 2d 673, 678 (S.D.N.Y. 2008); Bravo v. State, 963 So. 2d 370, 374 n.5 (Fla. Dist. Ct. App. 2007); In re Carleisha P., 144 Cal. App. 4th 912, 50 Cal. Rptr. 3d 777, 783 n.5 (Ct. App. 2006)*.

While it appears that the plain meaning of "refuse" requires an underlying request, [*23] we will delve further into the statutory history and legislative intent behind Article 49B § 22(a)(9). The legislature enacted Article 49B § 22(a)(9) with the "purpose of altering the laws prohibiting discriminatory housing practices to include the provisions of the federal Fair Housing Amendments Act of 1988" and to "prohibit[] discriminatory housing practices in a manner substantially equivalent or similar to the federal Fair Housing Amendments Act of 1988." Chapter 571 of the 1991 Acts. "'[W]here the purpose and language of a federal statute are substantially the same as that of a later state statute, interpretations of the federal statute are ordinarily persuasive.'" *Montgomery v. E. Corr. Inst., 377 Md. 615, 629, 835 A.2d 169 (2003)* (quoting *Fioretti v. Bd. of Dental Exam'rs, 351 Md. 66, 76, 716 A.2d 258 (1998))*. Moreover, when "the provisions are so similar and . . . the common intent behind them is so clear, we may and should be guided by the case law interpretation of the Federal statute when we examine the State analog . . . ." *Gardner v. State, 77 Md. App. 237, 247, 549 A.2d 1171 (1988)*. Because the General Assembly enacted Article 49B § 22(a)(9) to be substantially similar to the Federal Fair Housing Amendments Act [*24] ("FHAA"), we shall examine federal cases interpreting the FHAA.[8]

> 8  Congress enacted the FHAA in 1988 to add a prohibition against discrimination on the basis of disability in the federal Fair Housing Act ("FHA"), which originally barred discrimination in housing on the basis of race, color, religion, or national origin. *See Schwarz v. City of Treasure Island, 544 F.3d 1201, 1212 (11th Cir. 2008)* (discussing the history of the FHAA and FHA).

Article 49B § 22(a)(9) is almost identical to the counterpart provision of the FHAA, *42 U.S.C. § 3604(f)(3)(B)*,[9] and federal courts have consistently in-

terpreted *42 U.S.C. § 3604(f)(3)(B)* to require a prior request. The First Circuit summarized:

> To establish a prima facie case of failure to accommodate under the FHAA, a claimant must show that he is handicapped within the purview of *42 U.S.C. § 3602(h)*[,] . . . that the party charged knew or should reasonably have known of his handicap . . . [,] [and] *that he requested a particular accommodation* that is both reasonable and necessary to allow him an equal opportunity to use and enjoy the housing in question.

*Astralis Condo. Ass'n v. Sec'y, United States Dep't of Hous. & Urban Dev.*, 620 F.3d 62, 67 (1st Cir. 2010) [*25] (citing *Dubois v. Ass'n of Apart. Owners of 2987 Kalakaua*, 453 F.3d 1175, 1179 (9th Cir. 2006); *Bryant Woods Inn, Inc. v. Howard Cnty., Md.*, 124 F.3d 597, 603 (4th Cir. 1997)) (emphasis added).

    9  *42 U.S.C. § 3604(f)(3)(B)* states that unlawful discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling."

State appellate courts, interpreting their statutes that follow the FHAA, concur that the claimant must make a request. *See e.g., Lucas v. Riverside Park Condos. Unit Owners Ass'n*, 2009 ND 217, 776 N.W.2d 801, 808 (N.D. 2009) (quoting the elements from *Dubois*); *Lebanon Cnty. Hous. Auth. v. Landeck*, 2009 PA Super 37, 967 A.2d 1009, 1012 (Pa. Super. Ct. 2009) (quoting *Douglas v. Kriegsfeld Corp.*, 884 A.2d 1109, 1129 (D.C. 2005)). The District of Columbia Court of Appeals summarized the requirements for a FHA violation and stated:

> Under the Fair Housing Act, a landlord "is only obligated to provide a reasonable accommodation" to a tenant "*if a request for the accommodation has been made.*" A tenant who requests a "reasonable accommodation," moreover, should "make [*26] clear[]" to the landlord that "she is requesting an exception, change, or adjustment to a rule, policy, practice, or service because of her disability." And "she should explain what type of accommodation she is requesting." On the other hand, the Fair Housing Act "does not require that a request be made in a particular manner." Even more importantly, the ten-

ant's failure to make clear in her initial request "what type of accommodation she is requesting" is not fatal. According to applicable case law, including an administrative adjudication by HUD itself, once the tenant requests a "reasonable accommodation" (or, without using those exact words, requests an accommodation for a disability) the landlord is obliged under the Fair Housing Act to respond promptly. If the request is not sufficiently detailed to reveal the nature of that request, the Act -- as properly interpreted -- requires the landlord to "open a dialogue" with the tenant, eliciting more information as needed, to determine what specifics the tenant has in mind and whether such accommodation would, in fact, be reasonable under the circumstances. Any delay from the landlord's failure to respond promptly to the tenant's request [*27] may become the landlord's responsibility.

*Douglas*, 884 A.2d at 1122-23 (quoting HUD & Department of Justice Joint Statement on Reasonable Accommodations Under the Fair Housing Act, May 17, 2004, *available at* http://www.hud.gov/offices/fheo/library/huddojstatement.pdf, at 10-11) (emphasis added).

HUD and the Department of Justice ("DOJ") are both authorized to enforce the FHA. *See 42 U.S.C. §§ 3612, 3614*. HUD and DOJ issued a Joint Statement "regarding the rights and obligations of persons with disabilities and housing providers under the [Fair Housing] Act relating to reasonable accommodations." The Joint Statement asks and answers a series of questions to guide persons with disabilities. Question 14 poses: "Is a housing provider obligated to provide a reasonable accommodation to a resident or applicant if an accommodation has not been requested?" HUD and DOJ answer:

> *No. A housing provider is only obligated to provide a reasonable accommodation to a resident or applicant if a request for an accommodation has been made.* A provider has notice that a reasonable accommodation request has been made if a person, her family member, or someone acting on her behalf requests a change, exception, [*28] or adjustment to a rule, policy, practice, or service because of a disability, even if the words "reasonable accommodation" are not used as part of the request.

HUD & DOJ Joint Statement on Reasonable Accommodations Under the Fair Housing Act, May 17, 2004, at 11 (emphasis added).

The Commission cites no case law in support of its contention that mere knowledge of a handicap satisfies the requirements of the FHAA or the Maryland equivalent in Article 49B § 22(a)(9). Instead, it cites its own administrative decisions in this very matter and urges this Court to limit our review. Even though an agency's interpretation of a statute the agency is charged with enforcing is entitled to deference, that deference is not limitless. *See Classics Chi., 189 Md. App. at 706-07.* Therefore, we hold that the Campbell Company could not violate Article 49B § 22(a)(9) in the absence of an underlying request for a reasonable accommodation. *See Schwarz, 544 F.3d at 1219* ("[A] plaintiff must actually request an accommodation and be refused in order to bring a reasonable accommodation claim under the FHA," and a lack of a underlying request is "fatal to the claim.").

The Commission argues that the plain meaning [*29] of "refuse" contravenes the purpose of Article 49B § 22(a)(9) -- to ensure access for disabled individuals. While this is certainly a worthwhile purpose, the statute also states that it is to be "substantially equivalent or similar to the federal Fair Housing Amendments Act of 1988," which requires a request for there to be a refusal. Chapter 571 of the 1991 Acts. The use of the word "refuse" and not "fail," "withhold," "deny," or a similar word in Article 49B § 22(a)(9) is controlling because "no matter how much expertise [an agency] had, it could not trump . . . [t]he plain meaning of the statute" when the language is not ambiguous. *Adventist Health Care, Inc. v. Md. Health Care Comm'n, 392 Md. 103, 125, 896 A.2d 320 (2006).* We hold that "refuse" is not ambiguous, even though the Commission used "refuse" and "fail" interchangeably in its decisions and arguments. As such, because neither Scarlett nor anyone on his behalf ever requested a reasonable accommodation from the Campbell Company, the Campbell Company could not have refused to make a reasonable accommodation in violation of Article 49B § 22(a)(9).

Even if we found the language to be ambiguous and the legislative intent unclear, we would not [*30] find the Commission's interpretation of Article 49B § 22(a)(9) to be convincing. "The weight given an agency's construction . . . depends on several factors," including "the duration and consistency of the administrative practice"

and "the degree to which the agency's construction was made known to the public." *Marriott Emps. Fed. Credit Union v. Motor Vehicle Admin., 346 Md. 437, 445, 697 A.2d 455 (1997); see also INS v. Cardoza-Fonseca, 480 U.S. 421, 446 n.30, 107 S. Ct. 1207, 94 L. Ed. 2d 434 (1987)* (quoting *Watt v. Alaska, 451 U.S. 259, 273, 101 S. Ct. 1673, 68 L. Ed. 2d 80 (1981))* ("An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view."). This case presents the Commission's first opportunity to construe Article 49B § 22(a)(9) to prohibit the failure to make an unrequested accommodation, and the public has not been apprised of the statute's implications. As such, we give little deference to the Commission's broadening of the scope of the definition of "refuse." Moreover, in light of the legislative intent to conform to the federal FHAA and the overwhelming persuasive authority based on the federal FHAA and similar state laws, [*31] we hold that "to refuse to make reasonable accommodations" requires an underlying request.

The Commission argues that a request would have been "pointless," but based on the facts presented, the Campbell Company appeared willing to work with Scarlett to resolve his concerns and help him access the building. Accordingly, we cannot say that had Scarlett made a request for an accommodation, that the request would have been "pointless."

While we certainly do not condone certain actions on the part of the Campbell Company or find favor with the Campbell Building's lack of accessibility at the time of the mediation, we are limited to the statutory language of Article 49B § 22(a)(9), under which the Commission brought a violation against the Campbell Company. The statutory language of Article 49B § 22(a)(9) requires a "refusal." Since there was no request made of the Campbell Company, it could not refuse in violation of Article 49B § 22(a)(9). Based on this conclusion, we need not reach the Campbell Company's second question.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE ORDER OF THE MARYLAND COMMISSION ON HUMAN RELATIONS [*32] AND TO REMAND THIS CASE TO THAT AGENCY WITH INSTRUCTIONS TO DISMISS THE CHARGES.**

**APPELLEE TO PAY COSTS.**