IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|                          |     |                                |
|--------------------------|-----|--------------------------------|
| AMIE CARRIER             | :   |                                |
|                          | :   |                                |
| v.                       | :   | Civil Action No. DKC 11-0129   |
|                          | :   |                                |
| VCA ANIMAL HOSPITALS, INC.| :  |                                |
|                          | :   |                                |

**MEMORANDUM OPINION**

Presently pending and ready for review in this employment discrimination and failure to accommodate case is the motion for summary judgment filed by Defendant VCA Animal Hospitals, Inc. ("VCA"). (ECF No. 51). The issues have been fully briefed, and the court now rules, no hearing deemed necessary. Local Rule 105.6. For the following reasons, the motion for summary judgment will be granted in part and denied in part.

**I. Background**

**A. Factual Background**

The following facts are uncontroverted or taken in the light most favorable to Plaintiff Amie Carrier, unless otherwise indicated.

**1. Dr. Carrier's Medical Condition**

Dr. Carrier has epilepsy, which causes her to have seizures.[1] According to Dr. James Yan, one of Dr. Carrier's

---

[1] She is a resident of Maryland.

treating physicians, Dr. Carrier experiences "compressed partial seizures." (ECF No. 51-3, Yan Dep., at 33). Her seizures are "easy to control." (*Id.* at 34). She does not have them every day as some people do. (*Id.*). Her seizures typically occur "if she doesn't take medicine or [is] sleep deprived." (*Id.*). Dr. Yan testified that "[i]f she take[s] medicine, she should be okay." (*Id.* at 34-35).

When Dr. Carrier is about to experience a seizure, the "first inkling" she has that one is coming is "severe GI signs." (ECF No. 54-10, Carrier Aff., ¶ 1). In addition, she "may feel extremely tired, sick to [her] stomach, or sometimes [she will] have a tingling in [her] hands." (*Id.* ¶ 2). These pre-ictal symptoms usually last about five minutes. (*Id.* ¶ 5). During a seizure itself, which lasts from thirty seconds to two minutes, she is "not aware of what is going on." (*Id.* ¶¶ 3, 5). After a seizure, she is "confused, cold, [and her] muscles hurt." (*Id.* ¶ 4). She is "extremely thirsty," "usually feel[s] nauseous," and she "may have injuries" if she fell during the seizure. (*Id.*). These post-ictal symptoms last anywhere from thirty minutes to "hours." (*Id.* ¶ 5).[2]

---

[2] Dr. Carrier also suffers from clustering, which is multiple seizures in a row. (*Id.* ¶ 6). When clustering occurs, "it took days to completely return to normal." (*Id.*).

During her time at VCA, Dr. Carrier took several different types of anti-seizure medications. She started with Lamicatal, which was not effective. (*Id.* ¶ 10). She then switched to another drug called Trileptal. (*Id.*). Because of various side effects, Dr. Carrier stopped taking Trileptal and moved on to Dilantin. (*Id.* ¶¶ 13-14). The Dilantin made Dr. Carrier "tired" and have "slurred speech [and] increased appetite." (*Id.* ¶ 14). It caused her "hands to shake [and to have] suicidal thoughts," and sometimes it made her "restless and unable to sleep." (*Id.*). While on Dilantin, Dr. Carrier "felt out of it, dizzy and uncoordinated, [had] difficulty walking, and [was] generally ataxic depending on when the medication was taken during the day." (*Id.* ¶ 15). According to her, the "side effects were unpredictable and depended heavily on sleep and stress." (*Id.* ¶ 16).

## 2. Dr. Carrier's Employment and Medical Leave at VCA

VCA, a California corporation, owns and operates a network of roughly 540 animal hospitals throughout the United States. (ECF No. 51-5, Smith Decl., at 2 ¶ 3).[3] In July 2007, Dr.

_____

[3] This exhibit contains both Ms. Smith's declaration as well as numerous exhibits in support of that declaration. When referencing the declaration, this memorandum opinion will cite to both the relevant page and paragraph number(s). (The page numbers represent those assigned by the CM/ECF system.). When referencing exhibits attached to the declaration, the opinion will cite the relevant page number(s) in the ECF document as

Carrier began a veterinary residency program at VCA's facility in Gaithersburg, Maryland. On her first evaluation in November of that year, Dr. Carrier received ratings from "Average" to "Excellent" along with generally positive comments. (*See* ECF No. 54-6).

In December 2007, Dr. Carrier had a seizure for the first time that she is aware of. (ECF No. 51-4, Carrier Dep., at 114). Dr. Carrier's life was not significantly affected by her seizures, however. According to her, she "really didn't do anything differently" in relation to her "job" or her "life." (*See id*. at 112-13).[4] When specifically asked about her ability to do her job, Dr. Carrier testified that "once [she] was coherent," she could perform her duties. (*Id*. at 113). She experienced about ten seizures in total while actually at work during her tenure with VCA. (*Id*. at 149).

At first, VCA suspected that Dr. Carrier may have been having seizures, but it did not have confirmation of its suspicion right away. (*See* ECF No. 54-4, Sanders Dep., at 64).

---

well as the exhibit designation provided by Ms. Smith. The same citation format will be used when referencing other declarations submitted by VCA. In other citations to the record, however, such as with deposition transcripts, references are to the internal pagination.

[4] For about three months after Dr. Carrier first started having seizures, she was not supposed to drive. (*Id*. at 112). Since then, she has been legally permitted to drive. (*Id*.).

Regardless, from the second half of December 2007 to late January 2008, Dr. Carrier was granted a medical leave to address her health issues. (*See* ECF No. 51-5, at 2 ¶ 5; ECF No. 54-4, at 64). VCA subsequently offered to work with Dr. Carrier to provide her with time to address her health. (*See* ECF No. 51-11, Sanders Decl., Ex. A, at 12).

On April 26, 2008, Dr. Carrier experienced multiple seizures in a bathroom at work. (ECF No. 54-2, Carrier Dep., at 133-35). Dr. Carrier had gone into the bathroom and locked the door. (ECF No. 51-5, Ex. C, at 14). Hearing running water and a "banging" from inside, Dr. Carrier's colleague, Dr. Sara Brown, and several other members of the VCA support staff attempted to unlock the door. (*Id.*). Dr. Carrier finally unlocked the door herself. (*Id.*). At that point, Dr. Brown asked Dr. Carrier whether she was having a seizure, and Dr. Carrier responded no. (*Id.*).[5] Because Dr. Carrier was "hunched on the toilet and . . . difficult to rouse," however, paramedics were called. (*Id.*). By the time the paramedics arrived, Dr. Carrier's condition had improved such that she did not need to go to the hospital. (*See id.*). Following this incident, in May

---

[5] In her deposition, Dr. Carrier explained that she told Dr. Brown that she was not having a seizure either because she may not have understood what Dr. Brown was asking or because she was not, at that precise moment, having a seizure. (ECF No. 54-2, at 135).

2008, Dr. Carrier was granted another medical leave.  (ECF No. 54-4, at 83).

During that same month, VCA received a letter dated May 8, 2008, from Dr. Norman Luban, who had been treating Dr. Carrier for her epilepsy.  (ECF No. 54-7, Smith Dep., at 65).  The note read, in relevant part, as follows:

> Dr. Carrier is under my care for a seizure disorder.  There are well known triggers for seizures, which will cause breakthroughs including sleep deprivation.  It is my understanding that Dr. Carrier has been required to be up all night for more than one night in a row and in my opinion that is not serving her best health interest.  I think it puts her at significant risk for having an epileptic seizure.  I would suggest and recommend that any accommodation be made . . . on her behalf.

(ECF No. 51-6, Luban Dep., at 9).  In a separate note, Dr. Luban certified that he had seen Dr. Carrier on May 8th.  (*Id.* at 13). He wrote, regarding Dr. Carrier:  "Able to return to work. Sleep deprivation to be avoided."  (*Id.*).

On May 15, 2008, Dr. Carrier was taken to the emergency room for an apparent overdose of Dilantin, alcohol, or both. Dr. Carrier's boyfriend paged Dr. Luban to tell him about the visit.  (*Id.* at 11).  After speaking with Dr. Carrier's boyfriend, Dr. Luban made several observations.  He "strongly suspected that [Dr. Carrier] had not been faithful" in taking the appropriate dosage of Dilantin.  (*Id.*).  He thought that she

was "behaving in an irrational fashion." (*Id.*). And he found Dr. Carrier's pattern of visits to Dr. Yan and to himself strange. (*See id.*). On May 19, 2008, Dr. Luban sent a letter to Dr. Carrier terminating their professional relationship. (*Id.* at 10).

Dr. Yan continued to treat Dr. Carrier. Toward the end of May 2008, VCA faxed a written description of Dr. Carrier's position to Dr. Yan for him to evaluate Dr. Carrier's ability to return to work. (ECF No. 51-3, Ex. 4, at 14-18). The position description included a reference to the following duty: "Must be willing to work long or irregular hours under pressure conditions." (*Id.* at 15). In response, Dr. Yan provided a letter dated May 21, 2008, that certified that Dr. Carrier could return to work on May 27, 2008. (*Id.* at 19). In addition, his letter read: "Dr. Carrier has seizures. Currently, we are adjusting her medication. She should be able to go back to her regular job without restriction on 052708, or earlier." (*Id.*).

From May 2008 after she returned from her medical leave until her termination in December 2008, Dr. Carrier did not experience another seizure that she was aware of while at work. (ECF No. 51-4, at 138-40).

### 3.   Dr. Carrier's Termination from VCA

Throughout Dr. Carrier's tenure with VCA, several reports of unprofessional behavior were lodged against Dr. Carrier. For

example, shortly after Dr. Carrier returned from her January 2008 medical leave, she attended a continuing education course in Hawaii. (ECF No. 51-5, at 2 ¶ 6). During this trip, Dr. Carrier was reported to have "[t]hreatened to jump off of the balcony of her hotel," "[f]ought several times over the telephone with her boyfriend," and "[d]rank alcohol to an excessive degree." (*Id.*).

Various staff members at VCA, including Margaret Austin, the Office Manager, and Dr. Nancy Sanders, received other complaints about Dr. Carrier's interactions with the owners of patients and other staff members. Dr. Sanders testified, for instance, that she received complaints that Dr. Carrier was "rude at times, dismissive of people trying to address client complaint with her. Disappearing at times and not being able to be reached." (ECF No. 51-8, Sanders Dep., at 53).

On December 11, 2008, Dr. Carrier's employment with VCA was terminated. The "Employee Separation Report" that was compiled with respect to her discharge stated that she was "termed for unprofessional erratic behavior." (ECF No. 51-5, Ex. F., at 34). The report went on to detail several instances of behavior that VCA found unacceptable. Among the various reasons given, VCA pointed to Dr. Carrier's behavior on December 8, 2008. Numerous VCA staff members reported that Dr. Carrier was "incoherent, ataxic, slurring words, and generally looked in bad

shape." (*Id.* at 36). On several occasions, Dr. Carrier's superiors met with her and attempted to discuss their concerns, but Dr. Carrier consistently "diverted" the conversations away to tangential matters. (*See id.* at 36-37). Ultimately, a collection of Dr. Carrier's supervisors, including Dr. Sanders, human resources personnel, and in-house counsel, decided to terminate Dr. Carrier. (ECF No. 51-5, at 4 ¶ 14).

**B.   Procedural Background**

On May 20, 2009, Dr. Carrier filed a charge of discrimination with the Maryland Commission on Human Relations. On October 4, 2010, the Commission issued its Written Finding, concluding that there is "No Probable Cause to believe that [VCA] discriminated against [Dr. Carrier] because of her disability" pursuant to Title 20, Subtitle 6 of the State Government Article of the Maryland Code.

On December 3, 2010, Dr. Carrier filed a complaint against VCA in the Circuit Court for Montgomery County, Maryland. After service, VCA timely removed to this court on the basis of both federal question jurisdiction and diversity jurisdiction. (ECF No. 1). The complaint contains three counts: (1) violation of the Americans with Disabilities Act ("ADA"); (2) violation of

Title 20, Subtitle 6 of the State Government Article of the Maryland Code;[6] and (3) violation of the Montgomery County Code.

On January 26, 2011, VCA answered the complaint. (ECF No. 12). Discovery subsequently took place. A little less than a year later, on January 4, 2012, VCA moved for summary judgment as to all counts. (ECF No. 51). Dr. Carrier filed opposition papers on February 6, 2012. (ECF No. 54). VCA replied on February 23, 2012. (ECF No. 57).

## II. Standard of Review

A court may enter summary judgment only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). Summary judgment is inappropriate if any material factual issue "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *JKC Holding Co. LLC v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

---

[6] Because of the timing of the events underlying this case, the prior version of Title 20 of the State Government Articles of the Maryland Code actually applies. That earlier version, Article 49B of the Maryland Code, was recodified into Title 20 of the State Government Articles without substantive revision. *See Wash. Suburban Sanitary Comm'n v. Phillips*, 413 Md. 606, 610 n.2 (2010).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed.R.Civ.P. 56(e)). "A mere scintilla of proof . . . will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (citations omitted). At the same time, the court must construe the facts that are presented in the light most favorable to the party opposing the motion. *See Scott v. Harris*, 550 U.S. 372, 378 (2007); *Emmett*, 532 F.3d at 297.

## III. Analysis

### A.   Count One:  ADA

Dr. Carrier advances two theories for recovery under the ADA. First, she argues that VCA failed to provide her with a reasonable accommodation. (ECF No. 2 ¶¶ 53-55). Second, she argues that VCA wrongfully terminated her because she was disabled. (*Id.* ¶ 56). VCA counters that, under either theory, Dr. Carrier's claims must fail because she has not proffered sufficient evidence that she is disabled within the meaning of

the ADA.[7]   (ECF No. 51-1, at 21-26).   In this case, VCA is correct.

According to the general rule propounded by the ADA:  "No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual . . . ."  42 U.S.C. § 12112(a).  In other words, regardless of the theory under which Dr. Carrier seeks to pursue an ADA claim, she must establish that she has a "disability" within the meaning of the statute.  The ADA defines "disability" as:  "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such impairment."  42 U.S.C. § 12102(2).  Here, VCA challenges Dr. Carrier's reliance on subsection (A).[8]  While VCA concedes that

---

[7] The ADA was amended in 2008, which had the effect of, among other things, making it easier for a plaintiff to demonstrate her disability. *See Cochran v. Holder*, 436 F.App'x 227, 231 (4th Cir. 2011).  In light of the clear language in the ADA's amendments that they should become effective on January 1, 2009, the Fourth Circuit held the ADA's amendments do not apply retroactively.  *Id.* at 232.  Here, the parties agree that the alleged discriminatory acts occurred prior to January 1, 2009.  Thus, the ADA as it read before this date and the case law interpreting that version of the ADA govern the instant dispute.

[8] In the complaint, Dr. Carrier appears to rely on subsection (C) as well.  (ECF No. 2 ¶ 52).  In response to VCA's motion for summary judgment, which specifically challenged the applicability of subsection (C) (ECF No. 51-1, at 26-27), however, Dr. Carrier offered no rebuttal.  Accordingly, she has abandoned this basis for finding that she is disabled.  *See*

Dr. Carrier's epilepsy constitutes a physical or mental impairment, it argues that Dr. Carrier "cannot demonstrate that her medical condition of seizures/convulsions substantially limited a major life activity." (ECF No. 51-1, at 26).

Dr. Carrier identifies "caring for herself, walking, seeing, and hearing" as the major life activities that are limited by her condition. (*See* ECF No. 54, at 12).[9] To that end, Dr. Carrier's primary evidence in support of her contention that her epilepsy substantially limits those activities is her affidavit. This evidence, however, is insufficient to meet her burden on summary judgment for at least two reasons. First, as VCA observes (ECF No. 57, at 8), to the extent that Dr. Carrier's affidavit can be construed to show that any aspect of her life significantly changed, it cannot be credited. VCA points out that Dr. Carrier previously testified in her deposition that "[i]n relation to [her] job, [her] life[,] . . . [s]he really didn't do anything differently" as a result of her epilepsy. (ECF No. 57, at 10). Where, as here, the only issue of fact is created by an affiant contradicting her prior

---

*Ferdinand-Davenport v. Children's Guild*, 742 F.Supp.2d 772, 777 (D.Md. 2010); *Mentch v. E. Sav. Bank, FSB*, 949 F.Supp. 1236, 1246-47 (D.Md. 1997).

[9] VCA does not contest the categorization of these activities as "major life activities." Indeed, under the relevant regulations, they are all "major life activities." 29 C.F.R. § 1630.2(i).

deposition testimony, the district court may disregard the conflicting statements in the affidavit. *See Rohrbough v. Wyeth Labs., Inc.*, 916 F.2d 970, 975 (4th Cir. 1990).[10] Consequently, most of Dr. Carrier's affidavit cannot be considered when determining whether Dr. Carrier is disabled under the ADA.

Second, even if Dr. Carrier's affidavit were considered, it falls short of creating a triable issue of fact with respect to whether Dr. Carrier meets the definition of being disabled. "The determination of whether a person is disabled is an individualized inquiry, particular to the facts of each case." *EEOC v. Sara Lee Corp.*, 237 F.3d 349, 352 (4th Cir. 2001) (citing *Sutton v. United Air Lines*, 527 U.S. 471, 483 (1999)).[11] The "crucial question" in cases like this is whether Dr. Carrier's epilepsy "substantially limited one of her major life activities." *See id.* "[I]n determining whether an impairment is substantially limiting, courts may consider the 'nature and severity of the impairment,' the 'duration or expected duration of the impairment,' and the 'permanent or long term impact' of the impairment." *Pollard v. High's of Balt., Inc.*, 281 F.3d

---

[10] Although Dr. Carrier's affidavit is undated, Dr. Carrier does not refute VCA's contention that she executed it after her deposition.

[11] "A court may resolve this issue as a matter of law." *Heiko v. Colombo Sav. Bank, FSB*, 434 F.3d 249, 254 (4th Cir. 2006).

462, 467-68 (4th Cir. 2002) (quoting 29 C.F.R. § 1630.2(j)(2) (2002)).   "[T]he phrase 'substantially limits' suggests 'considerable' or 'to a large degree.'   The word 'substantial' thus clearly precludes impairments that interfere in only a minor way with the performance of manual tasks from qualifying as disabilities." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 196 (2002) (internal citations omitted).   Moreover, "if a person is taking measures to correct for, or mitigate, a physical or mental impairment, the effects of those measures — both positive and negative — must be taken into account when judging whether that person is 'substantially limited' in a major life activity and thus 'disabled' under the [ADA]." *Sutton*, 527 U.S. at 482.

In *Sara Lee Corp.*, the Fourth Circuit confronted a similar scenario in which a plaintiff with epilepsy sued her employer under the ADA for disability discrimination.   The plaintiff there argued that she was substantially limited in three different major life activities:  sleeping, thinking, and caring for herself.   In response to the employer's motion for summary judgment, the plaintiff adduced evidence that she suffered from "complex partial seizure disorder, . . . a 'life-long phenomena.'" *Sara Lee Corp.*, 237 F.3d at 351.  Although she did not experience so-called "grand mal seizures," she still "experienced seizures about once or twice a week." *Id.*  Her

daytime seizures[12] – four or five of which happened during work itself – normally lasted a couple of minutes:

> During these seizures, [the plaintiff] began shaking, her face took on a blank expression, and she became unaware of and unresponsive to her surroundings. After the seizure ended, [the plaintiff] was able to return to whatever work she had been performing before the episode started. These seizures also sometimes caused [the plaintiff] to suffer memory loss.

*Id.* Despite evidence of these manifestations of the plaintiff's epilepsy, however, the Fourth Circuit held that the plaintiff failed to meet her burden on summary judgment to demonstrate that she met the ADA's requirements for having a disability. In particular, the Fourth Circuit held that "a plaintiff's significant restriction in a major life activity must be compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." *Id.* at 352 (internal quotation marks omitted). In light of this restrictive standard, the Fourth Circuit explained, the plaintiff's epilepsy did not substantially limit her ability to sleep, think, or care for herself. Indeed, the plaintiff had testified that "the primary effects of her epilepsy were only that sometimes she would wake

---

[12] The plaintiff also experienced nocturnal seizures, which were accompanied by "shaking, kicking, salivating, and, on at least one occasion, bedwetting." *Id.*

up with a bruise on her body, that she would sporadically 'zone out' during the day, and that on one occasion she wet her bed." *Id.* at 353.

Here, Dr. Carrier's form of epilepsy is roughly equivalent to that of the plaintiff in *Sara Lee Corp.*, if not less severe. Like that plaintiff, Dr. Carrier has been diagnosed with "partial seizures" as opposed to "grand mal seizures"; Dr. Carrier's seizures, when they occur, last roughly the same amount of time; and Dr. Carrier's post-seizure symptoms are mild enough that she is able to return to work without any significant problems. That Dr. Carrier asserts a slightly different set of major life activities – caring for herself, walking, seeing, and hearing — as being affected is of no moment. Other than relying on the fact itself that she suffers seizures, Dr. Carrier has offered no evidence to suggest that her epilepsy imposes any restrictions on these activities that are greater than those of "the average person in the general population" performing the same activities.[13]

_____

[13] The Fourth Circuit rejected the notion that the mere fact that Dr. Carrier suffers seizures would be enough to defeat summary judgment on this basis:

> To hold that a person is disabled whenever that individual suffers from an occasional manifestation of an illness would expand the contours of the ADA beyond all bounds. An intermittent manifestation of a disease must

Dr. Carrier urges that her condition is more comparable to that of the plaintiff in *EEOC v. Rite Aid Corp.*, 750 F.Supp.2d 564 (D.Md. 2010), than that of the plaintiff in *Sara Lee Corp.*, but she has offered no evidence to persuade the court to reach this conclusion. In *Rite Aid Corp.*, Judge Blake observed: "The more severe nature of [the plaintiff's] epilepsy . . . distinguishes this case from *Sara Lee*. While the plaintiff in *Sara Lee* suffered from only the less severe complex partial seizures, Mr. Fultz [the plaintiff] routinely experiences grand mal seizures and has undergone brain surgery to attempt to address his condition." *Id.* at 569 n.1. In that case, the plaintiff

> submitted evidence showing that Mr. Fultz's epilepsy prevents him from bathing on his own, and that during a seizure he cannot stand, loses control over body movements, cannot speak, may lose control over his bladder, and is unable to remember the event. Mr. Fultz's seizures, especially his grand mal seizures, can last over 20 to 25 minutes, followed by five to ten minutes of confusion during which he cannot communicate with others. After having a grand mal seizure, Mr. Fultz also experiences a postictal period lasting up to 10 to 15

---

> be judged the same way as all other potential disabilities. The statute is explicit—to be disabled under the ADA, a person must have a substantial limitation on a major life activity.

*Sara Lee Corp.*, 237 F.3d at 352.

> hours during which he feels "muscle fatigue,
> tiredness, and completely worn out."

*Id.* at 569-70 (internal citations omitted).    None of Dr.

Carrier's evidence comes close to this showing.

Dr. Carrier does assert that her affidavit shows that the side effects of her *medication* substantially limit her ability to perform the major life activities of caring for herself, walking, seeing, and hearing.   (ECF No. 54, at 11-12).[14]   Still, although the Supreme Court has held that the negative side effects of medication must be included as part of the individualized inquiry of whether a plaintiff is disabled, *see Sutton*, 527 U.S. at 482, Dr. Carrier's broad statements regarding the side effects of Dilantin are not sufficiently probative to conclude that they *substantially* limited her in any major life activity.[15]    At best, they indicate a vague, occasional effect on her walking.   But courts have held that evidence of generalized difficulty with walking is inadequate to demonstrate a substantial limitation for purposes of the ADA.

---

[14] Dr. Carrier also cites a portion of Dr. Yan's deposition testimony in which he describes the side effects of Dilantin. (ECF No. 54, at 12).   Dr. Yan's testimony regarding Dilantin does not differ significantly from Dr. Carrier's affidavit.

[15] Dr. Carrier's first two medications have no bearing on this analysis.   She concedes that there were no side effects to Lamicatal and that the initial side effects to Trileptal eventually subsided.   In any event, she states that she no longer takes either drug.   Thus, the only possible side effects that she still experiences are those caused by Dilantin.

*See Turner v. Saloon, Ltd.*, 595 F.3d 679, 689 (7th Cir. 2010) ("We have held that walking with difficulty is not a significant restriction on walking."); *see also Black v. Roadway Express, Inc.*, 297 F.3d 445, (6th Cir. 2002) ("[M]oderate difficulty or pain experienced while walking does not rise to the level of a disability."). However specific the showing must be to demonstrate a substantial limitation on the ability to walk, Dr. Carrier has not met that threshold here.

The conclusion that Dr. Carrier cannot establish a prima facie case of discrimination under the ADA because she is not disabled is bolstered by the uncontroverted fact that Dr. Carrier did not suffer another seizure between May 2008 and her termination in December 2008. Thus, even if it could be said that Dr. Carrier's seizures were severe enough to meet the Supreme Court's rigorous standard for qualifying as a disability under the ADA, Dr. Carrier cannot also say that she was substantially limited thereby *at the time of the alleged adverse actions*. *See Kelly v. Sasol N. Am., Inc.*, No. CCB-05-1171, 2006 WL 3247136, at *4 (D.Md. Nov. 2, 2006) (analyzing whether the plaintiff was substantially limited in any major life activity "at the time [the defendant] allegedly denied him a reasonable accommodation"); *Taliaferro v. Assocs. Corp. of N. Am.*, 112 F.Supp.2d 483, 490-91 (D.S.C. 1999) (same as to wrongful

discharge).  Accordingly, VCA's motion must be granted as to Dr. Carrier's federal claims.

### B.   Count Two:  Article 49B

Dr. Carrier also bases her state law statutory cause of action on two theories:  that VCA failed to provide her with reasonable accommodation and that VCA wrongfully terminated her because she was disabled.  (ECF No. 2 ¶¶ 61-62).  Whereas Dr. Carrier's federal claims failed at the first step, however, Dr. Carrier's state claims encounter no such hurdle; Article 49B explicitly includes epilepsy in its definition of disability. Md. Code Ann. Art. 49B, § 15(g).  VCA concedes as much.  (ECF No. 51-1, at 20).  VCA therefore advances a variety of other reasons for granting summary judgment in its favor.

#### 1.   Failure To Accommodate

VCA argues that Dr. Carrier's failure to accommodate claim cannot proceed because Dr. Carrier "cannot establish that VCA violated any duty of reasonable accommodation towards her." (ECF No. 51-1, at 35).  Among other reasons, VCA argues that it "never 'refused' to provide a reasonable accommodation."  (*Id.*). In response, Dr. Carrier contends that the act of VCA firing her was itself a "refusal" to accommodate.  (*See* ECF No. 54, at 20).

The evidence, however, does not bear out Dr. Carrier's position.[16]

As originally enacted, "Article 49B d[id] not expressly impose upon employers an obligation of 'reasonable accommodation' for those individuals under physical or mental handicap." *Md. Comm'n on Human Relations v. Mayor of Balt.*, 86 Md.App. 167, 173 (1991). According to the Fourth Circuit, however, "the Court of Special Appeals of Maryland has interpreted the article to contain such a requirement." *Martin-Marietta Corp., Aero & Naval Sys. v. Md. Comm'n on Human Relations*, 38 F.3d 1392, 1398 (4th Cir. 1994) (citing *Mayor of Balt.*, 86 Md.App. at 178).[17]   For guidance in applying this requirement, the court may look to federal law interpreting the Rehabilitation Act of 1973. *See Mayor of Balt.*, 86 Md.App. at 173 (holding that cases interpreting the Rehabilitation Act may be used to interpret Article 49B's "reasonable accommodation" requirement because the guidelines adopted by the Maryland Commission on Human Relations that implement the state statute

---

[16] Because VCA's motion will be granted on this ground, the other grounds that VCA advances need not be addressed.

[17] Accordingly, when Article 49B was recodified in 2009, the pertinent section of the statute was further amended to make explicit the Court of Special Appeals' interpretation. *See* Md. Code Ann., State Gov't § 20-606(a)(4) ("An employer may not . . . fail or refuse to make a reasonable accommodation for the known disability of an otherwise qualified employee.").

were modeled after the federal regulations implementing the federal statute).[18]   Under federal law, to establish a prima facie case for failure to accommodate, Dr. Carrier must show: "that [s]he was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of [her] disability; (3) that with reasonable accommodation [s]he could perform the essential functions of the position . . . ; and (4) that the [employer] refused to make such accommodations."   *Rhoads v. FDIC*, 257 F.3d 373, 387 n.11 (4th Cir. 2001).

In this case, regarding the fourth prong of the prima facie test, Dr. Carrier actually acknowledges that VCA "established a precedent of accommodating Plaintiff's disability."   (ECF No. 54, at 20).   Indeed, Dr. Carrier presents no evidence that, from May 2008 through December 2008, VCA refused to accommodate her

---

[18] Federal law interpreting the ADA may also provide insight.   *See Baird ex rel. Baird v. Rose*, 192 F.3d 462, 468 (4th Cir. 1999) ("The ADA and Rehabilitation Act generally are construed to impose the same requirements due to the similarity of the language of the two acts.").   A court in this district has cautioned, however, that "there is no evidence that Maryland intended to enact Art. 49B as a state 'counterpart' to the federal Rehabilitation Act or the Americans with Disability Act." *Kohler v. Shenasky*, 914 F.Supp. 1206, 1211 (D.Md. 1995). Because the parties do not identify any authority, nor is the court aware of any, that suggests that the ADA or the Rehabilitation Act would not be instructive regarding VCA's duty to provide reasonable accommodation to Dr. Carrier, the court will look to federal law as needed to resolve this claim.

condition.[19]   In fact, the record is replete with evidence that VCA affirmatively encouraged Dr. Carrier to set her schedule so as to maximize her ability to rest.   Dr. Carrier only argues that, after more than six months of accommodation, her termination *itself* constituted a "refusal" to continue accommodating her condition.   (*Id.*).

Even construing this "evidence" in the light most favorable to her, however, there is no dispute of material fact requiring a trial.   In the Employee Separation Report prepared by VCA, which details the reasons for Dr. Carrier's termination, there is no reference whatsoever to Dr. Carrier's schedule as being a reason for her discharge.   (*See generally* ECF No. 51-5).[20] Without more, it cannot be said that Dr. Carrier has met her burden regarding this issue in response to VCA's motion for

---

[19]   For purposes of this analysis, the court assumes – without deciding – that Dr. Luban's note to VCA constitutes adequate notice of Dr. Carrier's disability and that, per that note, reasonable accommodation consisted of VCA not requiring Dr. Carrier to work back-to-back overnight shifts.   Given the record, however, this conclusion is far from clear.   To be sure, Dr. Luban affirmatively ended his treatment of Dr. Carrier soon after sending that note and informed VCA of that development. Moreover, any uncertainty over whether Dr. Luban's note should be heeded was likely clarified by Dr. Yan's subsequent certification of Dr. Carrier's good health and controlled epilepsy.   Regardless, for the reasons stated above, summary judgment is warranted in favor of VCA as to this claim.

[20]   If anything, the Employee Separation Report reinforces VCA's willingness to accommodate Dr. Carrier's illness.   (*See* ECF No. 51-5 at 37 (citing Dr. Carrier's "disregard for her own health issues" as a reason for termination)).

summary judgment. Accordingly, judgment will be entered in favor of VCA as to Dr. Carrier's Article 49B failure to accommodate claim.

### 2. Wrongful Termination

Regarding Dr. Carrier's wrongful termination claim under Article 49B, VCA argues that Dr. Carrier cannot demonstrate that "she was satisfactorily performing her job duties" or that "the decision to terminate her employment was made because of her alleged disability." (*See* ECF No. 51-1, at 36-37). Dr. Carrier counters with evidence that as early as October 2008, VCA had contemplated firing her. (ECF No. 54, at 20-21).

In Maryland, "an employer may not discharge . . . any individual . . . because of the individual's . . . disability unrelated in nature and extent so as to reasonably preclude the performance of the employment." Md. Code Ann. Art. 49B, § 16(a). In the absence of direct evidence that Dr. Carrier's disability caused her firing,[21] Dr. Carrier may still proceed under the proof scheme developed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Brandon v. Molesworth*, 104 Md.App. 167, 187 n.18 (1995) (holding that the *McDonnell Douglas* burden-shifting paradigm applies to statutory employment discrimination actions in Maryland), *rev'd in part on other*

---

[21] Neither party argues that direct evidence of discrimination exists in this case.

*grounds*, 341 Md. 621 (1995).   Under this scheme, a plaintiff must establish a prima facie case of discrimination.   If the plaintiff meets this burden, the employer must articulate a legitimate, nondiscriminatory reason for terminating the plaintiff's employment.   To survive summary judgment, the plaintiff may then show that the proffered reason was pretext.

As suggested by federal law, to establish a prima facie case for wrongful termination, Dr. Carrier must show "that (1) [s]he is within the . . . protected class; (2) [s]he was discharged; (3) at the time of [her] discharge, [s]he was performing at a level that met [her] employer's legitimate expectations; and (4) [her] discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination."   *Haulbrook v. Michelin N. Am.*, 252 F.3d 696, 702 (4th Cir. 2001).   As noted above, VCA challenges the third and fourth prongs of Dr. Carrier's prima facie case.

Regarding the third prong, Dr. Carrier has proffered evidence in the form of a performance evaluation from September 2008, in which Dr. Carrier earned ratings ranging mostly in the "Very Good" to "Excellent" categories.   (ECF No. 54-14, at 2).[22]

---

[22] Although Dr. Carrier does not identify her September 2008 performance evaluation as evidence to support her state law claim for wrongful discharge, she did identify it in support of her analogous federal law claim.   It is not unreasonable for the court to look to that evidence here.   *See* Fed.R.Civ.P. 56(c)(3)

Furthermore, Dr. Carrier has provided testimony of Dr. Sanders, who conducted her evaluation, which suggests that Dr. Carrier's performance at work was "very good" at least through November 2008. (ECF No. 54-4, at 98-99). Thus, despite VCA's argument and evidence that Dr. Carrier may not have conformed her behavior to VCA's professional standards, Dr. Carrier has advanced enough evidence to create a triable issue of fact on this third prong of the prima facie case.[23]

Regarding the fourth prong, Dr. Carrier points to an email chain between Dr. Sanders and William Fenner. (See generally ECF No. 54-15). In one of the emails, Dr. Sanders describes a second-year resident suffering from "recent onset seizures and

_____

("The court need consider only the cited materials, but it may consider other materials in the record."). In general, where the parties' positions regarding the federal and state law claims overlap, the court will consider the parties' evidence adduced in support of the federal claim with respect to the state claim as well.

[23] At least in the federal context, the burden of establishing a prima facie case of discrimination "is not onerous." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). For example, an employee can make the minimal showing that she was meeting her employer's legitimate expectations where she can demonstrate that she was generally satisfying her employer's relevant, objective performance standards at the time of her termination. *See Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 766 & n.1 (4th Cir. 2003) (holding that the district court erred in concluding that the employee had not "adduced sufficient evidence to meet her burden of demonstrating that she was performing satisfactorily at the time of [certain] adverse employment actions" where, among other things, she was recently informed by management that her work was "satisfactory").

the medical issues surrounding that problem," among other problems, who several VCA staff members "would like to see . . . go for the good of the 'whole.'" (*Id.* at 3). Dr. Carrier asserts that this email is discussing her (*see* ECF No. 54, at 20-21), and VCA does not dispute this implication. When viewed in conjunction with the fact that Dr. Sanders was one of the supervisors who collectively made the final decision to terminate Dr. Carrier's employment (*see* ECF No. 51-5, at 3 ¶ 14), this email sufficiently raises an inference of illegal discrimination.

Because Dr. Carrier can adduce evidence of a prima facie case of disability discrimination (or, at least, present a triable case), the burden shifts to VCA to articulate a legitimate, non-discriminatory reason for terminating Dr. Carrier. VCA has done so; it has set forth evidence that Dr. Carrier was terminated for "erratic, unprofessional" behavior. (*Id.*, Ex. F, at 34). Indeed, the Employee Separation Report cites several specific instances of such behavior on the part of Dr. Carrier as reasons for her discharge. A history of unprofessional behavior is certainly a legitimate, nondiscriminatory reason for releasing someone from employment. *See Runnebaum v. NationsBank of Md., NA*, 123 F.3d 156, 175 n.12 (4th Cir. 1997), *overruled on other grounds by Bragdon v. Abbott*, 524 U.S. 624 (1998).

It is therefore incumbent on Dr. Carrier to identify evidence that VCA's articulated reason for terminating Dr. Carrier was pretextual.  Here, although not entirely clear, Dr. Carrier's position appears to be that VCA made up an excuse to terminate her based on her behavior when on medication.  (*See* ECF No. 54, at 18-21).  To that end, Dr. Carrier points to the same email chain between Dr. Sanders and Mr. Fenner, which shows that Dr. Sanders – who, again, was one of the decisionmakers behind Dr. Carrier's termination – was well aware that the side effects from Dr. Carrier's medication could be mistaken for intoxication.  (*See* ECF No. 54-15, at 4).[24]  This fact is troublesome when taken together with the Employee Separation Report.  The Employee Separation Report explains that one of the reasons for discharging Dr. Carrier was her behavior on December

---

[24] Dr. Carrier's argument that VCA's reason for firing her was pretextual turns on whether the negative side effects of Dr. Carrier's epilepsy medicine should be considered a part of her disability under state law.  Neither party points to any authority addressing this precise issue.  The Court of Appeals of Maryland has, however, interpreted state and county anti-disability discrimination statutes broadly, particularly with respect to who falls within the protected class of having a disability.  *See, e.g.*, *Meade v. Shangri-La P'ship*, 424 Md. 476, 486-91 (2012).  In light of the Supreme Court's ruling in *Sutton* as well as recent federal guidelines that make clear that "non-ameliorative effects of mitigating measures, such as negative side effects of medication . . . may be considered" when determining whether an individual is disabled, *see* 29 C.F.R. § 1630.2(j)(4)(ii) (2012), it is highly likely that Maryland courts would likewise consider the negative side effects of medication as part of a disability.

8, 2008, where she was "incoherent, ataxic, slurring words, and generally looked in bad shape." (*See* ECF No. 51-5, Ex. F, at 36). The Employee Separation Report does not, however, go any further and state that Dr. Carrier was actually intoxicated.

Critically, in the email chain, Dr. Sanders admits she does not have any proof that Dr. Carrier's erratic behavior was attributable to anything other than her epilepsy medication, such as alcoholism or drug dependency, which may have been legitimate grounds for firing her. (*See id.*). In other words, Dr. Sanders knew that Dr. Carrier's behavior could have been caused by the epilepsy medication, but she failed to investigate that possibility. Thus, it is plausible that one of VCA's proffered "legitimate" reasons for termination — that Dr. Carrier exhibited erratic behavior — was actually pretext for terminating her on the basis of her disability. *Cf. Bechold v. IGW Sys., Inc.*, 817 F.2d 1282, 1285 (7th Cir. 1987) (holding, in the context of the Age Discrimination in Employment Act, that a "lack of inquiry" into a proffered reason for termination "may show that the [reason] was incredible, and merely a pretext for discrimination"); *O'Neill v. Henderson Cnty. Hosp. Corp.*, No. Civ. 1:04CV68, 2005 WL 3797394, at *4 (W.D.N.C. June 21, 2005) (holding, in the context of the Family Medical Leave Act, that evidence that a defendant "did not investigate other possible

explanations" for the reason given for termination could be probative of pretext).

In sum, the evidence that Dr. Carrier has presented leads to the conclusion that her Article 49B wrongful termination claim must survive summary judgment. VCA's motion will be denied as to this claim.

### C. Count Three: County Claims

Although Dr. Carrier initially pursued a cause of action under the Montgomery County Code based on the same theories of failure to accommodate and wrongful termination, she failed to respond in any way to VCA's motion for summary judgment regarding this claim. If a party moves for summary judgment concerning claims for which the non-moving party bears the ultimate burden of proof and the non-moving party fails to address specifically the movant's arguments regarding those claims, then the court may consider those claims abandoned and grant summary judgment. *See Ferdinand-Davenport*, 742 F.Supp.2d at 777; *Mentch*, 949 F.Supp. at 1246-47. Accordingly, Count Three will be deemed abandoned, and summary judgment will be granted in VCA's favor as to these claims.

**IV.   Conclusion**

For the foregoing reasons, the motion for summary judgment filed by Defendant VCA Animal Hospitals, Inc., will be granted in part and denied in part.   A separate order will follow.

/s/

DEBORAH K. CHASANOW
United States District Judge